**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

ARISTA NETWORKS, INC.,

        Plaintiff,

   v.

CISCO SYSTEMS, INC.,

        Defendant.

Case No.  16-cv-00923-BLF

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND**

[Re:  ECF 110]

      In a far flung litigation brawl played out in multiple forums including this Court, with two active cases, the Federal Circuit, the ITC and PTO, Arista and Cisco here do battle on an antitrust front.  Plaintiff Arista Networks, Inc. ("Arista") filed this action, alleging that Defendant Cisco Systems, Inc. ("Cisco") violated antitrust and unfair competition laws.  Arista seeks monetary damages and injunctive relief.

      Before the Court is Cisco's motion to dismiss the complaint under the Federal Rules of Civil Procedure 12(b)(6). Having considered the papers submitted by the parties and the oral argument presented at the September 7, 2017 hearing, the Court GRANTS IN PART and DENIES IN PART the motion to dismiss with LEAVE TO AMEND for the reasons stated below.

## I.     BACKGROUND

      For purposes of considering this motion, the Court deems facts pled in the Complaint to be true.

### A.     The Parties

      Arista alleges that for nearly two decades Cisco has dominated the market for Ethernet switches, which are used to connect computers, servers, storage, and other devices to form a network.  Compl. ¶ 11, ECF 1.  Founded in 2004, Arista began selling its own Ethernet switches in 2008.  *Id.* ¶ 18.

United States District Court
Northern District of California

United States District Court
Northern District of California

Along with purchasing Ethernet switches, a customer needs maintenance to ensure their hardware and software properly function. *Id.* ¶ 55. Hence, Ethernet switch suppliers or third-party vendors offer maintenance services, including bug fixes, software updates, hardware replacement services, onsite visits from certified engineers, etc. *Id.* As sellers of Ethernet switches, Arista and Cisco offer services for maintaining their own respective switches. *Id.* ¶¶ 36, 107.

### B.    Litigation between Arista and Cisco

Because the parties' arguments for the instant motion involve other proceedings, the litigation background between the parties is described. The Court takes judicial notice on facts that occurred after briefing was closed.

On December 5, 2014, Cisco filed two actions against Arista in this District. One action was a copyright and patent case ("the CLI case"), where Cisco alleged that Arista infringes Cisco's patents and copyrights in its command line interface ("CLI"). *Cisco Systems, Inc. v. Arista Networks, Inc.*, Case No. 14-cv-05344-BLF. Following a two-week trial in late 2016, a jury found that Arista infringed Cisco's copyright but that the infringement was excused by the scènes à faire affirmative defense. No patent infringement was found. *Id.* at Dkt. 749. Judgment was entered against Cisco on December 19, 2016, *id.* at Dkt. 750, and the Court denied Cisco's motion for judgment as a matter of law, *id.* at Dkt. 787. That action is on appeal before the U.S. Court of Appeals for the Federal Circuit. The other action is a patent case, where Cisco alleges that Arista infringes several patents owned by Cisco. *Cisco Systems, Inc. v. Arista Networks, Inc.*, Case No. 14-cv-05343-JSW. Judge Jeffrey S. White stayed that action until two cases pending before the U.S. International Trade Commission ("ITC") are resolved.

On December 19, 2014, Cisco filed two cases at the ITC, alleging that Arista imported Ethernet switches that infringe several of its patents. The cases are *In the Matter of Certain Network Devices, Related Software and Components Thereof (I)*, ITC Inv. No. 337-TA-944 ("the '944 Investigation") and *In the Matter of Certain Network Devices, Related Software and Components Thereof (II)*, ITC Inv. No. 337-TA-945 ("the '945 Investigation"). Exs. 2, 3 to Leary Decl. in Supp. of Mot., ECF 110-5, -6.

United States District Court
Northern District of California

1    In the '944 Investigation, the ITC affirmed Administrative Law Judge David P. Shaw's

2    finding that Arista's Ethernet switches infringe three Cisco patents.  Ex. 6 to Leary Decl. in Supp.

3    of Mot., ECF 110-9.  On June 23, 2016, it issued a limited exclusion order and cease and desist

4    order ("the '944 orders"), limiting Arista's ability to sell products that the ITC found to infringe

5    the three patents.  Ex. 7 to Leary Decl. in Supp. of Mot. ("'944 Limited Exclusion Order"), ECF

6    110-10; Ex. 8 to Leary Decl. in Supp. Of Mot. ("'944 Cease and Desist Order"), ECF 110-11.

7    Since then, Arista redesigned its switches and the U.S. Custom and Border Protection ("CBP")

8    ruled that the redesigned switches are not subject to the '944 orders.  Ex. A to Gerrity Decl. in

9    Supp. of Opp'n 39, ECF 116-2.

10    In the '945 Investigation, Administrative Law Judge Mary Joan McNamara found that

11    Arista's Ethernet switches infringe two other Cisco patents.  On May 4, 2017, the ITC affirmed

12    this finding and issued a limited exclusion order and cease and desist order ("the '945 orders").

13    Ex. 16 to Leary Decl. in Supp. of Reply ("'945 Limited Exclusion Order"), ECF 130-4; Ex. 17 to

14    Leary Decl. in Supp. of Reply ("'945 Cease and Desist Order"), ECF 130-5.

15    While the ITC proceedings were pending, Arista petitioned the U.S. Patent and Trademark

16    Office ("PTO") to conduct Inter Partes Review proceedings for several Cisco patents. The PTO's

17    Patent Trial and Appeal Board ("PTAB") issued final written decisions finding two Cisco

18    patents—those Arista was found to have infringed in the '945 Investigation—to be invalid.  The

19    PTAB's decisions for these two patents were issued on May 25, 2017 and June 1, 2017,

20    respectively.[1]  Both decisions are on appeal before the Federal Circuit.

21    Despite the PTAB's decisions, the ITC declined to stay its '945 orders. Eventually, the

22    '945 orders went into effect, limiting Arista's ability to sell products that the ITC found to infringe

23    in the '945 Investigation.  While Arista does not dispute that all of its Ethernet switches alleged in

24    the Complaint are subject to the '944 and '945 orders (collectively, "the ITC orders"), the parties

25    do dispute whether Arista currently has products that are not banned by the ITC orders.

26

27

28    _____

[1] Arista does not argue that the PTAB's decisions invaliding the two patents are binding on this
Court.

United States District Court
Northern District of California

### C.     The Complaint

In this action, Arista filed the Complaint on February 24, 2016.  At Cisco's urging, the Court stayed the case until judgment was entered in the CLI case.  ECF 95.  The stay was lifted on March 7, 2017.  ECF 107.  Subsequently, Cisco filed this motion to dismiss.  ECF 110.

The Complaint alleges that Cisco engages in unlawful maintenance of monopoly power and unlawfully attempts to monopolize certain markets in violation of § 2 of the Sherman Act, 15 U.S.C § 2.  Compl. ¶¶ 1, 133–46.  It also alleges that Cisco violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.  Id.* ¶¶ 1, 147–154.

The alleged relevant product markets are the market for all Ethernet switches and a narrower market—the market for high-speed Ethernet switches.  *Id.* ¶¶ 40–54.  This narrower market is directed towards customers—such as providers of search engines, data centers, frequency traders, and government agencies—who require Ethernet switches that forward large volumes of data traffic with minimal latency.  *Id.* ¶ 46.  Arista collectively refers to these product markets as "Relevant Product Markets."  *Id.* ¶¶ 54, 58.

The relevant geographic markets are alleged to be (1) the United States and (2) the world.  *Id.* ¶ 43.  "The global market for Ethernet switches includes manufacturers with product portfolios that are worldwide in scope, and multinational customers that have a demand for such global capability."  *Id.*  Cisco consistently holds a share of more than 65% in both the U.S. and global markets for all Ethernet switches.  *Id.* ¶ 45.  For high-speed Ethernet switches, Cisco maintains a share of around 70%.  *Id.* ¶ 53.

