MATTHEW D. POWERS (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
WILLIAM NELSON (Bar No. 196091)
william.nelson@tensegritylawgroup.com
ROBERT GERRITY (Bar No. 268084)
robert.gerrity@tensegritylawgroup.com
NATASHA SAPUTO (Bar No. 291151)
natasha.saputo@tensegritylawgroup.com
SAMANTHA JAMESON (Bar No. 296411)
samantha.jameson@tensegritylawgroup.com
JENNIFER ROBINSON (Bar No. 270954)
jen.robinson@tensegritylawgroup.com
WANLI CHEN (Bar No. 300254)
wanli.chen@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:  (650) 802-6000
Fax:  (650) 802-6001

Attorneys for Plaintiff
ARISTA NETWORKS, INC.

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ARISTA NETWORKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CISCO SYSTEMS, INC., <br><br> Defendant. | Case No. 5:16-CV-00923-BLF <br><br> **ARISTA NETWORKS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF CISCO SYSTEMS, INC.'S MONOPOLY POWER IN THE RELEVANT MARKETS** <br><br> Date:  April 19, 2018 <br> Time    9:00 A.M. <br> Judge: Hon. Beth Labson Freeman <br> Dept:  Courtroom 3 <br><br> Trial Date:  August 6, 2018 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT.......................................................................................................... 1

    A.    Summary Judgment That Arista Established Four Relevant Markets
Should Be Entered ........................................................................................ 1

        1.    Dr. Scott Morton Used the Accepted HMT to Define the Relevant
Markets ............................................................................................ 2

        2.    Cisco is Incorrect That a Showing of Interchangeability is
Required Separate From Addressing Cross-Elasticity of Demand
Through the HMT ............................................................................ 5

        3.    Cisco is Incorrect That the Relevant Market Must be the "Smallest
Possible Market," an Approach That Would Make Including
Submarkets Impossible.................................................................... 7

        4.    Dr. Scott Morton Did Consider Supply-Side Cross-Elasticity ............... 10

    B.    Summary Judgment That Cisco Has Monopoly Power in the Relevant
Markets Should Be Entered.......................................................................... 11

CONCLUSION........................................................................................................ 15

1

# TABLE OF AUTHORITIES

2

3
**Cases**

4
*Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns,*
   108 F.3d 1147 (9th Cir. 1997) ................................................................15

5

6
*Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.,*
   289 F.3d 589 (9th Cir. 2002) ..............................................................2, 5

7
*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) ........................................................................3, 5, 9

8

9
*Calnetics Corp. v. Volkswagen of Am., Inc.,*
   532 F.2d 674 (9th Cir. 1976) ................................................................11

10
*Colsa Corp. v. Martin Marietta Servs., Inc.,*
   133 F.3d 853 (11th Cir. 1998) ................................................................6

11

12
*Eagle v. Star-Kist Foods, Inc.,*
   812 F.2d 538 (9th Cir. 1987) ..................................................................7

13
*Forsyth v. Humana, Inc.,*
   114 F.3d 1467 (9th Cir. 1997) ................................................................9

14

15
*FTC v. Sysco Corp.,*
   113 F. Supp. 3d 1 (D.C. 2015) ................................................................2

16
*FTC v. Univ. Health, Inc.,*
   938 F.2d 1206 (11th Cir. 1991) ............................................................10

17
*Gen. Bus. Sys. v. N. Am. Philips Corp.,*
   699 F.2d 965 (9th Cir. 1983) ..................................................................8

18

19
*Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.,*
   397 F.3d 1217 (9th Cir. 2004) ..............................................................14

20
*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
   125 F.3d 1195 (9th Cir. 1997) ........................................................11, 12

21

22
*In re Se. Milk Antitrust Litig.,*
   739 F.3d 262 (6th Cir. 2014) ..................................................................2

23
*Kaplan v. Burroughs Corp.,*
   611 F.2d 286 (9th Cir. 1979) ..................................................................8

24

25
*Ky. Speedway, LLC v. NASCAR, Inc.,*
   588 F.3d 908 (6th Cir. 2009) ..................................................................6

26
*Menasha Corp. v. News America Marketing In-Store, Inc.*
   354 F.3d 661 (7th Cir. 2004) ..............................................................4, 8

27
*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
   924 F.2d 1484 (9th Cir. 1991) ................................................................6

28

*Newcal Indus., Inc. v. IKON Office Sol.,*
   513 F.3d 1038 (9th Cir. 2008) ....................................................................... 3, 9

*Olin Corp. v. FTC,*
   986, F.2d 1295 (9th Cir. 1993) .................................................................. 1, 5, 8

*Rebel Oil Co. v. Atl. Richfield Co.,*
   51 F.3d 1421 (9th Cir. 1995) ............................................................................. 8

*Safeway Inc. v. Abbott Labs.,*
   761 F. Supp. 2d 874 (N.D. Cal. 2011) ............................................................ 13

*SmithKline Beecham Corp. v. Abbott Labs.,*
   No. C 07-5702 CW, 2014 U.S. Dist. LEXIS 164367 (N.D. Cal. Nov. 24, 2014) ................... 12

*Theme Promotions, Inc. v. News Am. Mktg. FSI,*
   546 F.3d 991 (9th Cir. 2008) ................................................................... 2, 5, 6

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
   875 F.2d 1369 (9th Cir. 1989) ........................................................................... 8

*Times-Picayune Publ'g Co. v. United States,*
   345 U.S. 594 (1953) ..................................................................................... 8, 10

*TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.,*
   No. CV-09-1531-PHX-JAT, 2012 U.S. Dist. LEXIS 58228 (D. Ariz. Apr. 25, 2012) ........... 12

