**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ARISTA NETWORKS, INC., | Case No.  16-cv-00923-BLF |
| Plaintiff, | |
| v. | **ORDER ON *DAUBERT* MOTIONS** |
| | [Re: ECF 209, 211, 212, 217] |
| CISCO SYSTEMS INC., | |
| Defendant. | |

Before the Court are the parties' motions to exclude certain opinions of each party's experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  For the reasons stated on the record and set forth below, Plaintiff Arista Networks, Inc.'s ("Arista") motions are GRANTED IN PART and DENIED IN PART and Defendant Cisco Systems Inc.'s ("Cisco") motions are GRANTED IN PART and DENIED IN PART.

**I.    LEGAL STANDARD**

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. 579, 589 (1993).  In *Kumho Tire Co., Ltd. v. Carmichael*, the Supreme Court clarified that the "basic gatekeeping obligation" articulated in

*Daubert* applies not only to scientific testimony but to all expert testimony.  526 U.S. 137, 147

(1999).  The Supreme Court also made clear that the reliability inquiry is a flexible one, and

"whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a

particular case is a matter that the law grants the trial judge broad latitude to determine."  *Id.* at

153; *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

"*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not

guarantees of correctness."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010)

*aff'd*, 131 S. Ct. 2238 (2011).  So long as an expert's methodology is sound and his opinions

satisfy the requirements of Rule 702, underlying factual disputes and how much weight to accord

the expert's opinion are questions for the jury.  *Micro Chem.*, 317 F.3d at 1392; *Primiano v. Cook*,

598 F.3d 558, 565 (9th Cir. 2010).

## II.     DISCUSSION

The parties have each moved to exclude opinions rendered by the other party's technical

and economics experts.  Cisco seeks to exclude the opinions of Dr. John R. Black, Jr. and Dr.

Fiona Scott Morton.  Arista, for its part, seeks to exclude the opinions of Dr. Kevin Almeroth and

Dr. Dennis Carlton.  The Court first addresses the parties' motions regarding their respective

technical experts, Dr. Black and Dr. Almeroth.

### A.     Dr. John R. Black, Jr.

Cisco moves to exclude Dr. Black from offering opinions that were previously excluded in

the parties' CLI case.[1]  Black Mot. 1, ECF 217.  Specifically, Cisco asks the Court to preclude Dr.

Black's opinions regarding whether Cisco's CLI is a *de facto* or informal industry standard as well

as opinions on "corporate intent or beliefs of others."  *Id.*  Such opinions were precluded in the

CLI case.  *See* CLI *Daubert* Motions Order 2–5, Case No. 14-cv-05344-BLF, Dkt. 661.  Cisco

argues that Dr. Black's opinions in this case are identical to those which he offered in the CLI case

---

[1] Cisco previously filed an action against Arista, alleging that Arista infringes Cisco's patents and
copyrights in its command line interface ("CLI").  *Cisco Systems, Inc. v. Arista Networks, Inc.*,
Case No. 14-cv-05344-BLF (the "CLI case").  A jury found that Arista infringed Cisco's
copyright but that the infringement was excused by the scènes à faire affirmative defense.  The
jury did not find patent infringement.  *Id.* at Dkt. 749.

United States District Court
Northern District of California

1    and thus the Court should adopt its prior ruling in the CLI case.  Black Mot. 1–2.

2           Arista responds that it will not offer Dr. Black's opinions as to "whether Cisco's CLI is a

3    'standard,' *de facto* or otherwise," "to the extent that Cisco does not open the door by presenting

4    the opinion of its technical expert, Dr. Kevin Almeroth, that Cisco's CLI is *not* an industry

5    standard."  Black Opp'n 1, ECF 239-8 (emphasis in original).  Arista also states that Dr. Black

6    will not offer opinions regarding "corporate intent or beliefs of others."  *Id.*  Instead, Arista asserts

7    that Dr. Black will "present his analysis of the evidence he reviewed 'to determine whether Cisco

8    CLI has become common in the industry'" as the Court allowed in the CLI case.  *Id.* at 1–2.

9           The parties agree that the Court's rulings set forth in the CLI *Daubert* Motions Order

10   should apply in this action.  *See* Black Mot. 1; Hearing Tr. 5:24–6:1, ECF 280.  The Court does

11   not find any reason why the Court's prior rulings in the CLI case are inapplicable here.  As such,

12   Dr. Black shall be excluded from offering opinions that were precluded in the CLI *Daubert*

13   Motions Order.  Dr. Black will not be allowed to opine whether Cisco's CLI is a *de facto* or

14   informal industry standard.  Moreover, Dr. Black will be excluded from opining on corporate

15   intent or beliefs of others.  In particular, as Cisco requests, Dr. Black may not testify that "Cisco

16   was aware that its CLI was in widespread use by other vendors throughout the industry,

17   acquiesced in that use, and even encouraged that use" (Black Reply 3, ECF 249-4) because that

18   testimony directly relates to Cisco's state of mind.  However, he will be permitted to opine on the

19   common or frequent use of CLI by others in the industry based on his analysis of evidence as

20   permitted in the CLI *Daubert* Motions Order.  Based on the foregoing, the Court GRANTS

21   Cisco's motion to exclude Dr. Black's opinions relating to whether Cisco's CLI is a *de facto* or

22   informal industry standard as well as opinions on corporate intent or beliefs of others.

23          The Court addresses Arista's concern on whether Cisco will "open the door" by having Dr.

24   Almeroth testify that Cisco's CLI is not an industry standard.  As stated during the hearing, Dr.

25   Almeroth will be permitted to testify whether Cisco's CLI has been promulgated as a standard by

26   a standard setting organization.  Hearing Tr. 6:12–15, 7:16–23.  Dr. Almeroth, however, will not

27   be allowed to offer opinions that Cisco's CLI is not a *de facto* or informal industry standard, and

28   Arista may raise objections if he proceeds to do so.

United States District Court
Northern District of California

**B.    Dr. Kevin C. Almeroth**

Arista moves to exclude Dr. Almeroth's opinions that Cisco was "public and consistent" concerning its CLI intellectual property rights.  Almeroth Mot. 3–5, ECF 212.  Arista further seeks to preclude Dr. Almeroth's opinions that were previously excluded in the CLI case.  *Id.* at 5–6. Arista's challenges are separately addressed below.

