MATTHEW D. POWERS (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
WILLIAM NELSON (Bar No. 196091)
william.nelson@tensegritylawgroup.com
ROBERT GERRITY (Bar No. 268084)
robert.gerrity@tensegritylawgroup.com
NATASHA SAPUTO (Bar No. 291151)
natasha.saputo@tensegritylawgroup.com
SAMANTHA JAMESON (Bar No. 296411)
samantha.jameson@tensegritylawgroup.com
JENNIFER ROBINSON (Bar No. 270954)
jen.robinson@tensegritylawgroup.com
WANLI CHEN (Bar No. 300254)
wanli.chen@tensegritylawgroup.com
DANIEL M. RADKE (Bar No. 307718)
daniel.radke@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone: (650) 802-6000
Fax: (650) 802-6001

Attorneys for Plaintiff
ARISTA NETWORKS, INC.

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| ARISTA NETWORKS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CISCO SYSTEMS, INC.,<br><br>Defendant. | Case No. 5:16-CV-00923-BLF<br><br>**ARISTA NETWORKS, INC.'S PROFFER OF EVIDENCE REGARDING APPORTIONMENT OF DAMAGES**<br><br>Date: July 13, 2018<br>Time 10:00 A.M.<br>Judge: Hon. Beth Labson Freeman<br>Dept: Courtroom 3<br><br>**DEMAND FOR JURY TRIAL** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. LEGAL STANDARDS ..... 1

III. PROFFER OF EVIDENCE ..... 4

A. The Jury Can Rely on Dr. Scott Morton's Qualitative Analysis of the Evidence to Apportion Damages or to Determine That no Apportionment Is Necessary ..... 4

B. The Jury Can Rely on Cisco's Own Admissions as a Basis for Apportionment ..... 5

C. The Jury Can Rely on Arista's Sales History as a Basis for Apportionment ..... 8

1. Arista's Sales History by Customer Vertical ..... 8

2. The List of CLI-Valuing Customers for Whom Arista Knows it Lost a Sale due to Cisco's Litigation ..... 11

IV. REQUEST FOR IN-PERSON HEARING ..... 13

V. CONCLUSION ..... 13

# TABLE OF AUTHORITIES

**Cases**

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) .......... 1, 2, 5

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.*,
786 F.2d 1342 (9th Cir. 1985) .......... 3

*Handgards, Inc. v. Ethicon, Inc.*,
743 F.2d 1282 (9th Cir. 1984), *cert. denied*, 469 U.S. 1190 (1985) .......... 2

*In re High-Tech Emple. Antitrust Litig.*,
No. 11-CV-02509-LHK, 2014 U.S. Dist. LEXIS 47181 (N.D. Cal. Apr. 4, 2014) .......... 2

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) .......... 3

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) .......... 2, 3

*Knutson v. Daily Review, Inc.*,
548 F.2d 795 (9th Cir. 1976) .......... 3

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
791 F.2d 1356 (9th Cir. 1986). .......... 3, 5

*Matthew Enter. v. Chrysler Grp. LLC*,
No. 13-cv-04236-BLF, 2016 U.S. Dist. LEXIS 108686 (N.D. Cal. Aug. 3, 2016). .......... *passim*

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988) .......... 3

*Moore v. Jas. H. Matthews & Co.*,
682 F.2d 830 (9th Cir. 1982) .......... 1, 2, 3

*Vernon v. S. Cal. Edison Co.*,
955 F.2d 1361 (9th Cir. 1992) .......... 3

*Zenith Radio Corp. v. Hazeltine Research*,
395 U.S. 100 (1969) .......... 1, 3

# I. INTRODUCTION

Pursuant to the Court's Order at the Pretrial Conference, Arista hereby submits its proffer of evidence concerning apportionment of damages. Contrary to the representations of counsel for Cisco that "[t]here's not a shred of evidence in this case that could apportion" Arista's lost profits as determined by its expert economist Dr. Fiona Scott Morton, ECF No. 341 (6/14/18 Pretrial Conf. Tr.) at 98:16-17, there is more than sufficient evidence in the case upon which the jury could base an apportioned damages award. As described further below, this includes: Dr. Scott Morton's own admissible opinion regarding apportionment and the bases for it; Cisco's admissions regarding the "[redacted]" importance of the CLI to the substantial majority of Arista's customer base; the proportion of Arista's historical sales to specific industry "verticals" for which the CLI is important; and Arista's Salesforce.com data regarding lost sales opportunities. As described below, each of these approaches provides the necessary "reasonable foundation from which a jury can calculate the amount of damages" as a matter of reasonable inference. *Matthew Enter. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2016 U.S. Dist. LEXIS 108686, at *13 (N.D. Cal. Aug. 3, 2016).