The Complaint also alleges a maintenance and service market that includes services such as onsite visits from certified engineers, software updates, technical assistance center access, online resources, and hardware replacement.  *Id.* ¶ 55.  The service markets in the United States and world-wide are collectively referred as "Relevant Service Markets."  *Id.* ¶¶ 55, 58.

Generally, Arista alleges that Cisco engages in anticompetitive conduct by (1) reversing a long-time policy in which Cisco had represented its CLI as the industry standard ("the CLI-based claim"), *id.* ¶¶ 74–96, 142; and (2) penalizing SMARTnet customers when renewing Cisco's switch maintenance contracts if they have chosen to purchase non-Cisco Ethernet switches ("the

4

SMARTnet bundling claim"), *id.* ¶¶ 97–110, 142.

Regarding the CLI-based claim, for over a decade, Cisco allegedly has represented that its CLI commands were an "industry standard." *Id.* ¶ 74. For example, Cisco stated that "Cisco IOS [("Internetwork Operating System")] CLI has essentially become the standard for configuration in the networking industry," and made representations to a standard setting body called the Internet Engineering Task Force ("IETF") that Cisco CLI commands were to be used as a standard. *Id.* ¶ 75. Allegedly, Cisco's representations gave the impression that Cisco CLI commands "were in the public domain—or, at a minimum, that Cisco did not claim any proprietary rights in them" and were made under Cisco's "long-standing policy" to encourage customers and competitors to use the commands incorporated into Cisco's IOS CLI. *Id.* ¶¶ 76, 85. The anticompetitive conduct, Arista alleges, is that Cisco reversed this long-standing policy by "notifying customers and competitors industry-wide that use of 'its' CLI was reserved exclusively for use with Cisco's products." *Id.* ¶ 91. Under this reversal of policy, Cisco seeks to bar Arista from using the claimed copyrighted CLI commands, and it informed customers to avoid Arista's Ethernet switches in that "those products would soon be pulled off the market." *Id.* ¶¶ 91–92.

Further, Arista alleges antitrust violations based on Cisco's service contracts. *Id.* ¶¶ 33–39. Cisco offers its SMARTnet program, which provides technical assistance, proactive diagnostics, software updates, hardware replacement, etc., to customers who own Cisco Ethernet switches. *Id.* ¶ 97. No other competitor can offer the same range of services as what Cisco provides: Cisco states that "a Third Party Maintenance Provider is not authorized to provide [customers] with Cisco bug fixes, patches and updates." *Id.* ¶ 102 (alteration in original).

The Complaint alleges that when SMARTnet contracts come up for renewal, Cisco negotiates the renewal rate in tandem with the purchase of new Ethernet switches. *Id.* ¶ 105. If a customer chooses to buy non-Cisco switches, Cisco allegedly imposes a penalty on the SMARTnet renewal rates which deters customers from purchasing other competitors' products. *Id.* ¶¶ 105–06. These allegations form the basis for the SMARTnet bundling claim.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

1    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

2    U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When

3    considering such a motion, the Court "accept[s] factual allegations in the complaint as true and

4    construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St.*

5    *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

6          The Court may generally consider exhibits attached to or incorporated by reference into the

7    complaint and matters properly subject to judicial notice.  *See Tellabs, Inc. v. Makor Issues &*

8    *Rights, Ltd.*, 551 U.S. 308, 322 (2007).  In support of its motion, Cisco filed a Request for Judicial

9    Notice of (1) documents issued by the ITC, (2) documents docketed in the CLI case, and (3) a

10   webpage printout of Arista's website.  ECF 110-2.  Cisco's Request is GRANTED, as the ITC and

11   CLI case documents are matters of public record and Arista does not dispute the authenticity of the

12   public webpage printout.  Fed. R. Evid. 201; *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d

13   741, 746 n.6 (9th Cir. 2006).  While these documents are accepted as what they represent, specific

14   fact findings and legal conclusions set forth in those documents may not bind this Court.

15   Additionally, the Court takes judicial notice of proceedings in the PTO, ITC, and Federal Circuit

16   in relation to Cisco's patents.

## III.    DISCUSSION

17

18         The Court now turns to the grounds raised by Cisco to dismiss the complaint.

19   ### A.    Antitrust Standing and Antitrust Injury

20         A private plaintiff alleging violation of § 2 of the Sherman Act may seek monetary

21   damages and injunctive relief under the Clayton Act.  *Feitelson v. Google Inc.*, 80 F. Supp. 3d

22   1019, 1026 (N.D. Cal. 2015).  Section 4 of the Clayton Act allows the recovery of damages.  15

23   U.S.C. § 15.  Section 16 of the Clayton Act permits injunctive relief.  15 U.S.C. § 26.

24         The Court construes the Complaint to rely on both §§ 4 and 16 of the Clayton Act.  While

25   Counts I and II in the Complaint do not state which sections of the Clayton Act are relied on by

26   Arista to bring this private action, *see* Compl. ¶¶ 133–46, the Complaint does state that the action

27   arises under § 16 of the Clayton Act in its jurisdiction section, *id.* ¶ 7.  Also, although the

28   Complaint does not refer to § 4, it explicitly requests damages in the prayer for relief section.  *Id.*

United States District Court
Northern District of California

¶ 42.  In light of these statements, the Complaint is deemed to invoke both §§ 4 and 16 of the Clayton Act to allege violations of § 2 of the Sherman Act.

To enforce antitrust laws under these sections, the private plaintiff must have "antitrust standing."  *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–113 (1986); *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983).  The standing requirements for injunctive relief are lower than those for monetary damages.  *Feitelson*, 80 F. Supp. 3d at 1029.  "For example, § 4 requires a plaintiff to show actual injury, but § 16 requires a showing only of 'threatened' loss or damage."  *Cargill*, 479 U.S. at 111 (1986).  Likewise, § 4 requires a showing of injury to "business or property," whereas § 16 does not.  *Id.*  Thus, the standing analysis will not always be identical for these two sections.  *Id.* at 111 n.6.  While the differences between §§ 4 & 16 "do affect the nature of the injury cognizable under each section," they both require a showing of "antitrust injury."  *Id.* at 111.  That is, the plaintiff must allege "an injury of the type the antitrust laws were designed to prevent."  *Id.*

For purposes of § 4 of the Clayton Act, antitrust injury is shown by the following: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (internal citation omitted).  Also, the "injured [plaintiff must] be a participant in the same market as the alleged malefactors."  *Id.* (internal citation omitted).

As explained above, the antitrust injury requirements for § 16 of the Clayton Act are lower than those for § 4.  Under § 16, a plaintiff may need to show only threatened loss or damages but not actual damages.  *Cargill*, 479 U.S. at 111.  Nevertheless, the alleged harm by the plaintiff must still be a threat to its own interests.  *California v. Am. Stores Co.*, 495 U.S. 271, 296 (1990).

Here, Cisco argues that Arista has no antitrust injury because the ITC orders prohibit Arista from importing and selling Ethernet switches.  Mot. 7–9, ECF 110.  Moreover, Cisco contends that there is no antitrust injury because sales of Arista's switches are and have previously been unlawful as the ITC found that the switches infringe several Cisco patents.  *Id.*; Reply 3–6, ECF 130.

**1.  The ITC's Findings of Patent Infringement**

The crux of Cisco's arguments is that Arista unlawfully sold its Ethernet switches and thus suffered no antitrust injury.  The premise of this theory is that Arista's sales were unlawful from the start because the ITC found those switches to be infringing products, which are now banned from importation and sale in the United States.[2]  On this basis, Cisco argues that sales both before and after the ITC orders are unlawful, thus depriving Arista of antitrust standing.