*United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA,*
   No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 182940 (N.D. Cal. Nov. 3, 2017) ........ 2, 5, 8

*United States v. Syufy Enters.,*
   903 F.2d 659 (9th Cir. 1990) ........................................................................... 12

Cisco's Opposition fails to establish any genuine issue of fact to prevent entry of partial summary judgment of Cisco's monopoly power in four relevant antitrust markets. As to the relevant market definitions, Cisco's primary arguments are that Arista has not shown interchangeability and that its market definitions are too broad. However, Cisco ignores that analysis of cross-elasticity of demand through the HMT addresses interchangeability and Cisco cites to no case finding a ***plaintiff's*** relevant market definition to be too broad. *Olin* is the only case Cisco cites that even addresses that issue, but it ***supports*** granting of Arista's Motion because the Ninth Circuit in *Olin* affirmed the FTC's market definitions including both an overall market and an overlapping submarket based on application of the same HMT / SSNIP analysis used by Arista's expert Dr. Scott Morton. As to Cisco's market power, Cisco's Opposition fails to overcome the undisputed evidence and expert testimony establishing Cisco's monopoly power in the relevant markets. For these reasons, and as further explained below, judgment should be granted in Arista's favor and Cisco certainly has not established that judgment should be granted against Arista as Cisco seeks in its Motion and Opposition.

**ARGUMENT**

**A.      Summary Judgment That Arista Established Four Relevant Markets Should Be Entered**

Cisco's Opposition does not dispute that defining the relevant markets is a highly technical economic question requiring expert testimony, as demonstrated in Arista's Brief. D.I. 210-8 ("Mot.") at 1-2; D.I. 235-4 ("Opp.") at 6-15. Cisco also does not dispute that its economics expert, Dr. Carlton, proposed no alternative market definitions and offered no opinions or analysis disputing Dr. Scott Morton's definitions. *See* Opp. at 6-15 (identifying no citations to Dr. Carlton); *see also* Mot. at 3-4, 8. Indeed, Cisco's expert used Dr. Scott Morton's same relevant market definitions in his report to evaluate Cisco's market power and the competitive effects of Cisco's conduct. **Ex. 1** (Carlton Rpt., D.I. 210-9), ¶¶ 41-43, 95, 100. Nor does Cisco raise any objection to defining the geographic scope of the relevant markets to be the United States and the world. Opp. at 6-15.

Instead, Cisco's Opposition disputes only the sufficiency of Arista's evidence regarding the relevant product market definitions. Thus if the Court finds that there is no genuine dispute that Arista's evidence, including Dr. Scott Morton's analyses, is sufficient to meet Arista's burden, then Cisco does not dispute that it lacks the required expert economic analysis to dispute Arista's definitions and Arista's

Motion should be granted as to the relevant market definitions. Because Dr. Scott Morton properly applied an accepted methodology for defining antitrust markets and Cisco's Opposition is based solely on attorney arguments, which "'are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment.'" (*Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002)),[1] Arista's Motion should be granted.

### 1. Dr. Scott Morton Used the Accepted HMT to Define the Relevant Markets

The Ninth Circuit and this district hold that the Hypothetical Monopolist Test ("HMT")—that is, the analysis of whether a hypothetical monopolist in the proposed market could profitably impose a small but significant and nontransitory increase in price ("SSNIP")—is an accepted and appropriate methodology for economic experts to define the relevant markets in antitrust cases. Mot. at 6-8; *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1001-03 (9th Cir. 2008); *United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA,* No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 182940, at *79-81 (N.D. Cal. Nov. 3, 2017); *see also In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277-78, 281-82 (6th Cir. 2014) ("the hypothetical monopolist is 'a useful framework for organizing the factors the courts have applied in geographic market definition.'"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 33-34 (D.C. 2015) (HMT is "[o]ne of the primary methods used by economists to determine a product market"). Dr. Scott Morton performed exactly this SSNIP analysis in determining the four relevant markets in this case (**Ex. 14** (Scott Morton Rpt., D.I. 210-21), ¶¶ 77-94),[2] and Cisco's expert does not dispute her analysis of the relevant markets (Mot. at 3-4, 8).

Dr. Scott Morton analyzed the parties' pricing and sales data, as well as third-party market reports and other evidence about the Ethernet switch market, and applied the HMT in accordance with the current (2010) DOJ and FTC Horizontal Merger Guidelines ("2010 Guidelines"). **Ex. 14** (Scott Morton Rpt.), ¶¶ 77-94; **Ex. 15** (2010 Guidelines, D.I. 214-4) at 8-10. For the baseline price to evaluate the SSNIP, Dr. Scott Morton: applied the test against current prices; explained why that was appropriate

---

[1] Emphasis supplied and citations and quotations omitted throughout unless otherwise noted.

[2] Cisco asserts Dr. Scott Morton's report is "an unsworn hearsay statement that cannot by itself support summary judgment." Opp. at 9. Arista submits with this brief a sworn declaration by Dr. Scott Morton confirming the truthfulness of her expert report (**Ex. 14**) and her ability to testify to the opinions therein at trial.

and conservative; and explained how she avoided "the cellophane fallacy" that can arise when using the HMT in monopolization cases rather than merger cases (namely, that there is a risk that there may already exist a monopolist charging an above-competitive price). **Ex. 14** (Scott Morton Rpt.), ¶¶ 77-79.

As Dr. Scott Morton noted, the HMT allows multiple relevant markets to be defined, including submarkets, as both the 2010 Guidelines, the Supreme Court, and the Ninth Circuit have all recognized. *Id.*, ¶ 80; **Ex. 15** (2010 Guidelines) at 9-10 ("The hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market. . . . the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("However, ***within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets*** for antitrust purposes."); *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Dr. Scott Morton determined that the facts of this case support defining two product markets and two geographic markets to evaluate the effects of Cisco's conduct. **Ex. 14** (Scott Morton Rpt.), ¶¶ 81-94.