### i.    Dr. Almeroth's Opinions on Cisco's "Public and Consistent" Position Regarding Its Copyright

Arista contends that Dr. Almeroth, a computer scientist, submitted a Rebuttal Report that includes his opinion that "Cisco's position regarding its copyrighted CLI was public and consistent."  Almeroth Mot. 2, ECF 212 (citing Ex. 12 to Nelson Decl. ("Rebuttal Report") ¶¶ 129–31, ECF 210-19).  Under the heading "VI. Cisco's Position Regarding Its Copyrighted CLI was Public and Consistent," the Rebuttal Report states the following:

> **129.**    In 2003, Cisco sued Huawei alleging theft of intellectual property alleging that Huawei copied Cisco's CLI and source code. The result of this lawsuit was a settlement requiring Huawei to change its command line interface, which was known to the industry.
>
> **130.**    Based on my review of the written discovery in this case, Cisco was public about its position regarding Huawei and others copying its CLI….
>
> **131.**    Moreover, other switch vendors intentionally did not look at or copy Cisco's CLI in order to avoid Intellectual Property rights issues. For example, Philip Shafer was developing JUNOS CLI in the 1997 to 1998 timeframe.  During his development, he intentionally did not want to look at Cisco's CLI in order to avoid infringing Cisco's rights….

Rebuttal Report ¶¶ 129–31.  Arista argues that those statements are not expert testimony and that Dr. Almeroth improperly vouches for Cisco's view of disputed facts.  Almeroth Mot. 3–4.

Cisco responds that paragraphs 129 to 130 of Dr. Almeroth's Rebuttal Report recite background facts which support Dr. Almeroth's opinions that "Cisco's CLI is not an industry standard."  Almeroth Opp'n 3–4, ECF 237-3.  According to Cisco, Arista seeks to strike various facts that Dr. Almeroth considers in forming his opinions.  *Id.* at 4.   Cisco also asserts that Arista's reference to "public and consistent" in the Rebuttal Report's section heading

4

1    mischaracterizes the actual content of paragraphs 129 to 131 which addresses "background factual

2    information." *Id.*

3         The Court has reviewed section "VI. Cisco's Position Regarding Its Copyrighted CLI was

4    Public and Consistent" in Dr. Almeroth's Rebuttal Report.  As a general matter, Dr. Almeroth will

5    not be allowed to testify whether Cisco had a "public and consistent" position regarding its CLI

6    because he does not have the expertise to opine what it means for a company to take a "public and

7    consistent" position.  Moreover, this is a factual issue about which the jury needs no expert

8    testimony.  Cisco admits that Dr. Almeroth is not an expert on whether a company's position is

9    "public and consistent."  Hearing Tr. 17:21–23; *see also* Almeroth Opp'n 3.  This ruling, however,

10   does not preclude Dr. Almeroth from offering his opinions about the market players and how they

11   would have responded and reacted to Cisco's activities.

12        The Court turns to the three paragraphs in section VI of Dr. Almeroth's Rebuttal Report.

13   In paragraph 129, Dr. Almeroth summarizes his view of what the 2003 lawsuit between Cisco and

14   Huawei was about and how the lawsuit concluded.  Rebuttal Report ¶ 129.  This is neither the

15   proper subject of expert testimony nor does Dr. Almeroth have expertise in characterizing lawsuits

16   and their results.  Thus, to the extent that Dr. Almeroth proffers expert opinions on the nature of

17   the Huawei lawsuit, those opinions are inadmissible.  If Cisco intends to offer the statements in

18   paragraph 129 as a factual background, Cisco does not require an expert to introduce such

19   statements.  Allowing Dr. Almeroth to do so would amount to no more than an unfair vouching of

20   evidence. *See United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007).  In paragraph 130, Dr.

21   Almeroth opines that "Cisco was public about its position regarding Huawei and others copying

22   its CLI" based on his review of written discovery in this case.  Rebuttal Report ¶ 130.  Again, Dr.

23   Almeroth is simply vouching for fact evidence rather than providing expert opinions.  An expert

24   may not act as a mere conduit to provide an "additional summation" of evidence. *See id.* at 903–

25   04.  For these reasons, the Court excludes paragraphs 129 and 130 of Dr. Almeroth's report.

26        In paragraph 131, Dr. Almeroth opines that "other switch venders *intentionally* did not

27   look at or copy Cisco's CLI" and that, for example, "[Philip Shafer] *intentionally* did not want to

28   look at Cisco's CLI" when he was developing JUNOS CLI.  Rebuttal Report ¶ 131 (emphasis

United States District Court
Northern District of California

1    added).  Here, Dr. Almeroth opines on the subjective intent of others.  Experts may not speculate

2    about the state of mind or vouch for opinions of others as Cisco has persuasively argued regarding

3    Dr. Black's opinions.  For these reasons, Dr. Almeroth's opinion in paragraph 131 will be

4    excluded.  To be clear, Dr. Almeroth will be allowed to testify about his review of JUNOS and

5    whether or not it copies Cisco's CLI.

6          The Court is unpersuaded by Cisco's arguments that paragraphs 129 to 131 should not be

7    excluded because they are relevant to Dr. Almeroth's opinion that "Cisco's CLI is not an industry

8    standard" (Almeroth Opp'n 3–4; Hearing Tr. 13:2–8).  As stated during the hearing, the Court will

9    not allow testimony regarding whether or not Cisco's CLI is a *de facto* or informal standard.

10   Hearing Tr. 13:9–10.  As such, to the extent that Dr. Almeroth relies on those paragraphs to opine

11   that Cisco's CLI is not a *de facto* standard, those paragraphs are irrelevant and thus will not assist

12   the jury.  *See Daubert*, 509 U.S. at 591 (holding that expert testimony must assist the trier of fact).