# II. LEGAL STANDARDS

Supreme Court and Ninth Circuit precedent hold that proof sufficient to provide the jury with a basis to apportion damages, like all proof of the amount of damages in an antitrust case, is subject to a "relaxed standard." *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982). As the Supreme Court has explained,

> Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; ***damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts***. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of ***just and reasonable inference*** from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

*Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 123-24 (1969) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)).[1] This "willingness to accept a degree of uncertainty" in

[1] Emphasis supplied throughout unless otherwise noted.

antitrust cases "rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land," but it "also rests on the principle . . . that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566-67 (1981).

In keeping with this Supreme Court precedent, the Ninth Circuit has confirmed that it requires "a lesser quantum of proof to support the amount of damages" in antitrust cases, holding that an "antitrust plaintiff must simply provide evidence to support a 'just and reasonable estimate of the damage.'" *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) (citations omitted), *cert. denied*, 469 U.S. 1190 (1985). To enable the jury to make such an estimate, "[i]t will be enough if the evidence shows the extent of the damages as a matter of ***just and reasonable inference***, although the result be only approximate." *Moore*, 682 F.2d at 836. "In other words, an antitrust plaintiff is only obligated to provide the trier-of-fact with ***some*** basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." *Id.*

To be sure, even where, as here, "the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." *Bigelow,* 327 U.S.at 264-65. As this Court has held, although "damages may be ascertained from a jury's just and reasonable inference from proof of the wrongful act, its tendency to injure plaintiff's business, and evidence of decline in profits, there must nevertheless be a reasonable foundation from which a jury can calculate the amount of damages." *Matthew Enter.,* 2016 U.S. Dist. LEXIS 108686, at *13. But the jury is required only to be provided with "relevant data" sufficient to "make a ***just and reasonable estimate of the damage*** . . . and render its verdict accordingly," and in doing so "***juries are allowed to act upon probable and inferential***, as well as direct and positive proof," *Bigelow,* 327 U.S. at 264-65. "[A]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Id.*

This district recognizes the "well-established Supreme Court and Ninth Circuit authority holding that damages in antitrust cases often cannot, and therefore need not, be proven with exact certainty." *In re High-Tech Emple. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 U.S. Dist. LEXIS 47181, at *74-77 (N.D. Cal. Apr. 4, 2014) (J. Koh) (collecting and summarizing cases: *Zenith Radio*, 395 U.S. at 123

(1969) ("[D]amages issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."); *J. Truett Payne*, 451 U.S. at 566 (expressing "willingness to accept a degree of uncertainty" in antitrust damage proof given that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation"); *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) (proof of damages is sufficient "if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate") (citation omitted); *Moore*, 682 F.2d at 836 ("[A]n antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations.") (citation omitted); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 533 (6th Cir. 2008) ("[T]he antitrust cases are legion which reiterate the proposition that, if the fact of damages proven, the actual computation of damages may suffer from minor imperfections.") (citation omitted).).

As such, where courts have excluded damages opinions or reversed jury awards due to a failure to apportion the amount of harm between lawful and unlawful causes, they have done so ***only*** where a plaintiff has failed to present "***any*** evidence permitting the jury to parse out which damages are attributable to the unlawful competition." *Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1351 (9th Cir. 1985); *see also Vernon v. S. Cal. Edison Co.,* 955 F.2d 1361, 1372 (9th Cir. 1992) (no evidence "to segregate the losses, if any, caused by acts which were not antitrust violations from those that were."); *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 808 (9th Cir. 1988) (summary judgment proper where plaintiffs offered "***no*** expert witnesses ***or*** designated documents providing competent evidence from which a jury could fairly estimate damages."). So long as there is ***some*** evidence, including even "probable and inferential" proof, upon which a jury could apportion damages as a matter of reasonable inference, then the question of damages should go to the jury, and the Court should "not 'play Monday morning quarterback' and supplant the jury's evaluation of the complex and conflicting evidence" with its own. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 791 F.2d 1356, 1365-66 (9th Cir. 1986). That is the case here, and the question of apportionment should be left in the hands of the jury.