There are a few problems with Cisco's argument.  First, the Federal Circuit has clearly held that "ITC decisions are not binding on district courts."  *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996); *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1564 (Fed. Cir. 1996).  It follows that an accused infringer can generally raise defenses including, invalidity and non-infringement, regardless of whether those defenses were raised and lost before the ITC.  *Texas Instruments*, 90 F.3d at 1569.  Hence, as far as this case is concerned, there has been no binding determination that Arista is an infringer.  Without such a finding, the Court accepts that Arista sold its Ethernet switches lawfully before the ITC orders went into effect for purposes of this motion.  Thus, as discussed below, the Court does not agree with Cisco's premise and therefore finds that antitrust standing has been alleged.

Second, that the ITC orders bind Arista as to its future conduct does not change this conclusion.  While Arista is banned from importing and selling certain products as set forth in the '944 and '945 orders, it can still take a non-infringement position in this case, *id.*, and its prior sales are beyond the scope of the ITC orders.  Hence, Arista's antitrust standing is supported by its alleged injury that occurred while it sold Ethernet switches prior to the ITC orders' effective dates.

To bolster its position, after oral argument was heard, Cisco submitted a Response to Arista's September 25, 2017 Notice of Supplemental Authority.  ECF 147.  The Response states that the Federal Circuit "affirmed the ITC's findings of infringement" in the '944 Investigation and "affirmed the ITC's remedial orders."  *Id.* at 2 (citing *Arista Networks, Inc. v. ITC*, Nos. 2016-

---

[2] The Court does not consider whether Arista acted unlawfully by violating § 337 of the Tariff Act because Cisco argues only that Arista's sales were unlawful due to patent infringement, i.e., for violating patent laws.  Indeed, during oral argument, Cisco argued that the real issue is patent infringement.  Oral Arg. Tr. 13:24–35, ECF 144.

United States District Court
Northern District of California

2563, -2539 (Fed. Cir. Sept. 27, 2017)).  The Federal Circuit's opinion is sealed as of this date.

While the Court appreciates the parties' submissions, the conclusion that there has been no judicial determination of infringement does not change.  In *Texas Instruments*, the Federal Circuit clearly stated that the ITC determination of infringement—even if affirmed by a prior Federal Circuit panel—does not bind a district court.  *Texas Instruments*, 90 F.3d at 1563, 1558–70; *see also Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1019 (Fed. Cir. 1987) ("[The Federal Circuit's] appellate treatment of decisions of the Commission does not estop fresh consideration by other tribunals."); *Minnesota Mining & Mfg. Co. v. Beautone Specialties Co.*, 117 F. Supp. 2d 72, 81–83 (D. Mass. 1999).  That said, specific holdings, such as a construction of a claim, that a Federal Circuit panel affirmed may preclude the parties from relitigating the issue in the district court.  *Texas Instruments*, 90 F.3d at 1569–70; *see also Minnesota Mining & Mfg.*, 117 F. Supp. 2d at 83 (district court construing patent claims and analyzing question of infringement against the background of earlier ITC and Federal Circuit proceedings).  Here, issues of claim construction and infringement are not before the Court.  Therefore, as mentioned, the Court accepts that Arista has sold its Ethernet switches lawfully during the relevant time period for purposes of this motion.

Even if Arista's sales of Ethernet switches were shown to be unlawful, that itself, without inquiring into the specific violation and circumstances, would be insufficient to show that Arista lacks antitrust standing.  *Memorex Corp. v. Int'l Bus. Machines Corp.* makes clear that a violation of law does not necessarily mean that the violator is barred from bringing an antitrust action.  555 F.2d 1379, 1382 n.5 (9th Cir. 1977).  There Memorex sued IBM, alleging antitrust law violations.  *Id.* at 1380.  IBM raised a defense that Memorex stole IBM's trade secrets and thus was barred from bringing the antitrust action.  *Id.*  Because the Ninth Circuit was reviewing Memorex's motion to strike the defense, the court accepted IBM's trade secret allegations as true, i.e., Memorex committed a wrong.  *Id.* at 1380 n.1.  Despite that illegal conduct, emphasizing the public policy to ensure private actions deter defendants who commit a public wrong by violating antitrust laws, *Memorex* held that "illegality is not to be recognized as a defense to an antitrust action when the illegal acts by the plaintiff are directed against the defendant."  *Id.* at 1382–83.  Of

course, the plaintiff is fully subject to "civil and criminal penalties for [its] own illegal conduct." *Id.* at 1383 (citing *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139 (1968)).

Cisco argues that *Memorex*'s holding is inapplicable to this case.  Reply 4.  It contends that the antitrust plaintiff in *Memorex* committed a "private wrong" by stealing trade secrets whereas Arista infringed a "publicly issued" patent right.  *Id.*  Hence, according to Cisco, *Memorex* is distinguishable and Arista did not suffer antitrust injury because it committed a public wrong.  *Id.*

Although Cisco correctly characterizes *Memorex* regarding the stolen trade secrets, its conclusion is incorrect.  *Memorex* accepted that the antitrust plaintiff committed a wrong because the court was ruling on a motion to strike and reviewing an affirmative defense pleading that alleged trade secrets theft.  555 F.2d at 1380 n.1.  In contrast, this Court is not reviewing a pleading alleging patent infringement and thus does not accept as true that Arista infringed Cisco's patents.  As discussed, the ITC's findings of infringement are not binding, and thus there has been no determination on whether Arista committed a wrong.[3]  Otherwise, Arista would be deprived of a ruling on infringement from a federal court.  Hence, Cisco fails to show that Arista did not suffer antitrust injury.

The Court notes that, even if it were assumed that all of Arista's products infringed Cisco's patents, the cases cited by the parties do not clearly dispose the antitrust injury issue as discussed below.

To be clear, *Memorex* did not affirmatively hold that a patent infringer can suffer antitrust injury if it were selling only infringing products.  Memorex, who was assumed to have stolen trade secrets, did suffer injury in the market and could bring the antitrust action.  *See id.* (acknowledging that "some injury must . . . occur[]" and the antitrust defendant IBM did not argue there was no injury at all).

Recognizing this point, Cisco argues that a patent infringer suffers no injury when all sales were based on infringing products in light of *Monarch Marking System, Inc. v. Duncan Parking*

---

[3] Given that the issue of patent infringement is not present for the instant motion, the Court need not decide whether such infringement is a public wrong for purposes of an affirmative defense against antitrust liability.

*Meter Maintenance Co.*, No. 82-cv-02599, 1988 WL 5038 (N.D. Ill. Jan. 19, 1988) ("*Monarch I*"), *vacated on other grounds*, 1988 WL 23830 (N.D. Ill. Mar. 8, 1988) ("*Monarch II*") (collectively, "*Monarch*"). Mot. 9; Reply 3, 4. In *Monarch I*, the plaintiff asserted infringement of patented "price labels," and the defendant brought an antitrust counterclaim. 1988 WL 5038, at *1. The counterclaim was dismissed. Based on the defendant's representation conceding patent validity and infringement, the court held that the defendant had no market interest in the patented labels and did not suffer injury. *Id.*, at *5. In *Monarch II*, the court reinstated the antitrust counterclaim recognizing that the defendant had asserted that it also sold non-infringing products. 1988 WL 23830, at *1–2.