Specifically, Dr. Scott Morton concluded that the HMT was satisfied for the market for all Ethernet switches and for the submarket of high-speed Ethernet switches (those with speed equal to or greater than 10Gb), and that the HMT was satisfied in both the U.S. and world-wide geographic markets. *Id.* For the market for all Ethernet switches, Dr. Scott Morton analyzed the market and concluded that there were no substitutes that could take the place of Ethernet switches in the business-critical roles where customers use those switches (that is, that cloud datacenter companies and other switch customers could not use anything other than an Ethernet switch to provide the necessary network functionalities). *Id.*, ¶¶ 82-84. Dr. Scott Morton also determined that prices in the Ethernet switch market have fallen in the last five years due in part to increased competition in the market, including from Arista. *Id.* ¶¶ 84, 57-62. Based on these analyses, she concluded that a hypothetical monopolist in the Ethernet switch market—that is, a firm that did not face the increased competition existing in the real world that drove down prices over the past 5 years—would find it profitable to raise the price of Ethernet switches by at least 5% over current prices, satisfying the HMT. *Id.*, ¶¶ 84-85. Similarly, Dr. Scott Morton analyzed the market for high-speed (≥10Gb) Ethernet switches and determined that although a lower-speed switch may be an economical substitute for a high-speed switch for some customers, the evidence in this case

shows that lower-speed switches would not be sufficiently acceptable substitutes to enough customers in the high-speed switch market to defeat a monopolist's SSNIP. *Id.*, ¶¶ 86-89. Again, she found that the parties' sales and pricing data (and third-party market report data) confirmed that the high-speed Ethernet switch market also satisfies the HMT because high-speed switch sales are growing in spite of a price premium relative to lower-speed switches, and that the price differential between Cisco and Arista high-speed switches has decreased over the last 5 years as Arista's presence in the market has increased—concluding again that a hypothetical monopolist in the high-speed market (one not faced with that increased competition from Arista) would find it profitable to raise prices by a small but significant amount over current prices. *Id.*, ¶¶ 88-89. Dr. Scott Morton found the HMT satisfied for these product markets in both the U.S. and world-wide geographic markets. *Id.*, ¶¶ 90-94.

Cisco's assertion that "Dr. Scott Morton never actually applies the hypothetical monopolist test or performs a SSNIP analysis" (Opp. at 11) simply cannot be squared with the analysis summarized above. Nor did Cisco question Dr. Scott Morton about her HMT analysis at her deposition. Dr. Scott Morton's detailed economic analysis bears no resemblance to the facts of the case on which Cisco relies in *Menasha Corp. v. News America Marketing In-Store, Inc.* 354 F.3d 661 (7th Cir. 2004). Opp. at 11. There, the plaintiff "introduced no econometric evidence of any kind" to support its assertion that the relevant market should be narrowly limited to the market for coupon dispensers attached to store shelves, excluding any and all other forms of coupons and advertising (including other forms of in-store advertising). *Menasha* 354 F.3d at 663-66. Instead, the plaintiff offered a survey by "a journalist who asked friends and acquaintances whether they liked at-shelf coupons better than other kinds of coupons." *Id.* at 664. The district court rejected that survey as unscientific. *Id.*

In this case Cisco's own expert economist Dr. Carlton does not dispute Dr. Scott Morton's HMT analyses, and, in fact, he used her same relevant market definitions throughout his report to analyze Cisco's market power and the effects of Cisco's conduct on competition. **Ex. 1** (Carlton Rpt.), ¶ 41 ("█████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████"); *see also id.*, ¶¶ 42-43, 95, 100. Although Cisco attacks the sufficiency of Dr. Scott Morton's analysis in its Opposition, Cisco's criticisms are based solely on lay attorney argument, not on any economic analysis by any expert (let

1    alone any analysis that the HMT supports adoption of some alternative relevant market definition). Opp.

2    at 6-15. Nor did Cisco raise any of these arguments in its *Daubert* motion. *See* D.I. 208-4. Not only is

3    this attorney argument incorrect, but "the arguments and statements of counsel 'are not evidence and do

4    not create issues of material fact capable of defeating an otherwise valid motion for summary

5    judgment.'" *Barcamerica*, 289 F.3d at 593 n.4.

### 2.    Cisco is Incorrect That a Showing of Interchangeability is Required Separate From Addressing Cross-Elasticity of Demand Through the HMT

8          Cisco's Opposition argues that Dr. Scott Morton's HMT relevant market analysis is insufficient

9    because she purportedly does not show that ***all*** switches in each of the relevant markets are "reasonably

10   interchangeable" and because the evidence purportedly shows that some switches are not

11   interchangeable for some customers. Opp. at i, 6-14. No case requires such a showing. Every single case

12   cited by Cisco as identifying "reasonable interchangeability" as a factor that can be considered in

13   defining the relevant market follows that discussion by identifying "cross-elasticity of demand" as a

14   way to address interchangeability. *Id.* at 6-14; *see, e.g.*, *Olin Corp. v. FTC*, 986, F.2d 1295, 1298 (9th

15   Cir. 1993) (affirming the FTC's market definition and stating "The outer boundaries of a product market

16   are determined by the reasonable interchangeability of use ***or the cross-elasticity of demand*** between

17   the product itself and substitutes for it." (quoting *Brown Shoe*, 370 U.S. at 325)).