13         For the above reasons, Arista's motion to exclude Dr. Almeroth's opinions on whether

14   Cisco was "public and consistent" regarding its intellectual property in CLI, including paragraphs

15   129 to 131 in the Rebuttal Report, is GRANTED.  To be clear, the Court will not exclude the

16   subject matter contained in those paragraphs.  In addition, as stated during the hearing, this ruling

17   does not preclude Dr. Almeroth from offering opinions on how he views the evidence regarding

18   Cisco's marketing campaign related to its CLI and development of products.  Hearing Tr. 18:13–

19   16.

20         **ii.    Dr. Almeroth's Opinions that Were Previously Excluded in the CLI Case**

21         Arista seeks to exclude Dr. Almeroth's opinions that were not allowed in the CLI case.

22   Almeroth Mot. 5.  According to Arista, Dr. Almeroth's Rebuttal Report incorporates by reference

23   the entirety of his reports in the CLI case.  *Id.*  Arista argues that the Court should not permit Dr.

24   Almeroth to present previously excluded opinions.  *Id.*  Specifically, Arista challenges Dr.

25   Almeroth's opinions that Arista copied Cisco's source code and the "look and feel" of Cisco's

26   CLI.  *Id.* at 5–6.  Arista also asserts that Dr. Almeroth's opinions that speculate about Arista's

27   state of mind and that do nothing more than vouch for Cisco's version of disputed facts should be

28   excluded.  *Id.* at 6.

6

1   Cisco agrees that the Court's prior rulings regarding Dr. Almeroth's opinions in the CLI

2   case should apply to this action.  Almeroth Opp'n 7–8.  Accordingly, the Court GRANTS Arista's

3   motion to exclude Dr. Almeroth's opinions that were previously precluded in the CLI case as set

4   forth in the CLI *Daubert* Motions Order.

5   **C.   Dr. Dennis Carlton**

6   Arista advances several challenges to the opinions offered by Cisco's economics expert,

7   Dr. Carlton.  Carlton Mot., ECF 211.  The Court addresses each challenge below.

8
    **i.   Dr. Carlton's Opinions Regarding What Conduct the Antitrust Law Should and Should Not Punish**
9

10   Arista argues that Dr. Carlton's opinions regarding what "conduct the antitrust law should

11   and should not punish" must be excluded.  Carlton Mot. 2–4.  Specifically, Arista asserts that Dr.

12   Carlton's Report repeatedly expresses his opinions that, if Cisco were found liable under Arista's

13   theory, such a finding would be inconsistent with a procompetitive antitrust policy and "wreak

14   economic havoc."  *Id.* at 2–3, 3 n.2 (citing Ex. 1 to Nelson Decl. ("Carlton Report") ¶¶ 10, 13, 56,

15   60–62, 64, 77, 83, 85, ECF 210-9).  Those opinions should be excluded, Arista argues, because

16   experts are prohibited from "interpreting the law for the court or from advising the court about

17   how the law should apply to the facts of a particular case."  *Id.* at 3 (citing *Mannick v. Kaiser*

18   *Found. Health Plan, Inc.*, No. C 03-5905 PJH, 2006 WL 1626909, at *17 (N.D. Cal. June 9,

19   2006); *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)).

20   Cisco responds that Arista mischaracterizes Dr. Carlton's opinions.  Carlton Opp'n 2, ECF

21   233-4.  In Cisco's view, Dr. Carlton has not offered prescriptive opinions about antitrust laws.  *Id.*

22   Rather, Cisco asserts, Dr. Carlton's Report explains his opinions regarding the "economic

23   incentives that underlie intellectual property," "procompetitive benefits of information," and

24   "procompetitive aspects of formal standard setting."  *Id.* at 3–4.

25   After reviewing the paragraphs of Dr. Carlton's Report identified by Arista, the Court

26   concludes that some portions of those paragraphs should be excluded.  First, as a general matter,

27   Dr. Carlton's reference to "wreak economic havoc" will be precluded as that phrase is

28   inflammatory and will not aid the jury.

United States District Court
Northern District of California

United States District Court
Northern District of California

1        Second, Dr. Carlton's Report contains improper opinions that usurp the role of the court

2   and jury.  An expert's testimony may not "interpret[] the law for the court or . . . advis[e] the court

3   about how the law should apply to the facts of a particular case."  *Mannick*, 2006 WL 1626909, at

4   *17.  Nor should the expert testify about what conduct the antitrust laws should or should not

5   allow.  *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1362 (N.D. Ga.

6   2017).  Such opinions impermissibly "tell the jury what result to reach, and thus attempt[] to

7   substitute the expert's judgment for the jury's."  *Id.* (quoting *Nimely*, 414 F.3d at 397).  For

8   example, Dr. Carlton states in his report that a company should generally be able to "alter its

9   policies as it sees fit" and that Dr. Scott Morton's "interpretation of intellectual property laws

10  would create economic havoc among firms that invest to create intellectual property rights."

11  Carlton Report ¶ 13; *see also id.* ¶¶ 60–62 (offering similar opinions).  As another example, Dr.

12  Carlton essentially opines that certain conduct should not be punished by the antitrust laws.  *See,*

13  *e.g., id.* ¶¶ 83 ("[Dr. Scott Morton's] claim has far-reaching economic implications . . . . Such a

14  system would harm competition by undermining the intellectual property rights system and the

15  economic incentives that it is designed to create.").  The Court finds that paragraphs 13, 60, 61, 62

16  (last sentence), 77 (last sentence), and 83 of Dr. Carlton's Report run afoul of the above principles

17  that prohibit an expert from offering opinions that usurp the role of the court and jury and inform

18  the jury what result should be reached.  *Mannick*, 2006 WL 1626909, at *17 (holding that experts

19  should not interpret the law for the court); *In re Delta*, 245 F. Supp. 3d at 1362–63 (holding that

20  experts may not instruct the jury what result to reach).  Accordingly, paragraphs 13, 60, 61, 62

21  (last sentence), 77 (last sentence), and 83 of Dr. Carlton's Report are excluded.