## III. PROFFER OF EVIDENCE

### A. The Jury Can Rely on Dr. Scott Morton's Qualitative Analysis of the Evidence to Apportion Damages or to Determine That no Apportionment Is Necessary

The Court has already ruled that Arista may present one basis for the jury to apportion Arista's lost profits: the opinions of Dr. Fiona Scott Morton, the economic expert who measured those lost profits. In its *Daubert* motion, Cisco sought to exclude a purportedly "new opinion on apportionment" offered at Dr. Scott Morton's deposition (ECF No. 208-4 at 9-10); namely, that Cisco's anticompetitive CLI conduct had "a much more impactful and important part of the effect on demand than the patent litigation" brought by Cisco. *See* ECF No. 208-7 (2/15/2018 Morton Dep. Tr.) at 358:12–359:25. Her opinion was based, *inter alia,* on evidence from Cisco that the CLI is [REDACTED] to customer demand, as well as evidence that Arista had successfully designed around the ITC patents at issue, and avoided customer product shortages. *Id*. This evidence led her to conclude that Cisco's ITC case was a "less important factor in demand than closing the CLI," which was "much more impactful and important." *Id*. at 356:19-20, 358:12-359:25; *see also id*. at 361:1-5 (". . . the damages are going to be driven in substantial and material part by the CLI actions and associated FUD . . .").

The Court denied Cisco's motion, finding that Dr. Scott Morton's apportionment opinion was admissible. ECF No. 303 (Order on *Daubert* Motions) at 20. In doing so, the Court specifically found that "Dr. Scott Morton's deposition testimony regarding the larger effect of the CLI litigation compared to the patent litigation is not a new opinion undisclosed in her report." *Id*. at 19. The Court also rejected Cisco's argument "that Dr. Scott Morton conducted an improper ad hoc evaluation that warrants an exclusion of her damages opinion," concluding that "[w]hether her opinion is correct goes to 'the weight of the evidence rather than its admissibility' and is subject to cross-examination." *Id*. at 19-20.

Because the jury will hear Dr. Scott Morton's apportionment opinion, and the bases for it, they may properly rely on that opinion to apportion damages between Cisco's CLI conduct and its ITC litigation. The jury may, for example, credit her opinion that it is "unlikely that the [ITC] import bans themselves were the driving force behind the slowdown in new customer acquisitions" that supports her lost profits model; determine on that basis that no apportionment is necessary; and award Arista the full

amount of claimed lost profits. ECF No. 210-21 (Report of Fiona Scott Morton), ¶ 185. Or, if the jury determines that some apportionment is necessary, it may rely on her opinion that Cisco's CLI conduct had "a much more impactful and important part of the effect on demand than the patent litigation" to apportion at least 51% of the lost profits to that CLI conduct and award damages accordingly. ECF No. 208-7 (2/15/2018 Morton Dep. Tr.) at 358:12–359:25. Either result is supported by admissible evidence and expert opinion, and neither could properly be overturned on appeal. *See, e.g., L.A. Mem'l,* 791 F.2d at 1365-66 (jury verdicts must be affirmed where they "find substantial support in the record and lie within the range sustainable by the proof."); *see also Bigelow*, 327 U.S. 251 at 266 ("The evidence here was ample to support a just and reasonable inference that petitioners were damaged by respondents' action, whose unlawfulness the jury has found. . . . The comparison of petitioners' receipts before and after respondents' unlawful action impinged on petitioners' business afforded a sufficient basis for the jury's computation of the damage, where the respondents' wrongful action had prevented petitioners from making any more precise proof of the amount of the damage.")

### B. The Jury Can Rely on Cisco's Own Admissions as a Basis for Apportionment

The jury will also hear extensive evidence from Cisco and Arista fact witnesses, based on binding admissions from Cisco about the importance of a "Cisco-like CLI" to Arista's ability to make sales, which will readily serve as a basis for the jury to apportion Arista's lost profits damages between Cisco's CLI conduct and other causes. In prosecuting its copyright litigation, Cisco's fact witnesses repeatedly and consistently emphasized that the CLI played a critical role in Arista's ability to make sales, and take sales away from Cisco. For example, Cisco's own Senior Vice President of data center sales, Frank Palumbo, testified as Cisco's Rule 30(b)(6) representative that having a Cisco-like CLI was "[redacted] to Arista's ability to make sales against Cisco, and Mr. Palumbo vouched for a list of 74 major customers, including [redacted], for which Cisco contended Arista could not have sold products were it not for their use of a Cisco-like CLI. ECF No. 252-10 (Cisco interrogatory response listing customers); ECF No. 252-11 (6/7/2016 Palumbo Dep. Tr.) at 20:2-9 ("[redacted]