As the ITC's findings are not binding, the Court need not decide here whether a patent infringer is always barred from asserting antitrust claims against the patent owner, where the infringer sold only infringing products. Nevertheless, the Court is doubtful that *Monarch* clearly stands for such a proposition because the inquiry for antitrust injury should focus not on infringement but how the allegedly injured party is related to the market. In fact, *Monarch I* did inquire whether the defendant had "market interest", 1988 WL 5038, at *5, and *Monarch II* indicated that the antitrust counterclaim could be brought if the defendant had the "willingness and ability to compete" in the market, 1988 WL 23830, at *1.

Also, *Monarch* is unclear on whether the defendant sought damages or injunctive relief under §§ 4 and 16 of the Clayton Act, which have different thresholds for injury. Cisco's proposition that *Monarch* stands for a brightline rule—that an infringer with no non-infringing products has no standing whatsoever—may be in conflict with the fact that § 16 requires a showing of only threatened loss and that a potential competitor can suffer injury. *See Retrophin, Inc. v. Questcor Pharm., Inc.*, 41 F. Supp. 3d 906, 914 (C.D. Cal. 2014) ("[A] potential competitor has standing if he can show a genuine intent to enter the market and a preparedness to do so." (citing *Bubar v. Ampco Foods, Inc.,* 752 F.2d 445, 450 (9th Cir.1985))). Moreover, a patent infringer may continue to sell infringing products so long as it pays damages assessed and future license fees and it is not subject to an injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–94 (2006) (holding that a finding of patent infringement does not always render

United States District Court
Northern District of California

1    injunction appropriate).[4]

2        To further support its proposition, Cisco relies on several cases that held a party lacked

3    antitrust standing for engaging in unlawful conduct or for having an inability to participate in the

4    market.  The Court, however, is not convinced that those cases are applicable here.

5        First, Cisco submits that courts have held that a party lacks antitrust standing when it was

6    not a lawful competitor in the market due to the failure to obtain regulatory approval.  *See, e.g.*,

7    *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169–70 (N.D. Cal.

8    2004) (holding the plaintiff did not suffer antitrust injury because it failed to comply with statutory

9    requirements to lawfully compete in the electric service market).  *Modesto* relied on the

10   proposition that "an action under the antitrust laws will not lie where the business conducted by

11   the plaintiff, and alleged to have been restrained by the defendant, was itself unlawful."  *Id.* at

12   1169–70.  This statement is in tension with *Memorex*, and *Modesto* cited a case decided before

13   *Memorex* to support this proposition.  *Id.* at 1170.  Accordingly, *Modesto* does not lend much

14   support to Cisco's position.

15       Further, *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223 (3d Cir. 2013) is also

16   distinguishable.  In *Ethypharm*, a foreign antitrust plaintiff licensed its drugs to a U.S. distributor

17   who was responsible for obtaining FDA approval.  707 F.3d at 226. The court held that the

18   plaintiff was not a competitor in the United States because the plaintiff, by its own choice, did not

19   directly sell in the U.S. market as evidenced by not obtaining FDA approval.  *Id.* at 236–37.

20   Unlike *Ethypharm*, Cisco does not contend that Arista failed to receive some regulatory approval

21   (setting aside the issue of the ITC orders, which is discussed below) or that Arista chose not to

22   compete in the relevant product and geographic markets.

23       Cisco further argues that courts have held that a party who is clearly violating criminal

24   statutes lacks antitrust standing.  For example, *Pearl Music Co. v. Recording Indus. Ass'n of Am.,*

25   *Inc.* held that the plaintiff had no antitrust standing due to his wholly illegal conduct (i.e., selling

26   pirated tapes) which was directed against the public in violation of clear federal and state statutory

27

28   [4]  The Court notes that the ITC is not required to apply *eBay*'s traditional four-factor test for injunctive relief as the ITC's exclusion orders are based on criteria set forth in the Tariff Act. *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1359 (Fed. Cir. 2010).

United States District Court
Northern District of California

United States District Court
Northern District of California

criminal prohibitions.  460 F. Supp. 1060, 1068 (C.D. Cal. 1978).  While being consistent with *Memorex*, *Pearl Music* is inapplicable because Cisco does not argue that Arista violated any criminal statutes.

During oral argument, Cisco stated that lack of antitrust standing due to patent infringement can be raised as an affirmative defense.  Oral Arg. Tr. 19:12–14, 20:1–3.  This issue need not be reached because before the Court is a motion to dismiss the complaint.  However, in the event that patent infringement is found to cover all of Arista's products, Cisco may revisit this issue.

Accordingly, Cisco's motion to dismiss the claims based on the ITC's findings of infringement is DENIED.

### 2.  The ITC's '944 and '945 Orders

The ITC orders ban Arista from selling certain Ethernet switches.[5]  Cisco argues that Arista suffered no antitrust injury due to this ban.  Mot. 9.  Strictly speaking, this argument does not rely on the ITC's findings of infringement, but is rather based on injunctions issued by a federal agency.

As discussed below, Arista has antitrust standing by suffering antitrust injury during the period before the effective dates of the ITC orders.  For the period after the effective dates, Arista has not suffered antitrust injury because it is banned from selling Ethernet switches that are pled in the Complaint.

The Court first observes that several categories of Arista Ethernet switches are relevant:

(1) Imported Ethernet switches that Arista has sold since 2008 and are now subject to the ITC orders ("the Original Switches").

(2) Redesigned Ethernet switches that the CBP ruled as not being subject to the '944 orders ("the '944 Redesigned switches").

(3) Ethernet switches that are manufactured in the United States at any period ("Domestic Switches").

In view of the ITC orders and parties' arguments, Arista's Ethernet switches alleged in the

---

[5] The scopes of the '944 and '945 orders are essentially identical except for the asserted patents and a bond requirement.  Hence, for simplicity, the Court will collectively refers these orders as the "ITC orders" unless necessary to distinguish them.

1    Complaint are all imported switches subject to the ITC orders, i.e., Original Switches.  *See*

2    Mot. 10.  This fact is not disputed by Arista.

3           When a party has been enjoined from selling its only product, that party may not suffer

4    antitrust injury after the injunction issued because it is no longer a market participant.  *See*

5    *RealNetworks, Inc. v. DVD Copy Control Ass'n, Inc., No.* C 08-4548, 2010 WL 145098, at *5

6    (N.D. Cal. Jan. 8, 2010) (holding that the delay of a product launch due to a court ordered

7    preliminary injunction did not lead to antitrust standing).  Here, to the extent that the ITC orders

8    prohibit Arista from selling the Original Switches, any alleged loss or threat of loss on the sales of

9    such switches *after* the orders went into effect cannot contribute to antitrust standing.  The reason

10   is because Arista is not selling and cannot sell those switches due to the issued injunctions.  Arista

11   cannot escape this conclusion—the Complaint does not state any allegations that indicate Arista's

12   current ability to participate in the market despite the ITC's injunctions.

13          Arista argues that it has sold the '944 Redesigned Switches (which is not subject to the

14   '944 orders) and sells Domestic Switches (which are not subject to the ITC orders at all).  Opp'n

15   4, 10.  However the Complaint does not so allege.  Therefore, no allegations make plausible that

16   Arista suffered antitrust injury after the injunctions issued based on market participation by selling

17   these two categories of switches.  Nor does Arista's September 25, 2017 Notice (ECF 145)

18   changes this conclusion.  Insofar as the attached Federal Circuit's nonprecedential order (ECF

19   145-1) indicates that Arista has a product redesigned to avoid the ban under the '945 orders and

20   permitted to enter the United States, that redesigned product is not alleged in the Complaint.

21   Accordingly, the Court concludes that Arista has not suffered antitrust injury based on sales of

22   Ethernet switches that occurred after the ITC orders' effective dates, for the purposes of this

23   motion.