18         As the Ninth Circuit explains, the HMT / SSNIP analysis evaluates cross-elasticity of demand:

19   > Determining the relevant market can involve a complicated economic analysis, including
20   > concepts like ***cross-elasticity of demand, and "small but significant nontransitory increase in
     > price" ("SSNIP") analysis***. Cross-elasticity of demand measures the percentage change in
21   > quantity that consumers will demand of one product in response to a percentage change in the
     > price of another. . . .

22   > ***Similarly, a SSNIP analysis asks whether a monopolist in the proposed market could profitably
     > impose a small but significant and nontransitory price increase***. If a significant number of
23   > customers would respond to a SSNIP by purchasing substitute products, the SSNIP would not be
24   > profitable for the hypothetical monopolist.

25   *Theme Promotions*, 546 F.3d at 1002. This district has similarly explained that the HMT analyzes cross-

26   elasticity of demand. *United Food*, 2017 U.S. Dist. LEXIS 182940 at *79-81 & n. 26. Because Dr. Scott

27   Morton performed a SSNIP analysis and found the HMT satisfied for her market definitions, she

28   established sufficient cross-elasticity of demand and need not separately establish additional

interchangeability—let alone interchangeability of all products within the markets, as Cisco suggests.

Notably, as the Ninth Circuit explained in *Theme Promotions*, if the HMT / SSNIP analysis is **not** satisfied for a particular market definition, then the solution is that the definition "should be **expanded** to include those substitute products that constrain the monopolist's pricing." 546 F.3d at 1002. However, neither Cisco's Opposition nor its expert identify even a single purported substitute excluded from **any** of Dr. Scott Morton's four relevant market definitions that those definitions should be expanded to include. *See* Opp. at 6-15. That Cisco cannot identify any such missing substitute product further affirms the absence of a genuine dispute of fact as to the market definitions.

Cisco's Opp. also incorrectly argues that lay witness testimony can contradict or undermine Dr. Scott Morton's market definitions and HMT analysis. *See* Opp. at 6-14. Consistent with the Ninth Circuit's view that defining the relevant market is a "highly technical economic" exercise (*see Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991)), multiple courts have rejected the use of lay testimony to define the relevant markets. *Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998) ("construction of a relevant economic market or a showing of monopoly power in that market cannot . . . be based upon lay opinion testimony.") The Sixth Circuit found that "what [the party] proposes to use in place of expert testimony – namely lay testimony and internal documents – does not provide a sound economic basis for assessing the [relevant] market." *Ky. Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009); *see also* **Ex. 15** (2010 Guidelines) at 4 ("Relevant antitrust markets defined according to the [HMT] are not always intuitive and may not align with how industry members use the term 'market.'").

Even if a showing of some interchangeability for some customers among the relevant markets were required in addition to evaluation of cross-elasticity of demand through the HMT, Cisco's Opposition is also incorrect that Arista has no admissible evidence of interchangeability. *See* Opp. at 8. Dr. Scott Morton considered and identified evidence from both Cisco and Arista confirming the interchangeability of high- and low-speed switches in campus and datacenter environments. **Ex. 14** (Scott Morton Rpt.), ¶¶ 86-87 (at, *e.g.*, footnotes 152-153). Cisco Principal System Engineer and 30(b)(6) designee Cesar Obediente testified that

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████ Cisco's Senior VP of Data Center Sales

3 and another 30(b)(6) designee Frank Palumbo similarly testified that ████████████

4 ███████████████████████████████████████████████████

5 ████████████████████████████████████████████████.

6 **Ex. 20** (Palumbo 11/03/2017 30(b)(6) Dep. Tr.) at 30:11-22, 240:2-15. Arista's Senior Vice President

7 for Global Operations & Marketing Mark Foss testified that ███████████████████

8 ███████████████████████████████████████████████████

9 ██████████████████████████████████████. **Ex. 21** (Foss 10/23/2017 Dep. Tr.)

10 at 63:8-64:8; *see also* Cisco **Ex. K** (D.I. 235-11, 11/07/2017 Dep. Tr. of Arista Chief Customer Officer

11 Anshul Sadana)) at 287:6-290:20 (similarly ███████████████████████████████

12 █████████████████████████████). Because Cisco's Opposition identifies zero evidence

13 rebutting this showing or otherwise establishing an absence of interchangeability, Cisco failed to

14 establish a genuine dispute even if interchangeability were required.

15 Cisco's argument that Arista purportedly competes in a market narrower than either of the

16 defined product markets is similarly a legally irrelevant red herring. Opp. at 8-9. Cisco cites only a single

17 case for this proposition—*Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538 (9th Cir. 1987). However, that

18 case does not address how to define a relevant market—rather, it holds that fishermen who had no

19 authority to negotiate the sale price of the fish sold by their employer vessel owners to third party fish

20 canneries did not have standing to sue the canneries for antitrust violations. *Id.* at 540-41 (affirming

21 district court holding "that the crewmembers were neither consumers nor competitors in the relevant

22 market because they did not directly sell or purchase the tuna. Instead, they were employees of the vessel

23 owners who negotiated and set the prices for the fish."). There is no dispute—and certainly no evidence

24 to the contrary identified in Cisco's Opposition—that Arista is a competitor in all of the defined relevant

25 markets. Arista indisputably sells Ethernet switches in the U.S. and the world, including Ethernet

26 switches with speeds $\geq$10Gb, and so Arista competes directly in both the overall and high-speed Ethernet

27 switch markets. **Ex. 14** (Scott Morton Rpt.) at, *e.g.*, ¶ 44; *see also id.*, ¶¶ 45-63, 227-42.