22        On the other hand, the Court finds that other paragraphs identified by Arista are

23  admissible.  First of all, paragraph 10 will not be excluded.  In that paragraph, Dr. Carlton

24  describes the parties' CLI litigation and ITC actions and opines that "[t]he interference with firms

25  pursuing valid intellectual property claims and valid regulatory concerns would lead to a reduction

26  in economic efficiency, even though infringers like Arista may benefit from such interference."

27  Carlton Report ¶ 10.  Here, Dr. Carlton describes the economic effects of enforcing intellectual

28  property rights.  This opinion does not rise to the level of instructing the jury on what conduct the

1    antitrust laws should or should not punish.

2         Dr. Carlton will also be allowed to provide the opinions in paragraphs 56 and 85 of his

3    report.  In paragraph 56, Dr. Carlton testifies that it is "economically rational and efficient for a

4    firm to seek to enforce its property rights."  *Id.* ¶ 56.  In paragraph 85, Dr. Carlton opines that

5    companies will have less incentive to develop intellectual property if the validity of those rights

6    would depend on the motivation for filing past intellectual property lawsuits.  *Id.* ¶ 85.  In those

7    paragraphs, Dr. Carlton is not opining whether antitrust laws should prohibit specific conduct

8    unlike his other opinions that are excluded above.  Rather, he is explaining the rationality of

9    companies to enforce intellectual property rights and the incentive considerations for protecting

10   those rights.  Those opinions are not improper.

11        In addition, the Court will not exclude paragraph 64 where Dr. Carlton explains the

12   procompetitive benefits of allowing companies to disclose truthful information to customers.  This

13   opinion is not a prescriptive statement of the law that warrants exclusion.

14        Based on the above discussion, the Court GRANTS IN PART and DENIES IN PART

15   Arista's request to exclude Dr. Carlton's opinions regarding what conduct the antitrust laws

16   should or should not punish.

17              **ii.    Dr. Carlton's Opinions that Are Contrary to *Kodak***

18        Arista further moves to exclude Dr. Carlton's opinions that are in disagreement with the

19   Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451

20   (1992).  Carlton Mot. 4–7.  Specifically, Arista takes issue with Dr. Carlton's opinion that "[i]n

21   general, a firm should be able to alter its policies as it sees fit" and that "[a]bsent a legal

22   commitment in the form of a contract, no economic basis exists for Dr. Scott Morton's opinion

23   that another firm should rely on what it thinks its rival might do."  Carlton Report ¶ 13.  Arista

24   argues that those opinions are contrary to *Kodak* and thus must be excluded as being contrary to

25   law.  Carlton Mot. 4 (citing *Cave v. Saxon Mortg. Servs.*, Inc., No. 11-4586, 2015 WL 6153754, at

26   *9 (E.D. Pa. Oct. 20, 2015) (holding that expert opinions that are contrary to law are *per se*

27   unreliable)).  For similar reasons, Arista asserts that paragraphs 9, 12, 56, 59–61, 77 and 82–83 of

28   Dr. Carlton's Report should be excluded.  *See* Carlton Mot. 4–6.

United States District Court
Northern District of California

Cisco disputes Arista's characterization of Dr. Carlton's opinions as being inconsistent with *Kodak*.  Carlton Opp'n 2.  Cisco argues that Dr. Carlton opines on the economic bases of intellectual property rights and the procompetitive aspects of a formal standard setting (as opposed to "informal" standards).  *Id.* at 4–5.  In Cisco's view, those opinions are consistent with *Kodak*. *Id.*

The Court has reviewed the paragraphs identified by Arista and excludes paragraphs 13, 60, and 61 of Dr. Carlton's Report.  First, Dr. Carlton opines in paragraph 13 that "[i]n general, a firm should be able to alter its policies as it sees fit. To do otherwise would condemn a firm to forever being stuck with its initial business plan. Such a requirement would wreak economic havoc especially in rapidly changing industries . . . ."  Carlton Report ¶ 13.  The Court disagrees with Cisco's argument that such an opinion does not contradict *Kodak* because that case had a "very specific set of facts" that showed a policy change "that turned out to be an antitrust problem."  Hearing Tr. 27:21–28:5.  Dr. Carlton's broad opinion that a company should be able to freely change its policy is inconsistent with *Kodak* because Dr. Carlton's opinion does not recognize that a policy change can indeed violate antitrust laws as in *Kodak*.  Such an opinion is not permitted.  *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *7 (N.D. Cal. June 30, 2012) (excluding an expert's opinion that is contrary to law).

Second, in paragraphs 60 and 61, Dr. Carlton opines that as a general matter a company should be able to alter its policies as it sees fit.  Carlton Report ¶ 61.  He explains that imposing an implicit requirement for a company to not alter its policy would fundamentally alter the intellectual property system.  *See id.* ¶ 60.  Like paragraph 13, here Dr. Carlton's broad opinion that a company should be able to freely change its policy is inconsistent with *Kodak*.  As mentioned, *Kodak* recognizes that a policy change can violate antitrust laws.  *See Kodak*, 504 U.S. at 458, 477–86.[2]  Thus, paragraphs 60 and 61 of Dr. Carlton's Report are excluded.  *Apple*, 2012 WL 2571332, at *7 (excluding an expert's opinion that is contrary to law).

On the other hand, the Court will not exclude paragraphs 9, 12, 56, 59 and 82 as those

---

[2] The Court does not mean to suggest that *Kodak* bans all policy shifts, but rather that Dr. Carlton's opinions are impermissibly overbroad by suggesting that there are absolutely no limits.

United States District Court
Northern District of California

1    paragraphs are not contrary to *Kodak*.[3]  Regarding paragraph 9, Arista takes issue that in this

2    paragraph Dr. Carlton opines that "[p]enalizing [enforcement of IP rights] would harm

3    competition" without considering whether such enforcement was part of an "open early, closed

4    late policy change."  Carlton Mot. 6.  However, this opinion is not necessarily inconsistent with

5    *Kodak* which did not involve the particular type of "open early, closed late" scheme that is the

6    subject of this case.  For this reason, the Court finds that the opinions in paragraph 9 are not

7    precluded by *Kodak*.