[redacted] ECF No. 210-22 (6/7/2016 Palumbo Dep. Tr.) at 22:14-20 ("[redacted]

Similarly, Cisco's Senior Director of Product Management within the Enterprise Networking Group, Christine Bakan, testified at the copyright trial that the CLI is "the most comprehensive direct mechanism by which you could take advantage and use all the capabilities that are available on a switch or a router," and that the CLI is Cisco's customers' "preferred mechanism by far" to "manage the device" and "get information about the device." **Ex. 1**[2] (*Cisco Sys. v. Arista Networks, Inc*., No. 14-CV-5344-BLF (N.D. Cal. Nov. 28, 2016) Trial Tr. Vol. 3) at 460:17-19, 466:14-467:2. Further, Cisco's own damages expert in the copyright trial testified that "there will be customers, we have – we will talk about evidence of customers, that won't move [from Cisco to Arista] but for the CLI." **Ex. 2** (*Cisco Sys. v. Arista Networks, Inc*., No. 14-CV-5344-BLF (N.D. Cal. Dec. 2, 2016) Trial Tr. Vol. 7) at 1575:10-11.

These binding admissions from Cisco, in conjunction with evidence provided in discovery by Arista, readily serve as a basis for the jury to apportion Arista's lost profits. For example, Arista has produced its comprehensive customer and revenue history in discovery. ECF No. 298-3 (Ex. 557 on Arista's Exhibit List) at 42. Arista witnesses with personal familiarity with those billing records, including Chief Customer Officer Anshul Sadana and Senior Vice President of Global Operations and Marketing Mark Foss, can testify as to the proportion of Arista's annual revenue attributable to Cisco's list of 74 customers for whom Cisco contends that the CLI is [redacted]" and which Cisco contends would not be Arista customers but for Arista's use of a Cisco-like CLI in its products. During the period of Cisco's "closed CLI" anticompetitive conduct in 2015 and 2016, those customers comprised almost [redacted]% of Arista's revenue:

| Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Average (2015-2016) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[2] References to **Ex. 1-7** herein refer to the exhibits to the Declaration of William P. Nelson In Support Of Arista Networks, Inc.'s Proffer Of Evidence Regarding Apportionment Of Damages.

From this evidence, the jury could readily determine, as a matter of reasonable inference, that the same proportion of customers for whom the CLI was "[REDACTED]" for the sales Arista ***made,*** should be applied to the sales Arista ***lost***. In other words, the jury could decide that, just as [REDACTED]% of the sales Arista made during the conduct period were to customers that Cisco contends would not have purchased Arista equipment but for the presence of a Cisco-like CLI, so too should [REDACTED]% of the lost sales be attributed to customers for whom the CLI was "[REDACTED]." Supporting the reasonableness of such an inference is that, as Cisco's own economics expert has determined, [REDACTED]; during the period of 2015 and 2016, new customers accounted for [REDACTED] of Arista revenues in each quarter. ECF No. 210-09 (Report of Dennis Carlton, ¶ 104, Fig. 11). Since the predominant share of Arista's revenues derived from existing customers during that period, it would be more than reasonable for the jury to conclude that the predominant share of lost profits could ***also*** be attributed to existing Arista customers who were dissuaded from additional purchases of Arista equipment. As the jury would have before it Cisco's own assessment of the proportion of existing Arista customer revenue for which the CLI is "[REDACTED]" such that a Cisco-like CLI was necessary for Arista to make those sales ([REDACTED]%), it is reasonable for the jury to use that figure to apportion lost profits between profits lost due to Cisco's CLI conduct and profits lost due to other reasons, such as Cisco's ITC litigation. In that event, the jury would apply the [REDACTED]% figure to Dr. Scott Morton's baseline lost profits figure of $159.7 million, to arrive at a damages award of $[REDACTED] million. Such an award would be based neither on speculation nor guesswork, but instead on Cisco's own admissions about the importance of the CLI, and Arista's historical revenues by customer. As such, this evidence provides a "reasonable foundation from which a jury can calculate the amount of damages." *Matthew Enter.*, 2016 U.S. Dist. LEXIS 108686, at *13.