24          On the other hand, Arista has suffered antitrust injury during the earlier period before the

25   ITC orders went into effect.  Cisco contends that Arista had no right to sell the excluded products

26   "*before* or after" the ITC orders issued because the products are subject to the orders.  Mot. 9

27   (emphasis added).  However, Cisco fails to establish that Arista had no right to sell its Ethernet

28   switches before the ITC orders issued or that the ITC even has authority over past sales.  On their

United States District Court
Northern District of California

United States District Court
Northern District of California

face, the ITC orders limit the importation and sale of imported switches "for the remaining term" of the asserted Cisco patents.  '944 Cease and Desist Order 2–3; '945 Cease and Desist Order 2. Hence, the injunctive nature of the ITC orders does not apply retroactively to the Original Switches.  These orders do not make Arista's sales that occurred prior to their effective dates unlawful because they are not retroactive.[6]  In other words, the ITC orders cannot negate Arista's antitrust injury that it suffered before their effective dates.  Rather, for damages, their effect is to reduce the amount Arista may recover by limiting the injury to those that occurred before the ITC orders took effect.

As mentioned, the Original Switches pled in the Complaint were not subject to the ITC orders before the '944 orders went into effect.  Thus, during that earlier period, Arista had the ability to participate in the Relevant Product Markets and in fact does allege it had sold the Original Switches.  Accordingly, the Complaint sufficiently alleges that Arista suffered antitrust injury from Cisco's conduct during the period before the ITC enjoined Arista under the '944 orders.  Arista's prior sales are sufficient to establish antitrust standing.

During oral argument, the parties disputed whether Arista can currently legally sell Original Switches that were imported before the ITC orders went into effect.  Oral Arg. Tr. 13:13– 17, 50:20–22, 52:17–19.  On their face, the ITC orders command Arista to cease and desist from "sale after importation" and that it shall not "market, distribute, sell or otherwise transfer (except for exportation) imported covered products."  *E.g.*, '944 Cease and Desist Order 1, 3.  While this command does not explicitly state that no sale is allowed for Original Switches imported before the corresponding order issued, the ITC opinions finding infringement make clear that the cease and desist orders are intended to target "commercially significant inventories" in the United States that could "undercut the remedy provided by an exclusion order."  *E.g.*, Ex. 6 to Leary Decl. in Supp. of Mot. 54–56, ECF 110-9.  Accepting Cisco's interpretation that the ITC orders enjoin Arista from selling Original Switches that were imported before the ITC orders went into effect does not change the outcome of this motion.  The effect of such an interpretation of the cease and

---

[6] The Court is not aware that Arista has made any sales that violate the ITC orders.  Cisco does not argue that such sales exist or that those sales would taint sales made prior to the ITC orders' effective dates as unlawful.

desist orders would be only to limit the scope of injury, not the fact of injury.  Interpretation of the cease and desist orders is, thus, not required at this juncture, and the Court declines to make such a determination.  That matter is best left to the ITC or Federal Circuit.

Accordingly, Cisco's motion to dismiss based on the issuance of the ITC orders is DENIED because, the Complaint alleges that Arista sold its Ethernet switches in the Relevant Product Markets before the '944 orders became effective.

### 3.   Causation of Antitrust Injury

The presence of antitrust injury means that the suffered harm is "an injury of the type the antitrust laws were designed to prevent." *Cargill*, 479 U.S. at 111.  Therefore, whatever loss Arista suffered must have been caused by the alleged anticompetitive conduct by Cisco.  When this causation exists, Arista's loss is an antitrust injury.

Cisco contends such causation is not adequately pled.  Mot. 12.  It argues that the Complaint "falls short of plausibly pleading that any such difficulty was caused by Cisco's allegedly anticompetitive conduct, because the Complaint does not contain any allegations that would tend to exclude the possibility that Arista's alleged difficulty was caused by other factors." *Id.*  In essence, Cisco argues that other explanations—such as concerns of customers regarding the ITC's infringement findings—could have led to decline in Arista's sales rather than due to the alleged anticompetitive conduct.  *Id.*

While allegations that are "merely consistent" "stops short of the line between possibility and plausibility of 'entitlement to relief,'" *Iqbal*, 556 U.S. at 668, the Complaint provides sufficiently specific allegations of Cisco's purported conduct that directly and proximately caused harm to Arista.  For example, the Complaint alleges that "any customer who uses CLI commands that Cisco previously promoted as 'industry standard' is now at risk of facing the need either to rewrite its scripts and retrain its engineers, or to replace all of its non-Cisco Ethernet switches." Compl. ¶ 91.  Also alleged is that "Cisco has been telling customers that they should not invest in any of Arista's Ethernet switches because such products would soon be pulled off the market," and that this conduct harmed "competition and consumers."  *Id.* ¶¶ 92–93.  These allegations are more than "merely consistent" with a liability.  Rather, they are sufficient to make more than possible—

United States District Court
Northern District of California

1  in fact plausible—that Arista was harmed by Cisco's purported conduct.

2  Moreover, "[i]f there are two alternative explanations, one advanced by defendant and the

3  other advanced by plaintiff, *both of which are plausible*, plaintiff's complaint survives a motion to

4  dismiss under Rule 12(b)(6)." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1105 (9th

5  Cir. 2013) (citing *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)) (emphasis in original).

6  Here, Cisco's argument fails because it did not demonstrate that its explanation is plausible.  *See*

7  *id.*; *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)

8  ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation

9  is so convincing that plaintiff's explanation is *implausible*." (citing *Starr*, 652 F.3d at 1216)

10  (emphasis in original)).

11  Accordingly, Cisco's motion to dismiss the claims based on lack of causation of antitrust

12  injury is DENIED.

13  **B.    CLI-Based Claim**

14  The Complaint alleges that Cisco's purported policy reversal on CLI constitutes

15  anticompetitive conduct.  Compl. ¶ 135.  Cisco seeks to dismiss this CLI-based claim on several

16  grounds.

17  **1.    Collateral Estoppel**

18  In the CLI case, the jury found by a special verdict that Arista did not prove copyright

19  misuse by Cisco.  Jury Verdict, *Cisco v. Arista*, Case No. 14-cv-05344-BLF, Dkt. 749.  Cisco

20  argues that "[i]f Arista cannot prove its copyright misuse claim, then it follows that Arista cannot

21  prove the associated antitrust claim."  Mot. 14.

22  Collateral estoppel "bars the relitigation of issues actually adjudicated in previous litigation

23  between the same parties."  *Offshore Sportswear, Inc. v. Vuarnet Int'l, B.V.*, 114 F.3d 848, 850

24  (9th Cir. 1997).  To foreclose relitigation of an issue under collateral estoppel, four conditions

25  must be met: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually

26  litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate

27  the issue; and (4) the issue was necessary to decide the merits."  *Oyeniran v. Holder*, 672 F.3d

28  800, 806 (9th Cir. 2012), *as amended* (May 3, 2012).

United States District Court
Northern District of California

1    Here, at least the fourth factor is absent.  In the CLI case, the jury returned a verdict that

2    Arista proved the scènes à faire defense to Cisco's copyright infringement claim.  Jury Verdict.

3    Hence, the jury's finding of Arista's failure to prove copyright misuse was not necessary to the

4    judgment on the merits.  Therefore, this finding does not collaterally estop Arista from asserting

5    the CLI-based claim.

6    Cisco attempts to overcome the inapplicability of collateral estoppel by arguing that

7    Arista's allegations for the CLI-based claim are "facially implausible" because "they have already

8    been rejected by a jury."  Reply 9.  Even assuming, however, that the same allegations were

9    presented to the jury in the CLI case, Cisco fails to point to any legal authority that supports the

10   proposition that a jury's advisory verdict which does not trigger collateral estoppel makes the

11   allegations implausible for purposes of Rule 12(b)(6).