28       **3.**       **Cisco is Incorrect That the Relevant Market Must be the "Smallest Possible Market," an Approach That Would Make Including Submarkets Impossible**

Cisco's argues that Dr. Scott Morton's relevant product markets are too broad (Opp. at 11-12), but does not cite even a single case rejecting a plaintiff's relevant market definition as too broad. *See* Opp. at 6-15.[3] This is unsurprising, because the overbreadth caselaw cited by Cisco is intended to prevent **defendants** from artificially expanding the market definition to undermine a plaintiff's ability to prove market power. And in the other cases cited by Cisco that find a plaintiff's market **too narrow**, those defendants identified reasonable substitutes that the plaintiff's markets excluded.  Here, neither Cisco nor its expert identify any substitute products purportedly excluded from Arista's markets.

Only *Olin* even addresses the question of an antitrust defendant challenging a plaintiff's (in *Olin*, the FTC's) relevant market definition as too broad. Cisco cites to *Olin* no fewer than eight times in as many pages (Opp. at 6-13), but its reliance is misplaced. In *Olin*, the Ninth Circuit actually affirmed the FTC's relevant market definitions even though the FTC defined two relevant markets, one contained as a submarket within the other (analogous to Arista's definition here of a high-speed submarket and the overall Ethernet switch market). 986 F.2d at 1301. The FTC supported its definitions with the same HMT / SSNIP test used by Dr. Scott Morton in this case:

> The parties have further stipulated that one relevant United States product market consists solely of ISOS (the "ISOS-only" market). The Commission also identified over Olin's objection a second relevant United States product market, one comprised of both ISOS and CAL/HYPO (the "dry sanitizers" market). . . .

> Recognizing that the convenience of [ISOS] is reflected in a price premium that [ISOS] maintain over [CAL/HYPO], the Commission then analyzed whether this premium is sufficient to prevent inclusion of ISOS and CAL/HYPO in the same market. Ultimately, the Commission concluded that after the price spread between [CAL/HYPO] and [ISOS] narrowed, ***Olin could not profitably impose a small but significant and nontransitory increase in the price*** of [CAL/HYPO] because of the danger that consumers would then switch to [ISOS]. ***Given this indication of cross-elasticity of demand, the Commission concluded that ISOS and CAL/HYPO together compose a relevant product market*** (i.e., the dry sanitizers market).

*Id*. at 1297, 1300-01. The Ninth Circuit explained that "Recognizing ISOS as a submarket of the dry sanitizers market is not inherently contradictory with recognizing a dry sanitizers market [that includes

---

[3] Cisco's cited *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611-13 (1953); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995); *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989); *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 972 (9th Cir. 1983); *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 293-94 (9th Cir. 1979); and *Menasha* 354 F.3d at 663-66 cases all concern challenges to a plaintiff's relevant market definitions as **too narrow**. Cisco's cited *United Food* case granted SJ in the plaintiff's favor, rejecting the **defendant's** overly broad proposed relevant market because the defendant failed to support its definition with any expert SSNIP analysis or other evidence of sufficient cross-elasticity of demand. 2017 U.S. Dist. LEXIS 182940, at *84-90.

both compounds]" and that "a finding of cross-elasticity between ISOS and CAL/HYPO is not precluded by the fact that a higher price increase is necessary to induce a switch; a higher increase indicates only that the relationship between the two products is somewhat inelastic – but not necessarily so inelastic as to exclude the products from the same market . . . ." *Id*. at 1301-02.

Cisco's argument that a plaintiff must define the smallest possible relevant market is thus directly contrary to the *Olin* holding on which Cisco itself relies. It is similarly contrary to both Ninth Circuit and Supreme Court case law expressly recognizing that a relevant market can include recognizable submarkets. *Brown Shoe*, 370 U.S. at 325 ("***[W]ithin this broad market, well-defined submarkets may exist which, in themselves, constitute product markets*** for antitrust purposes."); *Newcal*, 513 F.3d at 1045 (citing *Brown Shoe*). Indeed Cisco's argument is further undermined by the same Merger Guidelines commentary (Cisco **Ex. V**, D.I. 236-23) on which Cisco also relies. That commentary, which purports to require "identifying the ***narrowest*** possible market and then broadening it by iteratively adding the next-best substitutes" (Opp. at 11, emphasis Cisco's), is commentary on the 1997 revisions to the 1992 Merger Guidelines that were replaced by the 2010 Guidelines, and that old commentary was not carried over as applicable to the new guidelines. **Ex. 22** (FTC press release explaining that the 2006 commentary refers to the 1997 Guidelines); **Ex. 23** (DOJ press release explaining that the 2010 Guidelines "Provide an updated explanation of the [HMT] used to define relevant antitrust markets and how the agencies implement that test in practice."). The 2010 guidelines are consistent with *Olin*, *Newcal* and other cases recognizing that a submarket and an overall market can both be relevant antitrust markets. **Ex. 15** at, *e.g.*, 9-10 ("The [HMT] ensures that markets are not defined too narrowly, but ***does not lead to a single relevant market***," noting "***the overarching principle*** that the purpose of defining the market and measuring market shares is ***to illuminate the evaluation of competitive effects***.").

As another example, the Ninth Circuit and other circuits have sustained relevant markets for "acute care services" (*i.e.* emergency surgical procedures) in hospitals, despite the fact there is clearly no interchangeability or cross-elasticity of demand among patients between, *e.g.*, an emergency appendectomy and open heart surgery (a patient in need of one procedure would never substitute for the other regardless of price). *See, e.g.*, *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997) (finding "niche" players offering limited acute care services may be part of the broader market). *See*

*also FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1210-11 n.11 (11th Cir. 1991) (finding that "we will treat the provision of acute-care services in general as the relevant product market.").

Thus, neither Cisco's reliance on cases rejecting defendants' narrow market definitions that exclude reasonable substitute products, nor Cisco's unsupported assertions that the relevant market must be the smallest possible market satisfying the HMT, suffice to establish a genuine dispute here.