8         As set forth in paragraph 12, Dr. Carlton asserts that "Dr. Scott Morton's analogy

9    regarding hold up in formal standard setting organizations is invalid for several reasons."  Carlton

10   Report ¶ 12.  Here, Dr. Carlton explains why this case is different from a "hold up" based on a

11   formal standard set by a standard setting organization.  *Id.*  The Court does not find that his

12   opinions as stated in paragraph 12 are inadmissible.  For instance, Dr. Carlton points out that

13   "there is no claim that Cisco had a contractual obligation to make its CLI available for free."  *Id.*

14   This statement on its own is factually correct and does not contradict *Kodak*.  However, Dr.

15   Carlton will not be allowed to opine that an anticompetitive "open early, closed late scheme"

16   *requires* a contractual obligation between the involved parties because *Kodak* does not preclude

17   the possibility that such a scheme is unlawful in the absence of a contractual relationship.  Dr.

18   Carlton also opines that "even if a firm initially does not charge for a product, it would be an

19   economic error to require that the firm should never charge for it."  *Id.*  This opinion is not

20   contrary to law because *Kodak* does not require a firm to never change its policy. But the phrase

21   "economic error" may mislead the jury and thus Dr. Carlton will not be allowed to use that phrase.

22        In paragraph 56, Dr. Carlton testifies that "it is economically rational and efficient for a

23   firm to seek to enforce its property rights."  Carlton Report ¶ 56.  In paragraph 59, Dr. Carlton

24   discusses that disputes over intellectual property rights are common and that he disagrees with

25   "Dr. Scott Morton's claim that it is anti-competitive to sue in order to enforce even a valid

26

27   _____

     [3] The Court also does not find that paragraphs 77 and 83 are necessarily inconsistent with *Kodak*.
28   The Court need not discuss those paragraphs in detail because those portions are already excluded
     as discussed in the previous subsection.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   intellectual property right." *Id.* ¶ 59.  Here, Dr. Carlton is explaining the rationality of companies

2   to enforce intellectual property rights and opines that intellectual property lawsuits are not anti-

3   competitive.  Those opinions are not inconsistent with *Kodak* and thus will be allowed.

4         Dr. Carlton further opines in paragraph 82 that companies that use another's intellectual

5   property can "protect themselves through contract or by relying on standards set by [a standard

6   setting organization]" and that "Cisco made no . . . contractual commitments to Arista or other

7   competitors for free use of its CLI."  Carlton Report ¶ 82.  Those statements are not contrary to

8   law and thus the opinions in paragraph 82 will be allowed.  That said, as discussed above, Dr.

9   Carlton will not be allowed to opine that an anticompetitive "open early, closed late scheme"

10  *requires* a contractual obligation between the involved parties because *Kodak* does not preclude

11  the possibility that such a scheme is unlawful in the absence of a contractual relationship.

12        Based on the foregoing discussion, the Court GRANTS IN PART and DENIES IN PART

13  Arista's request to exclude Dr. Carlton's opinions that are contrary to *Kodak*.  To be clear, Dr.

14  Carlton will be allowed to opine about intellectual property rights, the rights Cisco has, and why

15  those rights are valuable to Cisco in developing its competitive position in the market.

16              **iii.    Dr. Carlton's Opinions Regarding the Competitive Effects of Cisco's**

17              **Conduct**

18        Arista challenges Dr. Carlton's testimony that "Cisco's conduct . . . did not harm

19  competition but instead promoted it."  Carlton Mot. 7.  According to Arista, Dr. Carlton defines

20  "Cisco's conduct" as "1) bringing a lawsuit about Arista's use of Cisco's CLI, and 2) making

21  public and private communications with customers that Arista had a culture of copying."  *Id.*

22  (citing Carlton Report ¶¶ 52–101) (internal quotation marks omitted).  In this regard, Arista argues

23  that Dr. Carlton determines only whether Cisco's 2014 CLI lawsuit and "Cisco's communication

24  about it" were procompetitive but fails to assess evidence concerning Cisco's "open early, closed

25  late" policy shift.  *See id.* at 8.  Specifically, Arista asserts that Dr. Carlton did not review eight

26  documents that relate to Cisco's "open early, closed late" strategy.  *Id.* at 8–9.  On this basis,

27  Arista argues that Dr. Carlton fails to consider "core evidence" and thus his opinion that "Cisco's

28  copyright suit against Arista is procompetitive" and all associated assertions should be excluded.

*Id.* at 9–10.

In Cisco's view, Arista incorrectly argues that the fact that Dr. Carlton did not recall reviewing a handful of documents at the time of his deposition suggests that he did not consider relevant facts. Carlton Opp'n 9. Cisco points out that Arista lists eight allegedly "unreviewed" documents while Cisco has produced over 2 million documents in this case. *Id.* Cisco asserts that Dr. Carlton cannot reasonably remember each document that he reviewed and the lack of recollection on reviewing a few documents does not justify excluding his testimony. *Id.* Moreover, Cisco argues that Dr. Carlton did consider documents that have similar information contained in the allegedly unreviewed documents to reach his conclusions. *Id.*

The Court is satisfied that Dr. Carlton's opinions regarding the competitive effects of Cisco's conduct are admissible. Seven of the eight documents that Arista identifies contain Cisco's statements that describe its CLI as a "standard" or note other competitors' use of Cisco CLI. *See, e.g.*, Exs. 5, 6 to Nelson Decl., ECF 210-12, -13. Dr. Carlton testifies that he has "seen documents in which [Cisco] describes its CLI as [an] industry standard." Ex. A to Leary Decl. ("Carlton Dep.") 195:18–19, ECF 233-5; *id.* at 161:4–8. Thus, even if Dr. Carlton did not actually review the documents pointed out by Arista, he did consider similar information contain therein. Moreover, Dr. Carlton explains that he accounted for such information by speaking with Dr. Almeroth about the meaning of Cisco's description of its CLI as a standard. *Id.* at 161:4–13. Thus, contrary to Arista's contention, Dr. Carlton's opinions about the competitive effects of Cisco's conduct are "sufficiently tied to the facts of this case." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)). To the extent that Dr. Carlton did not consider certain documents, the Court finds that the alleged deficiencies in Dr. Carlton's opinions are better addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Clear-View Techs., Inc. v. Rasnick*, No. 13-CV-02744-BLF, 2015 WL 3505003, at *2 (N.D. Cal. June 2, 2015). The Court thus DENIES Arista's motion to exclude Dr. Carlton's opinions regarding the competitive effects of Cisco's conduct.