As another reasonable basis for the jury to apportion damages, Arista witnesses such as Mr. Sadana and Mr. Foss may also testify as to the proportion of Arista's annual revenue attributable to the ***overlap*** between Cisco's list of 74 customers for whom Cisco contends that the CLI is "[REDACTED]" and Arista's list of [REDACTED] customers it has identified as having lost sales during the conduct period due to Cisco's CLI conduct. The resultant percentage figure would therefore represent customers that ***both*** Cisco and Arista agree place substantial importance on the CLI in making purchase decisions, and which

Arista contends represents at least some portion of the lost profits during the period of Cisco's conduct – an average of [REDACTED]% in 2015 and 2016.

| Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Average (2015-2016) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] |

From this evidence, the jury could determine, as a matter of reasonable inference, that the proportion of Arista revenue represented by customers on both lists of customers to whom the CLI is significant should be applied to the profits Arista lost. In that event, the jury would apply the [REDACTED]% figure to Dr. Scott Morton's baseline lost profits figure of $[REDACTED] million, to arrive at a damages award of $[REDACTED] million.

### C. The Jury Can Rely on Arista's Sales History as a Basis for Apportionment

Arista may also present the jury with evidence of Arista's own sales history through Arista's fact witnesses, including information regarding the importance of a Cisco-like CLI to Arista's customers in different industries (Arista refers to these groupings of similarly-situated customers as "verticals"); the percentage of Arista's revenue received from each of those customer verticals; and Arista's Salesforce.com data regarding sales lost for the [REDACTED] customers that Arista identified as customers who used the CLI, valued the CLI, and/or considered a Cisco-like CLI to be a product requirement and for whom Arista lost a sale opportunity because of Cisco's litigation against Arista or fear of Cisco's litigation. This evidence may readily serve as additional reasonable bases for the jury to apportion Arista's lost profits damages between Cisco's CLI conduct and other causes, should the jury determine apportionment to be necessary.

#### 1. Arista's Sales History by Customer Vertical

Arista recognizes that Ethernet switch customers within a similar industry or similar type of business often may share similar deployments and use cases for Arista's products, and may similarly have a shared set of features and other aspects of Arista's products that are of particular importance to them. Arista refers to these groupings of similarly situated customers as customer "verticals" [REDACTED]

:



**Ex. 3** (excerpts of July 21, 2015 Arista Master Deck, Trial Exhibit 1124 and Exhibit 1124 to the 10/23/2017 Deposition of Mark Foss) at ARISTANDCA13004607; *see also*, *e.g.*, **Ex. 4** (excerpts of July 20, 2017 Master Deck, Trial Exhibit 1190 and Exhibit 1190 to the 11/16/2017 Deposition of Arista's CFO Ita Brennan) at slides 40-41 (also tracking revenue by verticals).

Arista witnesses including, *e.g.*, Chief Customer Officer Anshul Sadana and Senior Vice President of Global Operations and Marketing Mark Foss are personally familiar with Arista's tracking and use of customer vertical groupings. Arista witnesses including Anshul Sadana and Mark Foss are also personally familiar with the use and importance of the CLI by and to customers in the different customer vertical groupings. Indeed, Arista designated (and provided for deposition) Anshul Sadana as

Arista's 30(b)(6) designee on topics 17 and 29 and Mark Foss as its designee on topic 4—all topics asked by Cisco regarding precisely these customer vertical groupings:

> 4. The marketing and advertising of Arista's Ethernet switches, including any market segmentation ***or vertical breakdown*** used by Arista, segment-specific ***or vertical-specific*** marketing strategies, Arista's marketing collateral, and how Arista's marketing collateral is created and used.
>
> 17. Arista's strategies for competing in Ethernet switch markets, including general strategies, segment-specific, ***vertical-specific***, customer-specific, and competitor-specific strategies.
>
> 29. Arista's analysis of Ethernet switch markets during its ordinary course of business, including its analysis of market size/potential, identification of sub-markets, ***identification of verticals***, market trends, identification of key customers, and the sources of information upon which Arista relies.