12   Cisco construes some of the allegations to be based on a copyright abandonment theory.

13   Mot. 15.  Even assuming the Complaint relies on such a theory, the Court rejects that jury's denial

14   of Arista's copyright abandonment defense in the CLI case triggers collateral estoppel for the

15   same reasons discussed above.

16   Accordingly, Cisco's motion to dismiss the CLI-based claim under collateral estoppel is

17   DENIED.

18   **2.   Cause of Action Sounding in Fraud**

19   Cisco construes the Complaint to allege that Cisco "misled" the industry to believe it either

20   did not have or would not enforce its intellectual property in CLI.  Mot. 15.  Based on this

21   interpretation, Cisco argues that the cause of action sounds in fraud and the allegations fail to meet

22   the Federal Rules of Civil Procedure 9(b) "particularity" standard.  *Id* at 16–17.

23   The Court is unpersuaded by this argument.  Nowhere does the Complaint allege that

24   Cisco misled or misrepresented any position on its CLI.  Rather, the allegations are that Cisco

25   reversed a long-standing policy of regarding its CLI as the industry standard.  Compl. ¶¶ 31–32,

26   63, 70–96, 113–114, 118, 122–124, 131, 135, 142.  Construing the allegations in the light most

27   favorable to Arista, it can be inferred that Cisco may have had a bona fide intent of keeping an

28   open policy (without misrepresentation) but later reversed its position, plausibly engaging in

United States District Court
Northern District of California

1    anticompetitive behavior.  Accordingly, the CLI-based allegations do not amount to a fraud claim

2    and need not meet the Rule 9(b) standard.

3            Other challenges asserted by Cisco are not persuasive.  It argues that the Complaint fails to

4    identify (1) specific circumstances that created a duty for Cisco to disclose its CLI copyrights and

5    (2) specific "industry participants" who would have developed alternative CLI commands.

6    Mot. 17–18.  Although Cisco cites several cases to support its position, *id.*, they are inapposite.

7    The cases cited to discuss the duty to disclose intellectual property rights do not involve pleading

8    standards at the motion to dismiss stage.  *See Rambus Inc. v. Infineon Techs.*, 318 F.3d 1081, 1101

9    (Fed. Cir. 2003); *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 684 F. Supp. 2d 699, 723 (E.D.

10   Va. 2010); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 609 F. Supp. 2d 988, 1024 (N.D. Cal.

11   2009).  The case cited for the specificity required for pleading "industry participants" involved

12   fraud and thus applied the Rule 9(b) standard.  *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-

13   01846, 2011 WL 4948567, at *4 (N.D. Cal. Oct. 18, 2011).  Thus, these cases differ from the

14   situation of this case, and the Court rejects Cisco's assertion.

15           Accordingly, Cisco's motion to dismiss the CLI-based claim for sounding in fraud is

16   DENIED.

17           **3.  Implausibility of CLI-Based Allegations**

18           When considering a motion to dismiss, the Court "need not, however, accept as true

19   allegations that contradict matters properly subject to judicial notice or by exhibit."  *Sprewell v.*

20   *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Cisco argues that it always asserted

21   copyright over its CLI—and thus there was no policy reversal—as evidenced by a complaint filed

22   by Cisco against Huawei in 2003.  Reply 9.  In the *Huawei* suit, Mr. Charles Giancarlo, an

23   executive at Cisco in 2003, submitted a declaration stating that Cisco's CLI was copyrighted.

24   Ex. 19 to Leary Decl. in Supp. of Reply, ECF 130-7.  Based on the fact that Mr. Giancarlo later

25   became a board member at Arista and in view of the public nature of the *Huawei* complaint, Cisco

26   argues that Arista knew that Cisco had asserted CLI copyrights and thus could not be harmed by a

27   non-existent policy reversal.  Reply 9.  Arista admitted that it knew about the *Huawei* case during

28   oral argument.  *See* Oral Arg. Tr. 56:11–13.

United States District Court
Northern District of California

Arista's knowledge, however, does not contradict all CLI-based allegations set forth in the Complaint when viewing the allegations in the light most favorable to Arista.  First, the Complaint does not allege copyright abandonment.  Rather, it alleges that Cisco had a policy of treating the CLI commands as an open utility for the industry.  Compl ¶ 26.  Such a policy does not depend on whether Cisco owned copyright on its CLI.  Second, the Complaint alleges that other competitors such as Foundry and Extreme "followed Cisco IOS CLI" since at least 2004, after the *Huawei* case was filed.  *Id.* ¶ 27.  And there is no evidence that Cisco asserted copyright on its CLI against these competitors until it sued Arista for copyright infringement in 2014.  In fact, Arista marketed its switches without being sued from 2008, five years after the *Huawei* case was filed, until 2014.  Third, the *Huawei* case was mainly about Huawei's purported attempt to develop routers—rather than Ethernet switches—by misappropriating trade secrets, and infringing various copyrights (including those for CLI) and patents owned by Cisco.  *See* Ex. 18 to Leary Decl. in Supp. of Reply, ECF 130-6.  In light of these circumstances, the Court finds that it is plausible that Cisco continued to have an open policy for its CLI pertaining to Ethernet switches, and the industry, including Arista, continued to perceive this policy even after the *Huawei* case.

Accordingly, Cisco's motion to dismiss the CLI-based claim for lack of plausibility is DENIED.

## C.     SMARTnet Bundling Claim

While bundling discounts may be legitimate price competition, one situation can be found to be anticompetitive.  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 897 (9th Cir. 2008).  Specifically, the Ninth Circuit articulated the "discount attribution" standard:

> Under this standard, the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products. If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2. This standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a *hypothetical* equally efficient producer of the competitive product.

*PeaceHealth*, 515 F.3d at 906 (emphasis in original).  After *PeaceHealth*, the Ninth Circuit

United States District Court
Northern District of California

1   clarified that the "discount attribution" standard does not apply when competitors provide and

2   bundle the same products.  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1186–87

3   (9th Cir. 2016).

4         Cisco argues the SMARTnet bundling claim fails as a matter of law for the reason that the

5   "discount attribution" standard does not apply here.  Mot. 21–22.  It contends that both parties

6   "offer the same bundle of goods and services: Ethernet switches and accompanying maintenance

7   contracts" and thus the bundling claim is barred by *Aerotec.  Id.*

8         The Court rejects Cisco's argument because the allegations, taken as true, do not fall under

9   the *Aerotec* ruling.  In that case, Aerotec and Honeywell competed in the market for repairing

10   aircraft power units manufactured by Honeywell.  *Aerotec*, 836 F.3d at 1175.  Aerotec purchased

11   from Honeywell the replacement parts for the power units and offered the parts and services to

12   repair the units.  *Id.* at 1176.  Honeywell also offered the replacement parts and its repair services

13   with a bundle discount.  *Id.* at 1186.  Because the two companies sold the same repair parts

14   (manufactured by Honeywell) and the same services to repair power units (manufactured by

15   Honeywell), the Ninth Circuit declined to apply the "discount attribution" standard.  *Id.* at 1186–

16   87.