### 4.    Dr. Scott Morton Did Consider Supply-Side Cross-Elasticity

Cisco's last argument in Opposition with respect to the market definitions is that Dr. Scott Morton purportedly "failed to conduct any analysis of elasticity of supply in either alleged market." Opp. at 14. Not so. Dr. Scott Morton analyzed a host of evidence regarding the supply-side of the relevant markets—namely, the ability of Ethernet switch competitors to enter the market or expand their capacity in a manner that might undermine a hypothetical monopolist's ability to profitably enact an SSNIP in the relevant markets. *See, e.g.*, **Ex. 14** (Scott Morton Rpt.), ¶¶ 39-56, 95-107.

For example, Dr. Scott Morton concluded there are high barriers to entry and expansion of competitors (*i.e.*, suppliers) in both the overall Ethernet switch market and the high-speed market. *Id.*, ¶¶ 101-106. Dr. Scott Morton also concluded that Cisco has maintained a long term price premium relative to its competitors for more than a decade in both markets (*id.*, ¶ 107, Figs. 23-24) but that in spite of this price premium, Cisco has also maintained very high market share over the same period (*id.*, ¶¶ 95-100) and that no competitor other than Arista was able to reach a double-digit annual market share of even 10% (*id.*, ¶¶ 39-56). That Cisco maintained both a price premium and dominant market share in Dr. Scott Morton's relevant markets for such a long period of time (including against well-financed competitors like HP and Dell) is strong evidence that neither entry of new competitors nor expansion of existing competitors would undermine a hypothetical monopolist's ability to profitably enact a SSNIP. As Dr. Scott Morton found, this phenomenon persisted for so long that industry analysts developed a nickname for the Ethernet switch market: "Cisco and the seven dwarfs," due to Cisco's long-time dominance and the much smaller market shares of all other competitors. *Id.*, ¶ 105. As the Supreme Court observed, conduct of a dominant firm can be especially troubling where no competitors approach the share of the dominant firm. *Times-Picayune*, 345 U.S. at 612-13 n.33 ("And, obviously, if a producer controlling an even lesser share than here is ringed by numerous smaller satellites together accounting for

the rest, his mastery of the market is greater than were he facing fierce rivalry of other large sellers.").

Nor does Cisco's Opposition identify any contrary supply-side evidence that would undermine Dr. Scott Morton's HMT analysis or otherwise establish a genuine dispute of fact as to this issue. *See* Opp. at 14. This stands in stark contrast to the *Rebel Oil* and *Calnetics* cases relied on by Cisco—in those cases, the defendant offered supply-side evidence to support a broader definition, something neither Cisco nor its experts have done here. *See Rebel Oil*, 51 F.3d at 1436 (market of only self-service gasoline stations failed to account for the supply-side substitutability of full-service stations); *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 691 (9th Cir. 1976) (market "not reflective of the sales opportunities of independent manufacturers of automobile air conditioning equipment").

Because only Arista has offered proper expert analysis applying a valid economic test to assess the relevant markets and there is no genuine issue on the relevant geographic markets, the Court should grant Arista's motion on the definition of the relevant markets. For the same reasons given above, the Court should deny Cisco's request to grant SJ against Arista as to the definition of relevant markets.

**B.  Summary Judgment That Cisco Has Monopoly Power in the Relevant Markets Should Be Entered**

Cisco's opposition to Arista's motion for summary judgment that Cisco has monopoly power in the relevant markets is predicated on Cisco's insistence that it cannot be found to be a monopolist – even in markets where its share remained at 65% or higher throughout the period of the anticompetitive conduct, and its own expert failed to dispute Cisco's market power – solely because that market share also declined during the same period. That argument is meritless.

As Cisco admits, monopoly power "can be proven by either direct or circumstantial evidence." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). "To demonstrate market power by circumstantial evidence, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry or expansion and show that existing competitors lack the capacity to increase their output in the short run." *Id.* The evidence here, backed by unrebutted expert analysis, demonstrates Cisco's market power through circumstantial evidence.

First, Cisco does not dispute that its share of the U.S. "all Ethernet switch" market exceeded 65% through the end of 2016, the period of Cisco's anticompetitive conduct analyzed by Dr. Scott Morton –

1  the period that Cisco concedes is the "relevant time period for demonstrated monopoly power." Opp. at

2  18; *see* Mot. at 10 (Cisco's market share ranging from 76.8% in 2008 to 68.7% in 2016). Nor does Cisco

3  dispute that a market share of 65% establishes a *prima facie* case of monopoly power and is sufficient

4  to show that the defendant owns a dominant share of the market. *Image Tech.*, 125 F.3d at 1206.

5      Instead, Cisco relies on *United States v. Syufy Enters.*, 903 F.2d 659, 666 (9th Cir. 1990), to

6  contend that, despite the *prima facie* showing of Cisco's monopoly power in this market, and despite

7  the failure of its expert to disagree with the conclusion of Arista's expert that "[Cisco's market] shares

8  and the durability of these shares are consistent with Cisco possessing substantial market power,"

9  summary judgment is improper because Cisco's market share in this market declined (although

10  remaining above 65%) during the conduct period. Opp. at 18-19.

11     Cisco's reliance on *Syufy* is misplaced, and there is no merit to its suggestion that its market

12  share of 65% (as opposed to 76.8%) prevents entry of summary judgment of monopoly power in the

13  U.S. Ethernet switch market. In *Syufy,* the Ninth Circuit upheld the district court's finding that the

14  defendant, an owner of movie theaters, had not violated the antitrust laws by acquiring competitors'

15  theaters, where the defendant's market share had declined from 91% to 39% over the course of three

16  years. *Syufy*, 903 F.2d at 666. There has been no such precipitous decline in Cisco's share of the U.S.