**D.     Dr. Fiona Scott Morton**

Cisco raises three challenges to Dr. Scott Morton's opinions relating to (1) the existence of an informal industry standard for CLI, (2) damages assessment based on her forecasting model, and (3) apportionment of damages that were discussed during her deposition.  The Court addresses each challenge in turn.

### i.     Dr. Scott Morton's Opinions Regarding a *De Facto* or Informal Standard

Cisco seeks to preclude Dr. Scott Morton from testifying on the existence of a *de facto* or informal standard for CLI.  Scott Morton Mot. 2, ECF 209.  Cisco argues that Dr. Scott Morton lacks the expertise to identify a *de facto* or informal industry standard and that she did not use a reliable methodology to determine that Cisco's CLI is such a standard.  *Id.* at 3.  Arista responds that it will not seek to offer any opinion of Dr. Scott Morton that states that "Cisco's CLI is a 'standard,' *de facto* or otherwise."  Scott Morton Opp'n 3, ECF 239-6.  According to Arista, Dr. Scott Morton's analysis does not depend on whether Cisco's CLI is a standard.  *Id.*

The Court agrees with Cisco that Dr. Scott Morton lacks the expertise to determine whether Cisco's CLI is a standard.  Nor does she have the expertise to testify whether Cisco's CLI has the attributes of a standard.  While Dr. Scott Morton is a highly qualified economist, she has no special training in identifying informal industry standards.  Thus, the Court will preclude Dr. Scott Morton from opining on whether the CLI at issue in this case is a *de facto* or informal standard.  She will also not be allowed to opine on whether the CLI has attributes of a standard.  In addition, Dr. Scott Morton will not be permitted to use the term "hold up" which would mislead the jury.  Hearing Tr. 37:1–8, 14–16; *see also id.* at 45:19–24 (Arista stating that Dr. Scott Morton does not need to use the term "hold up" in offering her opinions).

Cisco further asserts that Dr. Scott Morton's opinions regarding anticompetitive "open early, closed late" conduct should be excluded because she has no basis for those opinions once she is precluded from testifying that "Cisco's CLI is a 'standard.'"  Scott Morton Reply 1, ECF 248.  To the extent that Cisco argues that Dr. Scott Morton should be precluded from offering opinions regarding Cisco's purported "open early, closed late" scheme at all, the Court rejects that argument.  Although Dr. Scott Morton frequently uses the term "standard" in her report, she also

1    describes Cisco's conduct based on evidence without referring to that term.  Dr. Scott Morton has

2    the expertise to understand the market reality from the facts of this case and thus will be allowed

3    to offer her opinions based on Cisco's marketing of CLI and the market reality.  Hearing Tr. 36:2–

4    4.

5            Accordingly, the Court GRANTS Cisco's motion to exclude Dr. Scott Morton's opinions

6    regarding the existence of a *de facto* or informal standard for CLI as set forth above.  This ruling,

7    however, does not preclude Dr. Scott Morton from testifying on the anticompetitive effects of an

8    "open early, closed late" scheme.

9
        ii.    **Dr. Scott Morton's Opinions Regarding Damages Based on Her Forecasting**
10             **Model**

11           Cisco moves to exclude Dr. Scott Morton's testimony regarding damages based on her

12   forecasting model.  Scott Morton Mot. 6.  Cisco contends that Dr. Scott Morton's forecasting

13   approach cannot distinguish between the effects of Cisco's purported CLI policy reversal and

14   other factors—such as the patent and ITC litigations, aggressive pricing and new switches from

15   Cisco, and growing competition—and thus cannot isolate "damages due to Cisco's [unlawful]

16   actions."  *Id.*  In other words, Cisco claims that Dr. Scott Morton's analysis fails to segregate the

17   losses caused by the purported anticompetitive conduct from other lawful conduct.  *See id.* (citing

18   *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992); *Farley Transp. Co. v.*

19   *Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985)); *see also id.* at 7–8.

20           Arista counters that courts have applied a relaxed standard for proving the amount of

21   damages once the fact of damage has been shown.  Scott Morton Opp'n 5 (citing *Moore v. Jas. H.*

22   *Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982)).  In this regard, Arista argues that "a plaintiff

23   need not exhaust all possible alternative sources of injury."  *Id.* at 5 (quoting *William Inglis &*

24   *Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1051 (9th Cir. 1981)); *see also id.* at 6–

25   7.  Arista further contends that Dr. Scott Morton properly considers multiple factors that affected

26   its revenue, including "developing market factors, competition from white box installations and

27   others, and the ITC import bans."  *Id.* at 6.