**Ex. 5** (Cisco's Fourth 30(b)(6) Notice to Arista, excerpts) at topics 4, 17, and 29. Both Mr. Sadana and Mr. Foss in fact testified about these customer vertical groupings at their depositions. **Ex. 6** (11/7/2017 Sadana Dep. Tr.) at, *e.g.*, 120:5-129:14 (testifying, for example, that ); **Ex. 7** (10/23/2017 Foss Dep. Tr.) at 175:4-176:17 (testifying regarding Exhibit 1124 and the same "" slide shown above).

Arista has produced its comprehensive customer and revenue history in discovery. ECF No. 298-3 (Ex. 557 on Arista's Exhibit List) at 42. Arista witnesses with personal familiarity with Arista's customer verticals groupings and with those billing records, including Anshul Sadana and Mark Foss, can testify regarding the customer verticals for which the CLI is important and can testify to the proportion of Arista's revenue attributable to those customer verticals. For example, Mr. Sadana may testify that the CLI is used by and important to customers in each of Arista's verticals other than the "" vertical. Based on Arista's produced comprehensive revenue data, Mr. Sadana or Mr. Foss can testify regarding the portion of Arista's revenue attributable to non- customers during the period of Cisco's "closed CLI" anticompetitive conduct. During the period of Cisco's "closed CLI" anticompetitive conduct in 2015 and 2016, those customers comprised approximately % of Arista's revenue:

| Quarter | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Average |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

Should the jury determine that further apportionment of Dr. Scott Morton's $159.7 million lost profits calculation is appropriate, the jury could readily determine, as a matter of reasonable inference, that the same proportion of Arista's revenue received from customers in verticals that value the CLI should be applied to apportion the sales that Arista lost. For example, the jury could decide that, just as % of the sales Arista ***made*** during Cisco's "closed CLI" conduct were to customers in verticals that value the CLI, so too should % of the sales Arista ***lost*** be attributed to customers that value the CLI. Again, supporting the reasonableness of such an inference is that, as Cisco's own economics expert has determined, during the period of 2015 and 2016, new customers accounted for of Arista revenues in each quarter. ECF No. 210-09 (Report of Dennis Carlton at ¶ 104, Fig. 11). Since the predominant share of Arista's revenues derived from existing customers during that period, it would be more than reasonable for the jury to conclude that the predominant share of lost profits could ***also*** be attributed to existing Arista customers who were dissuaded from additional purchases of Arista equipment. Further, the jury would have before it evidence of the proportion of Arista's revenue (based on current customers) attributable to customer verticals that value the CLI, which the jury could readily use to apportion lost profits. In that event, the jury could apply the % figure to Dr. Scott Morton's baseline lost profits figure of $159.7 million to arrive at a damages award of $ million. Again, such an award would be based neither on speculation nor guesswork, but instead on Arista's own sales records and experience regarding the importance of the CLI to different customer groupings. As such, this evidence provides another "reasonable foundation from which a jury can calculate the amount of damages." *Matthew Enter.*, 2016 U.S. Dist. LEXIS 108686, at *13.

**2. The List of CLI-Valuing Customers for Whom Arista Knows it Lost a Sale due to Cisco's Litigation**

As already discussed in Arista's Opposition to Cisco's Motion for Summary Judgment (and at the hearing regarding summary judgment motions), Arista's Chief Customer Officer, Anshul Sadana, testified at his deposition as Arista's 30(b)(6) designee regarding a list of customers where Arista lost sales to those customers due to Cisco's litigation against Arista or fear of Cisco's litigation and where those customers used the CLI to configure and manage their switches, valued the CLI, or considered the

presence of a Cisco-like CLI a requirement. ECF No. 239-27 (11/7/2017 Sadana Dep. Tr.) at 24:10-58:5; ECF No. 314-10 (Sadana Dep. Ex. and Trial Exhibit 1158); *see also* ECF No. 239-27 (11/7/2017 Sadana Dep. Tr.) at 44:24-45:16 and 63:9-24. Arista witnesses, including Mr. Sadana, Mr. Foss, and Arista Director of Sales Kevin McCabe can testify about their personal knowledge regarding these customers. These Arista witness can also testify as to the fact that the list is underinclusive and is just the "tip of the iceberg" because it represents only those lost sales opportunities and only those litigation-based losses that Arista in fact learned of—it does not account for sales opportunities that Arista lost due to Cisco's litigation but that Arista never became aware of. Arista's expert economist Dr. Scott Morton can also testify about this list of customers.