17         Here, unlike *Aerotec*, Arista does not allege that it offers services to maintain Cisco's

18   Ethernet switches.  In fact, the Complaint pleads that "a Third Party Maintenance Provider is not

19   authorized to provide [customers] with Cisco bug fixes, patches and updates."  Compl. ¶ 102

20   (alteration in original).  The service that Arista offers is for maintaining its own Ethernet switches,

21   not Cisco's.  *Id.* ¶ 107.  Therefore, while Arista and Cisco provides the same goods (i.e.,

22   interchangeable Ethernet switches), they do not provide the same services to maintain Cisco's

23   Ethernet switches, which is alleged to be bundled.  Only Cisco does the latter.  *Id.*

24         Nevertheless, the Court finds that the allegations to support the SMARTnet bundling claim

25   are insufficient.  "Threadbare recitals of the elements of a cause of action, supported by mere

26   conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell*

27   *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Here, the Complaint asserts a bundling

28   discount claim.  Compl. ¶ 106.  As such, it must state factual allegations that make the claim

United States District Court
Northern District of California

1  plausible in that if the purported price discount were attributed to Cisco's Ethernet switches, the

2  sales price would be below the incremental cost to produce those switches.  *See PeaceHealth*, 515

3  F.3d at 906.  While Arista need not plead its own costs, *id* at 905–06, mere recital of the claim's

4  elements is not enough, *Iqbal*, 556 U.S. at 662.  Here, the Complaint merely recites the elements

5  of the "discount attribution" standard in conclusory terms.  *See* Compl. ¶ 106.

6          Arista argues that the Complaint alleges various purported anticompetitive conduct,

7  including that Cisco prevents third party competitors from offering software update services that

8  form a core part of the SMARTnet program and that Cisco's practices amount to coercion against

9  customers because its competitors cannot offer the same services.  Opp'n 18–19.  However,

10  although these allegations may support another type of antitrust claim, they do not add factual

11  support that Cisco's purported bundling discount sets sales prices below the incremental cost.

12          While a plaintiff need not plead "detailed information" that is in control of a defendant, the

13  plaintiff still needs to plead facts that make the claim plausible.  *See Landers v. Quality Commc'ns,*

14  *Inc.*, 771 F.3d 638, 645 (9th Cir. 2014), *as amended* (Jan. 26, 2015).  "[W]ith the pleading of more

15  specific facts, the closer the complaint moves toward plausibility."  *Id.*  The Court finds that the

16  Complaint has not met the plausibility requirement.  On pleading the SMARTnet bundling claim,

17  Arista must have obtained some information, for example, from its customers, to make it believe

18  that Cisco is pricing below incremental costs.  *See* Compl. ¶ 106.  Such information is in Arista's

19  control.  The Complaint, however, is devoid of any allegations on *what kind or amount* of discount

20  or penalty pricing in relation to the alleged bundling claim was offered to Cisco customers who

21  had the temerity to purchase or attempt to purchase non-Cisco switches.

22          To be sure, pleading of "detailed facts" is not required.  *Landers*, 771 F.3d at 645.  And

23  pleadings are evaluated in "the light of judicial experience" and the "plausibility of a claim is

24  'context-specific.'"  *Id.*  While detailed cost and pricing information may be within Cisco's

25  control, Arista fails to allege certain facts it should have and its Complaint amounts to merely

26  reciting elements of the "distribution attribution" standard in conclusory terms.

27          Accordingly, Cisco's motion to dismiss the SMARTnet bundling claim for lack of factual

28  allegations is GRANTED.  The Court gives Arista leave to amend the Complaint to cure the

SMARTnet bundling claim's deficiencies and notes that certain factual allegations may be pled in redacted form to preserve confidentiality.

### D.     Relevant Market

To state a valid claim under the Sherman Act, a plaintiff must allege that a "relevant market" exists. *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). Under *Newcal*, courts in this circuit apply a lenient standard on assessing whether a "relevant market" is sufficiently pled. *Id.* at 1045. There is no requirement that this element must be pled with specificity. *Id.* "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Id.* In other words, a complaint may be dismissed if the alleged relevant market definition is facially unsustainable. *Id.*

The Complaint identifies two product markets in the United States and worldwide: (1) a market of all Ethernet switches and (2) a narrower market of high-speed Ethernet switches. Compl. ¶ 58. These markets are collectively referred as "Relevant Product Markets." *Id.* ¶¶ 54, 58. Cisco argues that the Complaint's identification of the Relevant Product Markets is facially deficient. Mot. 23. Cisco also challenges the global geographic market definition. *Id.* at 8 n.5.

### 1.     All Ethernet Switches Market

In assessing the relevant market definition, *Newcal* assessed three factors based on *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). First, "the relevant market must be a product market." *Newcal*, 513 F.3d at 1045. Second, "the market must encompass the product at issue as well as all economic substitutes for the product." *Id.* Third, "although the general market must include all economic substitutes, it is legally permissible to premise antitrust allegations on a submarket." *Id.*

Here, Cisco disputes whether the second factor is met: It argues that the "all Ethernet switches market" is not facially plausible because "Arista concedes . . . high-speed and low-speed [Ethernet] switches" are not interchangeable. Mot. 23. Generally, the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Hence,

courts have inquired whether a complaint pleads factual allegations on the reasonable interchangeability of products to assess the relevant market definition.

In asserting that *Newcal*'s second factor is met, Arista argues that the high and low speed Ethernet switches are interchangeable for some customers.  Opp'n 21.  Hence, it emphasized that "Cisco does not dispute that for some buyers of Ethernet switches, both low and high speed switches are interchangeable."  *Id.*  However, even if it was true that some level of interchangeability exists, the Complaint does not allege that high and low speed switches are interchangeable.  To the contrary, the Complaint alleges that "customers of high-speed Ethernet switches would not be able to turn to alternative technologies—including, but not limited to, lower-speed switches," Compl. ¶ 49, and indicated that low-speed switch customers "generally do not purchase high-speed Ethernet switches," which can be "significantly more expensive" than those used for low-speed applications, *see id.* ¶ 48.  Such allegations belie a reasonable inference of the existence of reasonable interchangeability between switches in the all Ethernet switches market, which Arista argues in its opposition.  Therefore, the Court accepts Cisco's argument.

To be clear, under certain circumstances, a complaint may plead a relevant market including sub-products that are largely not interchangeable.  In *Brown Shoe*, the Supreme Court reviewed a product market definition in relation to the shoe industry.  370 U.S. at 325.  The district court had separately assessed submarkets "men's," "women's," and "children's" shoes, but declined to employ finer "age/sex" distinctions.  *Id.* at 326–27.  Although "a little boy does not wear a little girl's 'black patent leather pump'", or "a male boy cannot wear a growing boy's shoes," *Brown Shoe* held that it was impractical and unwarranted to further divide the shoe market because the antitrust defendants had similar shares in the market regardless of age/sex distinctions of the shoe market.  *Id.* at 327–28.  In other words, it was unnecessary to divide the broader market (e.g., children's shoes) into submarkets despite that it was comprised of largely non-interchangeable sub-products (e.g., infant's, boy's, and girl's shoes).

While *Brown Shoe*'s analysis may apply to this case because Cisco's market share for all Ethernet switches and high-speed Ethernet switches are similar (both appear to be more than 60%, Compl. ¶¶ 45, 48) and it might be unwarranted to further divide the switch market, Arista does not

United States District Court
Northern District of California

1    present this argument.[7]  Therefore, the Court declines to find that the all Ethernet switches market

2    is sufficiently pled.

3         The Court notes that many of the cases cited by Cisco are not applicable here.  The reason

4    is because they inquire whether products outside the defined market are reasonably

5    interchangeable with those inside the market—not whether all products within the market are

6    interchangeable with each other.

7         For example, *Apple, Inc. v. Psystar Corp.* rejected the market consisting of only Apple,

8    Inc.'s operating system ("Mac OS") because the complaint failed to allege facts plausibly

9    supporting that Mac OS was not reasonably interchangeable with other operating systems such as

10   Microsoft Windows.  586 F. Supp. 2d 1190, 1199–1200 (N.D. Cal. 2008).  Similarly, *Manwin*

11   *Licensing Int'l S.A.R.L. v. ICM Registry, LLC* rejected the market definition because the plaintiffs

12   failed to allege their "top level domain"—the three letters in an internet address (e.g., com, net,

13   org)—was not reasonably interchangeable with other top level domains outside the market

14   definition.  No. CV 11-9514, 2012 WL 3962566, at *8 (C.D. Cal. Aug. 14, 2012).  In *Big Bear*

15   *Lodging Ass'n v. Snow Summit, Inc.*, the court held that the plaintiffs' market definition was

16   insufficient because they did not allege there were no goods which were reasonably

17   interchangeable with the products in the defined market.  182 F.3d 1096, 1105 (9th Cir. 1999).