17  Ethernet switch market or any other relevant market. More fundamentally, *Syufy* concerned a market in

18  which the plaintiff conceded that "there are no structural barriers to entry," such as "onerous front-end

19  investments that might deter competition from all but the hardiest and most financially secure investors."

20  *Id.* at 666-67. Subsequent decisions have consistently distinguished *Syufy* on this basis, limiting its

21  holding to markets where no meaningful barriers to entry exist. *See, e.g., SmithKline Beecham Corp. v.

22  Abbott Labs.,* No. C 07-5702 CW, 2014 U.S. Dist. LEXIS 164367, at *11-13 (N.D. Cal. Nov. 24, 2014)

23  (*"Syufy* is, at least in part, distinguishable from the instant case because there were no substantial barriers

24  to entry in that case. In this case, [plaintiff] presented evidence of significant barriers to entry"); *TriQuint

25  Semiconductor, Inc. v. Avago Techs. Ltd.,* No. CV-09-1531-PHX-JAT, 2012 U.S. Dist. LEXIS 58228,

26  at *14-17 (D. Ariz. Apr. 25, 2012) ("[T]he proposed markets are not the type in which it is possible for

27  a new competitor to unexpectedly emerge and very rapidly gain a dominant market share within two

28  years, as was the case in *Syufy*."). *Safeway Inc. v. Abbott Labs.,* 761 F. Supp. 2d 874, 890 (N.D. Cal.

1   2011) ("The market in *Syufy*, however, had no substantial barriers to entry.")

2        Here, there is substantial, unrebutted evidence of significant barriers to entry and expansion in

3   the relevant markets. As discussed in Arista's motion (Mot. at 10-15), this evidence includes: the

4   installed base of Cisco switches, which ███████████████████████████████████████████████

5   ███, and an entrenched preference for a Cisco-like CLI—a preference that Cisco's own witnesses have

6   described as ██████████████ to competitors' ability to make sales against Cisco; a required capital

7   investment numbering in the hundreds of millions of dollars; substantial switching costs associated with

8   incorporating a new competitor's product into a customer's network environment with existing switches

9   from another vendor; and the importance placed by customers on vendor reputation, meaning that they

10  are less likely to purchase equipment from unknown vendors.

11       As explained in Arista's Motion, the evidence also shows that this entrenched "████████"

12  customer preference for Cisco-like compatibility, and vendor switching costs all also operate as barriers

13  to competitor expansion, because each also serves to inhibit competitors from expanding output to

14  meaningfully challenge Cisco's dominant share even after entry into the market has occurred. As

15  Professor Scott Morton explained, the failure of any competitor other than Arista to gain market share

16  of more than 10.1%, despite Cisco's persistent price premium that it has commanded for its products, is

17  particularly strong evidence confirming these barriers to competitor expansion. Mot. at 10-15.

18       Cisco fails to rebut this evidence. Cisco claims that there is "no basis" for the evidence that Cisco

19  equipment makes up 80% of the installed base of switch equipment, Opp. at 23, ***but that is Cisco's own***

20  ***estimate.*** *See, e.g.,* **Ex. AA**, D.I. 235-19 at 86 :7-8 (Cisco's Senior Director Frank D'Agostino describing

21  "Cisco's 80% share of the network installed base."). Similarly, Cisco relies on its technical expert to

22  opine that Cisco's CLI is not an industry standard and "there are no technical impediments to changing

23  CLIs or using multiple CLIs," Opp. at 23, but its own Senior Vice President of data center sales, Frank

24  Palumbo, testified as Cisco's Rule 30(b)(6) representative that having a Cisco-like CLI was

25  "█████████" to a competitor's ability to make sales against Cisco, and Mr. Palumbo vouched for a list

26  of more than 70 major customers, including ███████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████, for which Cisco contended Arista could

1   not have sold products were it not for their use of a Cisco-like CLI. **Ex. 24** (Palumbo 6/7/2016 Exhibit

2   1356) at 5, 9, and Exhibit A; **Ex. 25** (6/7/2016 Palumbo Dep. Tr.) at 20:2-9 ("

3

4   "); **Ex. 17** at 22:14-20 ("

5

6   "). In fact, Cisco's technical expert

7   explicitly deferred to Mr. Palumbo on the question of entrenched customer preferences for a Cisco-like

8   CLI, limiting his opinion to a "technical analysis". **Ex. 26** (Almeroth Dep. Tr. 224:8-17) (testifying "

9

10   "). Cisco cannot now manufacture a ***genuine*** material dispute

11   of fact to avoid summary judgment by contradicting the testimony of its own witnesses and experts. *Cf.*

12   *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2004) ("a party

13   cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

14         Nor does Cisco rebut Arista's evidence that significant capital requirements constitute another

15   barrier to entry to these markets. First, Cisco's evidence that it "only" took         to fund Insieme,

16   a company acquired by Cisco, rather than $863 million, does not genuinely dispute Professor Scott

17   Morton's determination that there are significant barriers to entry arising from required capital

18   investments. Opp. at 24. Nor does Cisco's reference to the capital raised by two vendors of switch

19   software intended for use with "white box" switch products ($19 million and $119.5 million) create a

20   genuine dispute of fact. Neither of these companies has gained an appreciable share of any relevant

21   market (*see* **Ex. 14** at Figs. 4, 5; **Ex. 27** at 1, 2), thereby ***confirming*** the presence of significant barriers

22   to entry. Cisco's insistence that the evidence that no competitor other than Arista has ever reached a

23   market share higher than 10% is "misleading, since it is true in only one of Arista's four alleged

24   markets," Opp. at 24, is simply false. In fact, no competitor other than Arista has *ever* attained a market

25   share exceeding 10.1% for any year in ***any of the four relevant markets*** defined by Professor Scott

26   Morton, and not even Arista has exceeded that for any year in the overall U.S. and worldwide switch

27   markets, or the worldwide high speed switch markets. *See, e.g.,* **Ex. 14** at Fig. 4 (U.S overall market

28   share), Fig. 5 (worldwide overall market share); **Ex. 27** at 1 (U.S. high-speed market share), 2

(worldwide high-speed market share). The failure of competitors to expand their market share powerfully confirms the presence of significant barriers to both entry by new competitors, and expansion by existing ones, and supports summary judgment of Cisco's monopoly power in each relevant market.