28           In her report, Dr. Scott Morton uses a "forecasting approach" to predict Arista's revenues

United States District Court
Northern District of California

15

based on a statistical model which "assumes that, but for Cisco's conduct, Arista's revenues would have evolved in a similar fashion during the conduct period" as the revenues have evolved before the "conduct period."[4]  Ex. A to Seddon Decl. ("Scott Morton Report") ¶¶ 194–95, ECF 208-5. Dr. Scott Morton then determines the difference between her forecast and Arista's actual revenues to be Arista's "lost revenues."  *Id.* ¶ 235.  To estimate damages, Dr. Scott Morton multiplies the lost revenues with Arista's gross margins as a "measure of profits on incremental sales."  *Id.*

The above analysis conducted by Dr. Scott Morton does not utterly fail to segregate Arista's losses based on Cisco's purported anticompetitive conduct and other lawful factors.  In applying her forecasting approach, Dr. Scott Morton uses data from a "benchmark period" (from the fourth quarter of 2008 to the fourth quarter of 2014) to predict Arista's revenues during the "conduct period" that would have occurred "but for Cisco's conduct from the first quarter [of] 2015 onwards."  Scott Morton Report ¶¶ 209–10.  As Arista argues, Dr. Scott Morton's analysis takes into account Cisco's aggressive pricing and sales of new switches because those factors existed during the benchmark period.  *Id.* ¶¶ 60–62; *see also* Ex. B to Seddon Decl. ("Scott Morton Dep.") 363:23–9, ECF 208-7 (explaining that "much of the release [of new products] actually occurs in the [benchmark period]" and thus that factor is accounted in the model). Likewise, contrary to Cisco's contention, Dr. Scott Morton's model takes into account the increased competition from white box installations and Juniper which had increases in market share during the benchmark period.  *See* Scott Morton Dep. 364:10–18 (explaining that white boxes were introduced before the conduct period and thus are accounted for in the model); Fig. 4 of Scott Morton Report (showing Juniper's trend in market share during the benchmark period).[5] For these reasons, the Court is unpersuaded by Cisco's argument that Dr. Scott Morton's treatment

[4] Dr. Scott Morton treats the period from the first quarter in 2015 to the last quarter in 2016 as the "conduct period" when Cisco was actively litigating the CLI case.  Scott Morton Report ¶ 208. Cisco filed the CLI case on December 5, 2014 and the jury reached a jury verdict on December 14, 2016.

[5] Cisco also contends that Dr. Scott Morton fails to consider the increased market share of Huawei.  Scott Morton Mot. 8.  However, Huawei does not have a significant presence in the U.S. (*see* Fig. 4 of Scott Morton Report) and Huawei's increase in worldwide market share is largely irrelevant because Dr. Scott Morton estimates only loss of revenues in the U.S. as a conservative measure.  *Id.* ¶ 212 (explaining that the damages calculation exclusively considers only Arista's U.S. revenues as a conservative estimate).

United States District Court
Northern District of California

1   of Cisco's aggressive pricing and new switches as well as competition from other vendors renders

2   her opinions unreliable.  Whether Dr. Scott Morton's benchmark analysis properly considers the

3   effects of those factors goes to the weight rather than the admissibility of her opinions.  *Hemmings*

4   *v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("[I]n most cases, objections to the

5   inadequacies of a study are more appropriately considered an objection going to the weight of the

6   evidence rather than its admissibility.  Vigorous cross-examination of a study's inadequacies

7   allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice."

8   (internal citation omitted)).

9          Cisco also argues that Dr. Scott Morton does not separate the effects of Cisco's lawful

10  patent litigation and corresponding ITC investigations.  Scott Morton Report 7.  Arista admits that

11  Dr. Scott Morton's model does not "quantifiably" separate the impact of Cisco's purported

12  anticompetitive conduct from Cisco's ITC actions.  Scott Morton Opp'n 7.

13         Nevertheless, Arista asserts that Dr. Scott Morton "qualitatively" assesses the impact of the

14  ITC litigations.  *See* Hearing Tr. 51:23–52:13, 54:24–55:2; Scott Morton Opp'n 7.  Indeed, Dr.

15  Scott Morton has reviewed evidence to consider the effect of the parties' dispute before the ITC.

16  For example, Dr. Scott Morton analyzes the trend in Arista's new customer acquisitions before

17  and during the "conduct period" and concludes that the slowdown of acquisitions is attributable to

18  Cisco's change in CLI policy rather than the ITC import bans.  *See id.* ¶¶ 185–86.  Moreover, Dr.

19  Scott Morton also considers that Arista was able to maintain production in face of the ITC's

20  import ban by "████████████████████████████████████████████████████████

21  ████████████████████████████████████"  *Id.* ¶ 234.  In her deposition, she

22  explains that her analysis gives substantial weight to Cisco's CLI-related conduct and that her

23  assessment is supported by Cisco's 30(b)(6) witness' description of the CLI as being

24  "foundational."  Scott Morton Dep. 268:2–12; 355:1–356:22; 362:21–363:3.  Because Dr. Scott

25  Morton considers evidence and conducts an analysis to support her discount of the effects of

26  Cisco's ITC actions, the Court concludes that her opinions are based on an adequate foundation

27  and a reliable methodology. Therefore, Dr. Scott Morton's damages opinions based on her

28

United States District Court
Northern District of California

forecasting model will not be excluded.[6]

The cases relied on by Cisco—*City of Vernon* and *Farley*—do not dictate a conclusion that Dr. Scott Morton's damages opinions are inadmissible.  Those cases do not directly address the admissibility of an expert's testimony but rather speak to the issue of an antitrust plaintiff's burden of proving damages.  *See City of Vernon*, 955 F.2d at 1373; *Farley*, 786 F.2d at 1351–52.

That said, *City of Vernon* and *Farley* raise a concern on Arista's burden to prove damages.  Those cases hold that the antitrust plaintiff must proffer sufficient evidence so that a jury could reasonably estimate without speculation the amount of damages attributable to the unlawful conduct.  *See City of Vernon*, 955 F.2d at 1371–73; *Farley*, 786 F.2d at 1350–52.  In this regard, Dr. Scott Morton's opinions raise an issue due to her model's inability to quantitatively separate out the effects of Cisco's purported anticompetitive conduct and the ITC actions.  But as the Ninth Circuit recognized in *City of Vernon*, a plaintiff's evidence on damages may be "filled in by testimony at trial."  955 F.2d at 1373 (citing *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1513 (9th Cir. 1985)).  Here, Arista represents that it will proffer other evidence to support apportionment of damages.  Hearing Tr. 63:16–17.  For the instant motion, the Court is reviewing only the admissibility of Dr. Scott Morton's opinions based on her forecasting model and thus need not determine whether Arista would be able to ultimately satisfy its burden to prove damages without requiring speculation.