Should the jury determine that further apportionment of Dr. Scott Morton's $159.7 million lost profits calculation is appropriate, this list (again in conjunction with Arista's comprehensive revenue and sales history information provided in discovery) can serve as another basis for the jury to apportion Arista's lost profits. For example, Arista has produced in discovery its Salesforce.com data recording lost sales opportunities, including lost sales for this list of [REDACTED] customers who value the CLI and for whom Arista lost a sale due to Cisco's litigation against Arista or fear of that litigation. ECF No. 298-3 (Exs. 4712 and 4713 on Arista's Exhibit List) at 157. Arista witnesses with personal familiarity with Arista's Salesforce.com data, including Anshul Sadana and Mark Foss, can testify as to the Salesforce.com data for these lost sales, including, for example, the anticipated dollar value recorded in that system for the lost sales. For example, the Salesforce.com data shows that the value of sales lost during the period of Cisco's "closed CLI" anticompetitive conduct in 2015 and 2016 for these [REDACTED] customers was in the range of $[REDACTED] million. Applying Arista's profit margin for the same time period, with which Mr. Sadana and Mr. Foss are also personally familiar, to that revenue range produces an estimated lost profits of $[REDACTED] million for the "tip of the iceberg" lost sales opportunities captured in the Salesforce.com data for these [REDACTED] customers. From this evidence, the jury could readily determine, as a matter of reasonable inference, that at least $[REDACTED] million of Dr. Scott Morton's baseline lost profits figure of $159.7 million is attributable to Cisco's "closed CLI" anticompetitive conduct. Such an award would be based neither on speculation nor guesswork, but instead on Arista's own records and knowledge of sales in fact lost from customers who value the CLI due to Cisco's litigation against Arista or fear of Cisco's

litigation. As such, this evidence also provides a "reasonable foundation from which a jury can calculate the amount of damages." *Matthew Enter*., 2016 U.S. Dist. LEXIS 108686, at *13.

## IV. REQUEST FOR IN-PERSON HEARING

Arista respectfully asks to be heard at an in-person hearing on these issues. The Court has currently set a hearing regarding this proffer for July 13, 2018 at 10:00 am.

## V. CONCLUSION

As summarized above, Arista will be able to present evidence at trial from which a jury could apportion Arista's lost profits as a matter of just and reasonable inference should the jury determine that apportionment of Arista's lost profits is appropriate.

Date: June 28, 2018

Respectfully submitted,

/s/ *Matthew D. Powers*

MATTHEW D. POWERS (SBN 104795)
WILLIAM NELSON (SBN 196091)
ROBERT GERRITY (SBN 268084)
NATASHA SAPUTO (SBN 291151)
SAMANTHA JAMESON (Bar No. 296411)
JENNIFER ROBINSON (Bar No. 270954)
WANLI CHEN (Bar No. 300254)
DANIEL M. RADKE (Bar No. 307718)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone: (650) 802-6000
Facsimile: (650) 802-6001
Email:
matthew.powers@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com
robert.gerrity@tensegritylawgroup.com
natasha.saputo@tensegritylawgroup.com
samantha.jameson@tensegritylawgroup.com
jen.robinson@tensegritylawgroup.com
wanli.chen@tensegritylawgroup.com
daniel.radke@tensegritylawgroup.com

DAVID H. REICHENBERG (*Pro Hac Vice*)
COZEN O'CONNOR
277 Park Avenue, 19th Floor
New York, NY 10172

Telephone: (212) 883-4900
Fax: (646) 461-2091
Email:
dreichenberg@cozen.com

JONATHAN M. JACOBSON (NY SBN 1350495)
CHUL PAK (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue Of The Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
Email:
jjacobson@wsgr.com
cpak@wsgr.com

SUSAN CREIGHTON (SBN 135528)
SCOTT A. SHER (SBN 190053)
BRADLEY T. TENNIS (SBN 281206)
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, Fifth Floor
Washington, D.C., 20006
Telephone: (202) 973-8800
Facsimile: (202) 973-8899
Email:
screighton@wsgr.com
ssher@wsgr.com
btennis@wsgr.com

ROBERT A. VAN NEST (SBN 84065)
BRIAN L. FERRALL (SBN 160847)
DAVID J. SILBERT (SBN 173128)
NICHOLAS DAVID MARAIS
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
Email:
rvannest@keker.com
bferrall@keker.com
dsilbert@keker.com
nmarais@keker.com

Attorneys for Plaintiff
ARISTA NETWORKS, INC.