18        In contrast, the Complaint does allege that Ethernet switches are generally not

19   interchangeable with other types of devices.  Specifically, it alleges "there is no adequate

20   substitute technology that provides the same function and value" as Ethernet switches and "routers

21   are complements for Ethernet switches and not substitutes."  Compl. ¶¶ 40, 41.  Thus, the issues

22   raised in the above cases are not present here.

23        In any case, because Arista's argument that there is some interchangeability between high

24   and low speed switches is inconsistent with its Complaint, Cisco's motion to dismiss the claims

25   for insufficiently pleading the all Ethernet switches market is GRANTED with leave to amend.

26

27

28

---

[7] Arista relies on *Brown Shoe* only to argue that a plaintiff may define the relevant product market in terms of both a general market and a submarket.  Opp'n 21.

United States District Court
Northern District of California

### 2. High-Speed Ethernet Switches Market

For the "high-speed Ethernet switches market," Cisco argues that Arista makes conclusory statements and does not sufficiently allege injury in this narrower market. Mot 23–24. The allegations, however, are not conclusory. According to the Complaint, Arista has been selling high-speed Ethernet switches but now faces a "barrier to entry" due to Cisco's reversal of its policy. Compl. ¶¶ 18, 31. For example, "Cisco seeks to claim that those CLI commands are protected by copyright and to prevent Arista from using it." *Id.* ¶ 31. And "Cisco now claims that Arista software's ability simply to understand CLI commands entered by . . . high-speed Ethernet switch customers, infringes its copyright." *Id.* Also, the Complaint alleges that the reversal in policy includes announcing to customers that its CLI commands are not industry standards, locking in customers. *Id.* ¶¶ 63, 89. The injury to Arista is also supported by the allegation that "Cisco has been telling customers that they should not invest in any of Arista's Ethernet switches because such products would soon be pulled off the market" pursuant to the policy change. *Id.* ¶ 92. Accordingly, the Court finds the allegations are sufficient and not conclusory.

Even assuming the purported anticompetitive conduct was largely unsuccessful, Arista's success in growing in the high-speed Ethernet switches market does not necessarily defeat the alleged harm to Arista and the competition. Indeed Arista may have grown to a larger market share if no anticompetitive conduct existed. While Cisco asserts that Arista's growth indicates that Cisco lacks market power, Reply 15, Arista alleges that Cisco has maintained around 66~70% over the past years, Compl. ¶ 17. Construing the allegations most favorable to Arista, the Court finds that Arista has adequately pled that Cisco has monopoly power or there is a dangerous probability of achieving monopoly power. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924–25 (9th Cir. 1980) ("[M]arket shares on the order of 60 [%] to 70 [%] have supported findings of monopoly power.").

Cisco cites two cases, arguing that the allegations of Arista's growth in market share indicate Cisco's lack of market power. Reply 15. These cases, however, are distinguishable from the instant case.[8]

---

[8] The courts in both cases, discussed below, reviewed a summary judgment motion unlike the

First, citing *Rebel Oil Co v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), Cisco argues that "'undisputed evidence indicating that competitors [e.g., Arista] have expanded output in the recent past' shows that the [sic] Cisco lacks the ability to control Arista's output." Reply 15 (first alteration in original). However, *Rebel Oil*'s discussion on the competitors' output refers to their capability to produce or transport gasoline—not the change in market share. 51 F.3d at 1441–42. In fact, *Rebel Oil* distinguishes "expansion" in the market from "output" of products. *See id.* at 1442 (distinguishing acquisition of gasoline stations from output of gasoline). Here, Cisco fails to show why Arista's alleged growth in the market means Arista has the ability to increase production of high-speed Ethernet switches so as to undercut Cisco's ability to control output and prices.

Moreover, *Rebel Oil* held that the competitors' capacity to increase output indicated a lack of the defendant's market power *in the context of a predatory pricing scheme* for a "highly elastic" product—supply of gasoline. *Id.* at 1141–43. In contrast, Arista does not allege such a claim or product. The Court notes that Arista's increase in market share does not necessarily mean Cisco has no market power. The increase in market share could have occurred—despite that Cisco has market power—because the overall size of the high-speed Ethernet switches market is growing, *see* Compl. ¶ 47.

Second, *Inter-Cty. Title Co. v. Data Trace Info. Servs.*, LLC, 105 F. App'x 136, 137 (9th Cir. 2004) is also distinguishable. The court dismissed the monopolization claim on the basis that the plaintiff's business increased in the recent past while the plaintiff failed to supply evidence of a barrier to entry. *Id.* Unlike *Inter-Cty. Title*, here Arista alleges in detail how Cisco's reversal in its CLI policy creates a barrier to entry by locking in customers who relied on Cisco's prior representation. Compl. ¶¶ 61–65. Therefore, *Inter-Cty. Title* does not foreclose that Arista sufficiently alleges Cisco has market power.

Contrary to Cisco's contention, Mot. 24, the Complaint need not identify specific products that fall into the Relevant Product Markets to survive a motion to dismiss, *Iqbal*, 556 U.S. at 678 (holding Rule 8 does not require "detailed factual allegations"). The Complaint is sufficient situation in this case.

because it alleges Ethernet switches that use CLI commands have been subject to the purported anticompetitive conduct.

Accordingly, Cisco's motion to dismiss the claims for insufficiently pleading the high-speed Ethernet switches market is DENIED.

### 3. Global Market

Cisco argues that Arista's claims relating to the global market cannot stand.  Mot. 8 n.5. This argument is premised on Cisco's contention that the Complaint failed to plead antitrust injury in the domestic market.  *Id.*  Because the Court has concluded that the Complaint alleges Arista plausibly suffered antitrust injury before the ITC orders went into effect, the Court rejects this argument and finds that it sufficiently pleads a global market.  *See Gatan, Inc. v. Nion Co.*, No. 15-CV-01862, 2017 WL 3478837, at *4 (N.D. Cal. Aug. 14, 2017) (denying a motion to dismiss where counter-complainant alleged a global market based on anti-competitive conduct in the United States).

Cisco's motion to dismiss the claims for insufficiently pleading the global geographic market is DENIED.

### E.   UCL Claim

Arista's UCL claim based on "unlawful" and "unfair" conduct rises and falls with its antitrust claims.  *See DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1146–47 (N.D. Cal. 2010); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (Cal. Ct. Appl. 2001).  The UCL claim survives this motion to dismiss because it is based on all antitrust claims, some of which are not being dismissed.  As Arista has been given leave to amend its antitrust claims, it shall also have the opportunity to amend the UCL claim to make it consistent with the antitrust claims as necessary.

## IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDRED that:

1. Cisco's motion to dismiss is GRANTED as to the claims based on the alleged practice of bundling SMARTnet renewals;

2. Cisco's motion to dismiss is GRANTED as to the claims based on the all Ethernet

United States District Court
Northern District of California

switches market; and

3. Cisco's motion to dismiss is DENIED as to the claims based on other Cisco's alleged conduct, including the purported reversal of its CLI policy.

Arista may amend its complaint to cure the deficiencies only as to the dismissed claims **within twenty-one (21) days** of the date of this order.  Such an amendment is allowed.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.2008) (holding that a court granting a motion to dismiss should permit leave to amend unless it would be clearly futile).

**IT IS SO ORDERED.**

Dated: October 10, 2017

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California