Finally, Cisco offers nothing to dispute the additional barrier to entry identified by its own expert Dr. Carlton – the importance to switch customers of vendor reputation. Cisco cites case law that "reputation *alone* does not constitute a sufficient entry barrier in this Circuit," Opp. at 25, but Arista has not contended that vendor reputation alone is an entry barrier; rather, Arista has identified customer concerns over vendor reputation (a concern endorsed by Cisco's Dr. Carlton as mattering a ███████ ████ ) as one of several factors indicating high barriers to entry. Cisco's legal authority is inapposite, because "the *only* entry barrier" identified there was vendor reputation. *Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns,* 108 F.3d 1147, 1154 (9th Cir. 1997).

Just as summary judgment of monopoly power is warranted in the overall U.S. Ethernet switch market, Cisco fares no better in its effort to avoid summary judgment of monopoly power in the other three relevant markets. Cisco's yearly share of the worldwide Ethernet switch market never fell below 55% from 2008 through the end of 2016, the time period Cisco concedes is relevant. *See* Opp. at 18 (conceding that "[t]he relevant time-period for demonstrated monopoly power is the period in which [defendants] were engaging in the [alleged anticompetitive conduct]." **Ex. 14** at Fig. 5. In the U.S. high-speed switch market, Cisco's yearly market share never fell below 55% through the end of 2016. **Ex. 27** at 1 (U.S. high-speed market share). And in the worldwide high speed switch market, Cisco's annual market share was greater than 50% for all relevant years—more than five times the share of any other vendor. **Ex. 27** at 2 (worldwide high-speed market share). As Dr. Scott Morton has explained, Cisco's dominant shares in these markets, and the "durability of these shares are consistent with Cisco possessing substantial market power." In combination with the undisputed barriers to entry and expansion in these markets, as described above, they demonstrate that summary judgment of monopoly power in each of these markets is warranted.

**CONCLUSION**

For the above reasons and the reasons described in Arista's Opening Brief (D.I. 210-8), Arista's Motion for Partial Summary Judgment should be granted.

1   Dated:  April 13, 2018                    Respectfully submitted,

2

3                                            ___/s/ Matthew D. Powers___
                                             MATTHEW D. POWERS (SBN 104795)
4                                            WILLIAM NELSON (SBN 196091)
                                             ROBERT GERRITY (SBN 268084)
5                                            NATASHA SAPUTO (SBN 291151)
                                             SAMANTHA JAMESON (Bar No. 296411)
6                                            JENNIFER ROBINSON (Bar No. 270954)
                                             WANLI CHEN (Bar No. 300254)
7                                            TENSEGRITY LAW GROUP, LLP
                                             555 Twin Dolphin Drive, Suite 650
8                                            Redwood Shores, CA 94065
                                             Telephone:    (650) 802-6000
9                                            Facsimile:    (650) 802-6001
                                             Email:
10                                           matthew.powers@tensegritylawgroup.com
                                             william.nelson@tensegritylawgroup.com
11                                           robert.gerrity@tensegritylawgroup.com
                                             natasha.saputo@tensegritylawgroup.com
12                                           samantha.jameson@tensegritylawgroup.com
                                             jen.robinson@tensegritylawgroup.com
13                                           wanli.chen@tensegritylawgroup.com

14                                           DAVID H. REICHENBERG (*Pro Hac Vice*)
                                             COZEN O'CONNOR
15                                           277 Park Avenue, 19th Floor
                                             New York, NY 10172
16                                           Telephone:  (212) 883-4900
                                             Fax:  (646) 461-2091
17                                           Email:
                                             dreichenberg@cozen.com
18
                                             JONATHAN M. JACOBSON (NY SBN 1350495)
19                                           CHUL PAK (*Pro Hac Vice*)
                                             WILSON SONSINI GOODRICH & ROSATI
20                                           1301 Avenue Of The Americas, 40th Floor
                                             New York, NY 10019
21                                           Telephone: (212) 999-5800
                                             Facsimile: (212) 999-5899
22                                           Email:
                                             jjacobson@wsgr.com
23                                           cpak@wsgr.com

24                                           SUSAN CREIGHTON (SBN 135528)
                                             SCOTT A. SHER (SBN 190053)
25                                           BRADLEY T. TENNIS (SBN 281206)
                                             WILSON SONSINI GOODRICH & ROSATI
26                                           1700 K Street NW, Fifth Floor
                                             Washington, D.C., 20006
27                                           Telephone: (202) 973-8800
                                             Facsimile: (202) 973-8899
28                                           Email:
                                             screighton@wsgr.com
                                             ssher@wsgr.com

btennis@wsgr.com

ROBERT A. VAN NEST (SBN 84065)
BRIAN L. FERRALL (SBN 160847)
MICHAEL S. KWUN (SBN 198945)
DAVID J. SILBERT (SBN 173128)
NICHOLAS DAVID MARAIS
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
Email:
rvannest@keker.com
bferrall@keker.com
mkwun@keker.com
dsilbert@keker.com
nmarais@keker.com

Attorneys for Plaintiff
ARISTA NETWORKS, INC.