Accordingly, the Court DENIES Cisco's motion to exclude Dr. Scott Morton's opinions regarding damages based on her forecasting model.  During the hearing, Cisco argued that it would be prejudiced if Arista were allowed to present a huge damages number without a basis for apportionment.  Hearing Tr. 43:2–3.  At this juncture, the Court is unable to determine the merits of Cisco's "prejudice" argument without knowing the entirety of Arista's apportionment evidence.  Cisco will have the opportunity to raise objections during trial.

---

[6] Cisco also contends that Arista failed to take discovery of its customers on whether Arista's lost sales were due to the CLI litigation or the ITC actions.  *See* Hearing Tr. 41:2–8.  Arista responds that it cannot survey unidentified customers and that it is not required to survey all customers in the industry.  *Id.* at 55:15–21.  The Court finds that Arista's lack of discovery of its customers does not affect the reliability and admissibility of Dr. Scott Morton's opinions although conducting such discovery may have bolstered her analysis.

United States District Court
Northern District of California

### iii.    Dr. Scott Morton's Opinions on Apportionment that are Purportedly Undisclosed in Her Expert Report

Cisco seeks to exclude Dr. Scott Morton's opinions on apportionment of damages that she provided during her deposition.  Scott Morton Mot. 9.  Specifically, Cisco challenges Dr. Scott Morton's deposition testimony that "the effects of the [CLI] copyright litigation are 'a much more impactful and important part of the effect on demand than the patent litigation.'"  *Id.* (citing Scott Morton Dep. 358:12–359:25).  Cisco contends that this opinion should be excluded because the opinion is not disclosed in Dr. Scott Morton's Report and it is based on an ad hoc evaluation that she is unqualified to perform.  *Id.* at 9–10.

Arista counters that Dr. Scott Morton properly responded to the questions of Cisco's counsel at deposition regarding the confounding effects on damages such as the ITC proceedings. Scott Morton Opp'n 9.  Arista further argues that Dr. Scott Morton is qualified to elaborate on the details of her damages model.  *Id.* at 10.

The Court agrees with Arista.  Dr. Scott Morton's deposition testimony regarding the larger effect of the CLI litigation compared to the patent litigation is not a new opinion undisclosed in her report.  For example, Dr. Scott Morton considers the impact of Cisco's conduct on Arista's acquisition of new customers.  Scott Morton Report ¶¶ 183–86.  She analyzes the decline in new customer acquisitions during the conduct period and concludes that the slowdown is attributable to Cisco's change in CLI policy and the CLI litigation rather than the ITC import bans.  *See id.* ¶¶ 185–86.  Thus, the Court finds that Dr. Scott Morton's response that was made during her deposition does not go beyond what she opines in her expert report.  Dr. Scott Morton is not limited to the reading of her report.  *Lewert v. Boiron, Inc.*, 212 F. Supp. 3d 917, 932 (C.D. Cal. 2016).  Indeed, an expert may "supplement, elaborate upon, and explain his [or her] report in . . . oral testimony."  *Id.*  Dr. Scott Morton did not make an improper opinion when she elaborated her damages analysis at her deposition.

In addition, the Court is unpersuaded by Cisco's argument that Dr. Scott Morton conducted an improper ad hoc evaluation that warrants an exclusion of her damages opinion.  Cisco takes issue with Dr. Scott Morton's deposition statement that patents "'pose[] a much less serious long-run threat to a customer' because 'you can design around them.'"  Scott Morton Mot. 9 (citing

1    Scott Morton Dep. 359:8–12).  Here, the Court does not find that Dr. Scott Morton is testifying

2    about designing around patents as a technical matter, which is a field that she does not have

3    expertise.  Rather, Dr. Scott Morton is opining on the economic effects of patent lawsuits while

4    giving consideration to the possibility of circumventing patents.  Whether her opinion is correct

5    goes to "the weight of the evidence rather than its admissibility" and is subject to cross-

6    examination.  *Hemmings*, 285 F.3d at 1188.

7         Accordingly, Cisco's motion to exclude Dr. Scott Morton's opinions on apportionment of

8    damages that she provided during her deposition is DENIED.

9    **III.    ORDER**

10        For the foregoing reasons, Cisco and Arista's *Daubert* motions are both GRANTED IN

11   PART and DENIED IN PART.

12        1.    Cisco's motions to exclude expert testimony are GRANTED with respect to:

13             a.    Dr. Black's opinions regarding whether Cisco's CLI is a *de facto* or informal

14                  industry standard as well as opinions on corporate intent or beliefs of others as

15                  set forth in the CLI *Daubert* Motions Order.

16             b.    Dr. Scott Morton's opinions regarding the existence of a *de facto* or informal

17                  standard.

18        2.    Cisco's motions to exclude expert testimony are DENIED with respect to:

19             a.    Dr. Scott Morton's opinions regarding damages based on her forecasting

20                  model.

21             b.    Dr. Scott Morton's opinions on apportionment of damages that she provided

22                  during her deposition.

23        3.    Arista's motions to exclude expert testimony are GRANTED with respect to:

24             a.    Dr. Almeroth's opinions regarding whether Cisco was public and consistent

25                  concerning its intellectual property in the CLI, including paragraphs 129–131 of

26                  Dr. Almeroth's Rebuttal Report.

27             b.     Dr. Almeroth's opinions regarding purported source code copying, the "look

28                  and feel" of Cisco's CLI, and Arista's state of mind or vouching for the

United States District Court
Northern District of California

20

opinions of others as set forth in the CLI *Daubert* Motions Order.

    c.  Dr. Carlton's opinions regarding what conduct the antitrust laws should and should not punish that are presented in paragraphs 13, 60, 61, 62 (last sentence), 77 (last sentence), and 83 of Dr. Carlton's Report.

    d.  Dr. Carlton's opinions that are inconsistent with *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) and presented in paragraphs 13, 60, and 61 of Dr. Carlton's Report.

4.    Arista's motion to exclude Dr. Carlton's opinions is DENIED as to the remainder.

**IT IS SO ORDERED.**

Dated: June 1, 2018

BETH LABSON FREEMAN
United States District Judge