UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ARISTA NETWORKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CISCO SYSTEMS INC., <br><br> Defendant. | Case No. 16-cv-00923-BLF <br><br> **ORDER REGARDING PLAINTIFF ARISTA NETWORKS, INC.'S PROFFER OF EVIDENCE ON APPORTIONMENT OF DAMAGES** <br><br> [Re: ECF 347-4] |

Imploring the Court to perform its gatekeeping function, Defendant Cisco Systems, Inc. ("Cisco") seeks to exclude Plaintiff Arista Networks, Inc.'s ("Arista") expert report for failure to apportion damages between lawful conduct and allegedly unlawful conduct. The Court is well aware of its obligations, including its overarching responsibility to allow cases to be tried on the merits and not improperly scuttled by inadequate evidentiary objections.

Cisco previously moved to exclude Arista's expert report under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, Cisco argued that the expert report of Dr. Fiona Scott Morton fails to segregate Arista's losses caused by Cisco's purported anticompetitive conduct from other lawful conduct. The Court denied Cisco's motion to exclude Dr. Scott Morton's damages opinions based on her forecasting model because Dr. Scott Morton conducted a qualitative analysis to support her discount of the effects of Cisco's ITC actions. *Daubert* Order 17–18, ECF 303. The Court, however, noted that Dr. Scott Morton's opinions raised an issue of whether Arista had sufficient factual evidence of apportionment to support any damages claim. *Id.* at 18. This was based on Dr. Scott Morton's acknowledgement that she was

unable to *quantitatively* distinguish the effects of Cisco's purported anticompetitive conduct from the ITC actions in her forecasting model. Arista represented that it would be able to proffer other evidence to support the apportionment of damages. *Id.*

On June 28, 2018, Arista submitted its proffer of evidence regarding the apportionment of damages. Proffer, ECF 347-4. Cisco submitted a response on July 6, 2018. Response, ECF 354-3. The Court held a hearing on July 13, 2018. The issue presented to the Court is whether Arista proffers sufficient evidence regarding apportionment of damages in support a just and reasonable estimate of damages.[1] For the reasons set forth below, the Court DENIES Cisco's request to exclude Dr. Scott Morton's damages opinions.

## I. LEGAL STANDARD

In antitrust cases, courts have distinguished between proof of causation of damages and proof of the amount of damages. *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992) (citing *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1164 (7th Cir. 1983)). Courts have "required a lesser quantum of proof to support the amount of damages." *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) (citation omitted). "It will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982) (citation omitted).

As such, in rendering a verdict, a "jury may make a just and reasonable estimate of the damage based on relevant data." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946). "In such circumstances[,] 'juries are allowed to act on probable and inferential as well as (upon) direct and positive proof.'" *Id.* (citations omitted). The "jury's finding of the amount of damages must be upheld unless the amount is 'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.'" *Handgards*, 743 F.2d at 1297 (citation omitted). On the other hand, a plaintiff fails to satisfy its burden to show the amount of damages when there is an "utter failure to make any segregation between damages attributable to lawful

---

[1] Cisco alternatively argued in its brief that the Court should reconsider its denial of summary judgment. Response 19–20. The Court declines to do so.

1  competition and that attributable to the unlawful scheme." *City of Vernon*, 955 F.2d at 1372
2  (citing *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985)).

## II.  DISCUSSION

Before turning to Arista's proffer of evidence, the Court summarizes relevant portions of Dr. Scott Morton's opinions.  Dr. Scott Morton applies a forecasting model to estimate Arista's lost revenues and damages.  Scott Morton Report ¶¶ 194–95, ECF 208-6.  In doing so, Dr. Scott Morton uses a "benchmark period"[2] to take into account lawful factors including Cisco's aggressive pricing and sales of new switches.  Scott Morton Report ¶¶ 60–62; Scott Morton Dep. 363:23–9, ECF 208-7.  The forecasting model also takes into account competition from traditional competitors like Juniper as well as competition from white box installations.  *See* Scott Morton Dep. 364:10–18; Fig. 4 of Scott Morton Report.  Thus, the forecasting model does quantitatively account for lost sales caused by external market factors.  Cisco challenges the failure to also quantitatively apportion lost sales between the CLI and ITC litigation.

Additionally, Arista points out that Dr. Scott Morton provides numerous reasons why she discounts the effects of the ITC litigation on Arista's lost revenue.  For example, Dr. Scott Morton analyzes the trend in Arista's new customer acquisitions before and during the "conduct period"[3] and concludes that the slowdown of acquisitions is attributable to Cisco's change in CLI policy rather than the ITC import bans.  *See* Scott Morton Report ¶¶ 185–86.  She also explains that her analysis gives substantial weight to Cisco's CLI-related conduct and that her assessment is supported by Cisco's 30(b)(6) witness Frank Palumbo's description of the CLI as being "foundational."  Scott Morton Dep. 268:2–12; 355:1–356:22; 362:21–363:3.  In addition, when considering the impact of the ITC litigation on Arista's sales, Dr. Scott Morton considers that patents can be designed around and takes into account that Arista was able to maintain production in the face of the ITC's import ban by "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] Dr. Scott Morton defines the "benchmark period" to be the time between the fourth quarter of 2008 and the fourth quarter of 2014.  Scott Morton Report ¶ 209.
[3] Dr. Scott Morton treats the period from the first quarter in 2015 to the last quarter in 2016 as the "conduct period" when Cisco was actively litigating the CLI case.  Scott Morton Report ¶ 208. Cisco filed the CLI case in December 5, 2014 and the jury reached a jury verdict on December 14, 2016.

1 ██████████████████████████████████████████████████████████." Scott Morton Dep.
2 358:12–359:25; Scott Morton Report ¶ 234. Considering those factors, Dr. Scott Morton opines
3 that the CLI litigation was "a much more impactful and important part of the effect on demand
4 than the patent litigation." *See, e.g.*, Scott Morton Dep. 359:20–359:25. She concludes that the
5 ITC litigation was a "less important factor in demand than closing the CLI" and that "the damages
6 are going to be driven in substantial and material part by the CLI actions and associated FUD."
7 *Id.* at 356:19–20, 361:1–5.

8 Although Dr. Scott Morton considers evidence and discounts the effects of the ITC
9 litigation, Arista admits that her forecasting model does not "quantifiably" separate the impact of
10 Cisco's purported anticompetitive conduct from Cisco's ITC actions. To address this issue, Arista
11 submits its Proffer to show that it has evidence to support the apportionment of damages. The
12 Court now turns to Arista's proffer of evidence and the parties' arguments.

13 **A.   Dr. Scott Morton's Report and Deposition Testimony**

14 Arista argues that a jury may rely on Dr. Scott Morton's opinions and the bases for her
15 opinions to apportion damages. Proffer 4. As an example, Arista contends that the jury may
16 credit Dr. Scott Morton's opinion that it is "unlikely that the [ITC] import bans themselves were
17 the driving force behind the slowdown in the new customer acquisitions" and determine that no
18 apportionment is necessary. *Id.* at 4–5 (citing Scott Morton Report ¶ 185). Arista further asserts
19 that, if the jury determines that "some apportionment is necessary," the jury may rely on her
20 opinion that Cisco's CLI conduct has "a much more impactful and important part of the effect on
21 demand than the patent litigation" to apportion at least 51% of the lost profits to the CLI conduct.
22 *Id.* at 5 (citing Scott Morton Dep. 358:12–359:25).

23 Cisco counters that Dr. Scott Morton's opinions cannot support apportionment of damages.
24 Response 6. Specifically, Cisco argues that Dr. Scott Morton does not offer any opinions that
25 quantify the lost sales caused by the alleged anticompetitive conduct. *Id.* at 6–7. In Cisco's view,
26 the Ninth Circuit has reversed a damages award based on a "methodology virtually identical to the
27 one that Arista proposes to offer through Dr. Scott Morton." *Id.* at 6 (citing *Magnetar Techs. Corp.*
28 *v. Intamin, Ltd.*, 801 F.3d 1150, 1158 (9th Cir. 2015)). In fact, Cisco deems the apportionment

4

opinions to be excludable junk science.

The Court does not find that *Magnetar* bars Arista from introducing Dr. Scott Morton's opinions on damages. In *Magnetar*, the Ninth Circuit affirmed the district court's decision to grant summary judgment because the expert's damages assessment would have left the jury to speculate or guess the proper amount of damages. 801 F.3d at 1159.

*Magnetar* considered the plaintiff's failure to provide a proper estimate of the amount of damages. 801 F.3d at 1159. The plaintiff failed to segregate the losses caused by unlawful conduct. *Id.* The court also addressed whether the alleged violation caused the damages. *Id.* at 1160. *Magnetar*, however, is distinguishable from this case. First, *Magnetar* rejected the expert's use of the plaintiff's projected revenue because the expert did not "delve into the merits of the projected results." *Id.* at 1159. Unlike the expert in *Magnetar*, Dr. Scott Morton developed a statistical model to project Arista's revenues. Scott Morton Report ¶¶ 223–230. Cisco does not dispute the reliability of that projection.

Second, *Magnetar* noted that "[b]ecause [the expert] did not make an effort to separate the losses . . ., it would have been impossible for a jury to estimate the lost profits attributable to [the anticompetitive] conduct." 801 F.3d at 1159–60. To the contrary, here, Dr. Scott Morton did not fail to consider effects of the ITC actions and she accounted for the effects of other market forces. As summarized earlier, Dr. Scott Morton opined that the CLI litigation was much more impactful than the ITC litigation and discounted the effects of the ITC actions after considering a number of factors. Dr. Scott Morton's opinions and certain fact evidence (as discussed later in this order) allow a jury to apportion damages that were caused by the alleged anticompetitive conduct by drawing reasonable inferences from the evidence.

Third, *Magnetar* found that none of the plaintiff's witness testimony established that the defendant's conduct caused the lost profits. 801 F.3d at 1160. The court further stated that the potential customers' statements that they decided not to purchase plaintiff's products due to "potential litigation" did not provide a clear causal link to lost profits. *Id.* Cisco vigorously argues that Arista similarly has no witness testimony and also that Arista does not even offer customer statements. However, even if Arista falls into some of the same evidentiary traps as

*Magnetar*, other evidence, including data on Arista's new customer acquisitions and Cisco's statements regarding customers who would not have purchased Arista's switches but for the CLI, can support Dr. Scott Morton's opinions as to impact of the CLI litigation. The Court therefore is unpersuaded by Cisco's reliance on *Magnetar*.

Further, Arista correctly points out that Dr. Scott Morton relies on evidence to opine that Cisco's CLI-related conduct had a bigger impact on Arista's lost sales than the ITC litigation. For instance, Dr. Scott Morton bases her opinion on evidence regarding the trend in Arista's new customer acquisitions before and during the "conduct period" (Scott Morton Report ¶¶ 185–86) as well as Arista's ability to maintain production by ▮ (Scott Morton Report ¶ 234). Dr. Scott Morton also considers evidence on the importance of CLI including Mr. Palumbo's statement that the CLI is foundational. *See, e.g.*, Scott Morton Dep. 268:2–12; 356:19–22. She concludes that the weight of the evidence shows that the ITC litigation was a less important factor than the CLI litigation. *See, e.g., id.* at 356:11–22; 359:8–25; 360:16–361:8. The Court is satisfied that Dr. Scott Morton has relied on a number of distinct pieces of evidence to reach her conclusion.

Upon considering the evidence discussed by Dr. Scott Morton, the Court finds that Dr. Scott Morton's report and deposition testimony would allow a jury to reasonably infer that at minimum Cisco's CLI-related conduct caused 51% of Arista's purported lost profits. *Moore*, 682 F.2d at 836 ("It will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.").

The Court notes that Cisco argued during the hearing that there is an abundance of evidence that shows Arista faced difficulty in delivering switches to customers due to the ITC import ban. To be sure, Cisco may present strong counter evidence against Arista's position. However, what Cisco offers is rebuttal evidence that may refute Dr. Scott Morton's opinions as opposed to showing the absence of evidence that supports her opinions. The Court does not find that Cisco has established that Arista has no evidence at all. Moreover, a large portion of the evidence Cisco cited pertains to proceedings before the ITC where there was no need to discuss the impact of the CLI litigation or to show apportionment.

### B. Cisco's Own Admissions as a Basis For Apportionment

Arista represents that Cisco's own admissions serve as a basis for a jury to apportion Dr. Scott Morton's baseline lost profits. Proffer 5–8. Arista argues that it will offer evidence including "binding admissions" from Cisco about the importance of a "Cisco-like CLI." *Id.* at 5. As an example, Arista asserts that Cisco's Senior Vice President of Data Center Sales, Mr. Palumbo, testified that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ . *Id.* According to Arista, Mr. Palumbo ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *Id.* (citing Palumbo Dep. 20:2–9, ECF 252-11; Palumbo Dep. 22:14–20, ECF 210-22). Arista further contends that Cisco's "binding admissions" serve as a basis for the jury to apportion Arista's lost profits in conjunction with evidence regarding (i) Cisco's list of 74 customers or (ii) the overlap between Cisco's list of 74 customers and Arista's list of ▉ customers who Arista has identified as having lost sales. Proffer 6–7. The Court addresses each argument separately.

#### i. Cisco's List of 74 Customers

Arista contends that its Chief Customer Officer Anshul Sadana and Senior Vice President of Global Operations and Marketing Mark Foss can testify about the proportion of Arista's annual revenue attributable to Cisco's list of 74 customers. Proffer 6. According Arista, those customers comprised 71.8% of Arista's revenue in 2015 and 2016. *Id.* Arista also asserts that Cisco's own expert, Dennis Carlton, determined that new customers comprise only a small portion (i.e., under 10%) of Arista's revenue. *Id.* at 7 (citing Carlton Report ¶ 104, ECF 210-9). On this basis, Arista claims that the predominant share of Arista's revenues was derived from existing customers. *Id.* Arista further argues that "it would be more than reasonable for the jury to conclude that the predominant share of lost profits" could be attributed to existing customers who would not have purchased Arista's switches but for its use of Cisco-like CLI. *Id.*

Cisco raises several points in opposition. First, Cisco argues that Arista offers new theories that were never disclosed and thus Arista's disclosure is untimely. Response 8 (citing Fed. R. Civ. P. 26(a), 37(c)(1)). During the hearing, Arista contended that it is not presenting new theories but rather it is pointing to previously disclosed evidence that supports apportionment in

7

favor of the effects of the CLI litigation.  The Court does not find that the Arista failed to disclose a new theory of damages, but rather offers this calculation to support Dr. Scott Morton's opinions based on previously disclosed evidence.   In addition, contrary to Cisco's contention (Response 13–14), the mere calculation of Arista's average revenues earned from the 74 customers does not require "scientific, technical, or other specialized knowledge" of an expert.  *Cf.* Fed. R. Evid. 702 (an expert may testify when his or her "scientific, technical, or other specialized knowledge" will help the trier of fact understand the evidence).  As such, Cisco's list of 74 customers and related statements are admissible to support Dr. Scott Morton's damages opinions and the inference that Cisco's CLI-related conduct caused at least 51% of Arista's purported lost profits.

Second, Cisco asserts that Arista offers no evidence that links the "importance of a 'Cisco-like CLI'" to any alleged lost sales.  Response 9–10.  In this regard, Cisco points out that Arista never changed its CLI.  *Id.* at 10.  In other words, Cisco asserts that customers never faced a situation where Arista's switches did not have the CLI and thus, any lost sales must have been caused by other lawful factors.  *See* Hearing Tr. 54:19–24, ECF 362.  However, as Arista argued during the hearing, Arista's theory of the case is that Cisco's purported conduct caused lost sales by threatening customers that they could not continue using Arista's products as the CLI feature would be removed due the CLI litigation.  *See id.* at 85:11–17.  Thus, the fact that Arista did continue to use the CLI in its switches does not conclusively show that the importance of the CLI is irrelevant to the lost sales.  Cisco further argues that Arista offers no evidence that any customer had concerns about Arista's CLI.  Response 10.  But the point that Arista raises in its proffer is that Cisco's "binding admissions" constitute evidence that shows at least certain customers would not have purchased Arista's switches *without* the CLI.  And Arista can show that those Cisco-identified customers made up a sizable portion of Arista's sales.  From this evidence, a reasonable jury could infer that the threat of elimination of the CLI features caused those 74 customers to shop elsewhere.

Third, Cisco contends that Arista's quantitative analysis is based on the "faulty assumption that the percentage of sales made to the identified customers is identical to the percentage of sales lost to those same customers."  Response 11.  However, whether Arista's "assumption" is faulty is

more appropriately addressed through cross-examination and rebuttal rather than as a basis for exclusion of evidence. Here, Arista contends that the predominant share of Arista's revenues was derived from existing customers based on Dr. Carlton's testimony that new customers comprise only a small portion of revenues. Proffer 7. In this situation, the gap between the projected and actual revenues in Dr. Scott Morton's model may reasonably constitute lost profits from existing customers and, accordingly, 71.8% of that loss may pertain to customers who would not have purchased Arista's switches but for the CLI. In this regard, Arista's evidence based on the revenue of Cisco's list of 74 customers supports Dr. Scott Morton's opinions and the inference that at least 51% of Arista's purported lost profits was caused by the CLI litigation.

Fourth, Cisco argues that "Arista's customer-based theories are insufficient because they do not actually apportion sales lost due to the alleged anticompetitive conduct from sales lost due to other causes." Response 11. According to Cisco, Arista mistakenly assumes that "if a customer considers CLI to be important, *all* sales made to that customer were the result of that consideration and *all* lost sales associated with that customer were the result of the alleged anticompetitive conduct." *Id.* (emphasis in original). To the extent that Arista seeks to rely on that assumption to apportion an equal amount of lost sales, that conclusion would require additional expert analysis regarding customer conduct in changing its purchasing practices due to potentially changing circumstances. However, insofar as Cisco's 74 customers are concerned, Arista presents that Cisco's own admissions show that those customers would not have purchased Arista's switches *but for* Arista's use of the CLI. Thus, Cisco's arguments are unpersuasive with respect to the 74 customers in Cisco's list.

Fifth, Cisco asserts that evidence demonstrates that numerous lawful factors caused Arista's lost sales. Response 12. In particular, Cisco points to evidence regarding specific customers in connection to the ITC actions (Exs. I and J to Seddon Decl., ECF 354-10, -11), pricing (Exs. K and L to Seddon Decl., ECF 354-12, -13), and customer technical requirements (Exs. M and N to Seddon Decl., ECF 354-14, -15). Response 12. The cited evidence, however, shows that Cisco has strong counter-arguments as opposed to showing Arista's lack of evidence. The Court also notes that the main concern is evidence regarding the ITC actions, where Cisco

1   contends that two customers chose not to purchase Arista's switches due to the ITC litigation as
2   provided in Exhibits I and J to Seddon Declaration. However, those two customers are not listed
3   in Cisco's list of 74 customers. Thus, the evidence regarding the two customers does not
4   undermine Arista's proffer based on the list of 74 customers.

5   Cisco further contends that Arista offers no evidence of lost sales from *all* the customers
6   on Cisco's list. Response 15. In particular, Cisco points to Microsoft—one of the 74 customers in
7   Cisco's list. *Id.*; Cisco's Supplemental Objection and Responses to Interrogatory No. 15, ECF
8   252-10. Cisco asserts that Mr. Sadana testified that Microsoft was not on the list of Arista's lost
9   sales. *See* Ex. E to Seddon Decl. ("Sadana Dep.") 44:7-16, ECF 354-6. However, any
10  inconsistency between Arisa's list of lost sales and Cisco's list of 74 customers is best addressed
11  by proper cross-examination. Mr. Sadana's testimony regarding Microsoft does not negate the
12  existence of Cisco's list of 74 customers and related statements. Thus, Cisco's contention does
13  not show that Arista lacks fact evidence to support Dr. Scott Morton's opinions.

14  In addition, Cisco claims that Arista is precluded from offering testimony on lost sales for
15  many customers in Cisco's list due to Judge van Keulen's discovery order and the Court's
16  Motions *in Limine* Order (ECF 342). Response 15. Cisco asserts that Arista has not offered a
17  designated witness to be questioned for over 50 customers on Cisco's 74-customer list, and thus
18  Arista cannot offer evidence concerning lost sales from those customers. *Id.* Whether Arista will
19  be able to present evidence on all 74 customers is not an issue the Court can address at this time.
20  Arista stated during the hearing that it will abide by the previous orders, and the Court expects that
21  Arista will do so.

22  For the above reasons, the Court is unpersuaded by Cisco's arguments. The Court is
23  satisfied that Arista's evidence regarding Cisco's list of 74 customers and their related revenue
24  may support Dr. Scott Morton's opinions and that a jury may reasonably infer that at minimum
25  Cisco's CLI-related conduct caused 51% of Arista's purported lost profits.

26        **ii.**   **Overlap Between Cisco's List of 74 Customers and Arista's List of ▆ Customers**
27  Arista argues that Mr. Sadana and Mr. Foss can testify about the proportion of Arista's
28

annual revenue that is attributable to the overlap between Cisco's list of 74 customers and "Arista's list of ▉ customers [who Arista] has identified as having lost sales." Proffer 7. The resulting percentage of Arista's revenue based on the overlap is an average ▉ in 2015 and 2016. *Id.* at 7–8. At the hearing, Arista indicated that it does not intend to present apportionment of damages for ▉ based on the overlap of customers. Hearing Tr. 25:3. The Court therefore need not address this argument. Of course, it may turn out that the jury is presented with admissible evidence of lost sales that corresponds only to that smaller group of customers. Thus, the Court anticipates that Cisco will seek to impeach Arista's witnesses on the absence of evidence of lost sales from these 74 customers to either undermine entirely the validity of Arista's argument or at least blunt its impact significantly.

### C.   Arista's Sales History as a Basis For Apportionment

Arista contends that the jury may apportion damages based on Arista's sales history. Proffer 8. Specifically, Arista argues that its (i) customer "verticals" data and (ii) list of ▉ customers from whom Arista lost sales due to the CLI litigation can each serve as a basis for apportionment. The Court separately addresses the two arguments.

#### i.   Customer Verticals Data

Arista categorizes customers who have similar "deployments and use cases" into groups which are referred to as customer "verticals." Proffer 8. Arista tracks and uses the vertical groupings for its ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *Id.* at 8–9. According to Arista, Mr. Sadana and Mr. Foss are familiar with its customer verticals as well as "the use and importance of the CLI by and to customers in the different customer vertical groupings." *Id.* at 9. As an example, Arista represents that "the CLI is used by and important to customers in each of Arista's verticals other than ▉▉▉▉▉▉▉▉▉ *Id.* at 10. Arista further asserts that the revenue attributable to the ▉▉▉▉▉ customers amount to 65% of Arista's annual revenue. *Id.*   Arista then makes similar arguments which it presented in connection with Cisco's list of 74 customers for estimating the purported 71.8% apportionment value. *Id.* at 11.

Cisco counters that Arista's proffer based on customer verticals requires expert testimony.

11

Response 13–14.  In Cisco's view, Arista relies on "economic analysis based on specialized knowledge regarding similarly-situated customers." *Id.* at 14.  Cisco further asserts that Arista does not identify any lost sales caused by the alleged anticompetitive conduct but instead "simply sweeps in *all* Arista customers" from various industries except for the "Cloud Titans" vertical. *Id.* at 17 (emphasis in original).  According to Cisco, Arista's customer verticals based "theory" encompasses about 4,200 customers.  *Id.* at 18.

The Court finds that Arista's reliance on customer verticals would require expert testimony.  Here, Arista attempts to lump about 4,200 customers into certain groups and offers Mr. Sadana and Mr. Foss' testimony that "the CLI was important" for those groups as a whole.  Proffer 10.  But Arista does not represent that those fact witnesses have the "scientific, technical, or other specialized knowledge" to testify that the characteristics of certain industries (as opposed to specific customers) require the use of CLI or how or whether existing customers would alter purchasing practices in the face of a threat to eliminate those CLI features.  *See* Fed. R. Evid. 702.  Such testimony would require an analysis by a qualified expert.  As indicated above, there is a significant difference between the presumed conduct of customers who merely found CLI important and those who found it essential.  Arista cannot offer an undisclosed expert opinion through lay witnesses.  Because Arista offers no expert testimony on this issue, the Court concludes that Arista may not rely on its customer verticals evidence for the purposes of establishing the amount of damages.

### ii. List of Customers from Whom Arista Believes it Lost Sales

Arista argues that Mr. Sadana testified during his deposition regarding "a list of ▮ customers where Arista lost sales . . . due to Cisco's litigation against Arista or fear of Cisco's litigation and where those customers . . . valued the CLI, or considered the presence of a Cisco-like CLI [as] a requirement." Proffer 11–12.  Arista also contends that Mr. Sadana, Mr. Foss, and Arista Director of Sales Kevin McCabe can testify about their personal knowledge regarding those customers and that the list is underinclusive.  *Id.* at 12.

In Arista's view, the list of ▮ customers along with Arista's sales history data can serve as a basis for the jury to apportion damages.  Proffer 12.  Arista contends that Mr. Sadana and Mr.

12

1    Foss can rely on its Salesforce.com data to testify that the range of lost sales for the ▇ customers
2    in 2015 and 2016 was ▇▇▇▇▇▇▇. *Id.* On this basis, Arista argues that a jury can
3    reasonably infer that at least ▇▇▇▇▇▇ of Dr. Scott Morton's "baseline lost profits figure
4    of $159.7 million" is attributable to Cisco's alleged anticompetitive conduct. *Id.*

   Cisco raises several arguments why Arista's proffer based on the list of ▇ customers and
Salesforce data is deficient. First, Cisco asserts that Arista has no proof that it lost any sales to the
▇ customers due to the CLI litigation or fear of potential litigation. Response 18–19. According
to Cisco, Mr. Sadana cannot distinguish between lost sales caused by the CLI litigation and lost
sales caused by the ITC actions. *Id.* at 17. Cisco also asserts that neither Mr. Foss nor Mr.
McCabe can "shed any further light on the issue" because they only "discussed the ITC actions
and related issues with customers." *Id.* Here, Arista intends to offer its fact witness testimony that
the ▇ customers valued the CLI. But Arista's evidence based on fact witness testimony appears
to be weak due to the potential that Mr. Sadana (or Mr. Foss and Mr. McCabe) will admit that he
made no distinction between the CLI and ITC litigation when he compiled Arista's ▇-customer
list. The Court, however, will not exclude fact witness testimony regarding the customer list
because the contour of the evidence is unclear. At this time, it cannot be said that Arista's fact
witnesses—in particular, Mr. Sadana—cannot provide any testimony that shows sales were lost
due to the CLI litigation. On this point, Arista argues that Mr. Sadana did not admit in his
deposition that he failed to prepare the customer list based on hearing about the CLI when talking
to customers. If, at trial, Cisco elicits the broad admission it claims Mr. Sadana made in his
deposition, Cisco may move to strike the testimony and the Court will determine whether the
request should be granted.

   Regarding the list of ▇ customers, Cisco further argues that Arista cannot offer evidence
on lost sales as to *all* ▇ customers because the list is subject to hearsay. Response 16. Due to the
Court's previous ruling on hearsay (*see* Motions *in Limine* Order 20–24) and Judge van Keulen's
order, it is unclear what portion of the list of ▇ customers Arista will be permitted to introduce.
Arista assures the Court that it will comply with the Motions *in Limine* Order.

   Second, Cisco contends that Arista has no evidence that all sales identified in the

United States District Court
Northern District of California

Salesforce data were lost due to the CLI litigation as opposed to other lawful factors. Response 19. In this regard, Cisco argues that the Salesforce data does not include any explanation for the "reasons why sales were lost." *Id.* Here, Cisco raises an issue that Arista did not produce the available information on "reasons why sales were lost" contained in the Salesforce data during discovery. *Id.* at 19 n.3. Both parties appear to be unsure whether such information exists. *Id.*; Hearing Tr. 80:7–8. The Court finds this issue to be largely irrelevant for the purposes of Arista's proffer. Here, Arista represents that Mr. Sadana may testify about the reasons why sales for the ▮ customers were lost and that the Salesforce data includes the *dollar amount* of those sales. Hearing Tr. 40:6–7. As such, Arista does not appear to rely on the Salesforce data to show why Arista lost sales but rather to introduce the dollar amount. For these reasons, the Court rejects Cisco's challenge to Arista's Salesforce data based on the failure to include "reasons why sales were lost." The Court also notes that the Salesforce data explicitly lists the dollar "amount" (*see* Ex. D to Seddon Decl., ECF 354-5), and thus Arista need not introduce expert testimony to the extent that it simply relies on the listed numbers in the Salesforce data. However, there is a fatal problem with these numbers as discussed below.

Third, Cisco argues that the Salesforce data is speculative and "nothing more than guesswork." Response 19. For support, Cisco asserts that Mr. McCabe testified that the amounts recorded in the Salesforce data are not accurate. *Id.* (citing Ex. G to Seddon Decl. ("McCabe Dep.") 215:1–23, ECF 354-8). Mr. Sadana also testified that Arista does not consider "Salesforce to be the most authentic data." Ex. S to Seddon Decl. 171:7–8, ECF 354–19. The Court agrees with Cisco's argument that Arista's proffer raises an issue on the reliability of the Salesforce data. As Mr. McCabe testified, the accuracy of the dollar amount of a lost sale that is entered into the Salesforce data depends on the "stage" of the bidding process for that transaction. *See* McCabe Dep. 215:1–23, 218:5–12. Indeed, Arista's own acknowledgment that the Salesforce data is unreliable and subject to change is reflected in the range of the calculated lost profits (i.e., ▮ ▮). The Court thus finds that Arista's proffer based on the Salesforce data lacks proper foundation and is thus speculative. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("[T]he jury may not render a verdict based on speculation or guesswork.").

Because Arista's Salesforce data is unreliable and requires speculation, the Court concludes that Arista may not rely on its proffer based on the Salesforce data to support Dr. Scott Morton's opinions to apportion damages.

## III. CONCLUSION

Although the Court rejects certain aspects of Arista's proffer, the Court is satisfied that Arista has sufficient evidence to support Dr. Scott Morton's damages opinions from which a jury may reasonably infer that Cisco's CLI-related conduct caused at least 51% of Arista's purported lost profits. To be clear, Cisco raises strong arguments against Arista's position. However, those arguments generally are directed to rebuttal evidence and cross-examination as opposed to exclusion of Dr. Scott Morton's opinions. Arista's proffer is not meant to prove its damages case at this time, but rather to demonstrate that Arista has sufficient admissible evidence to support apportionment. The parties will have the opportunity to challenge the opposing party's evidence at trial. For the foregoing reasons, the Court DENIES Cisco's request to exclude Dr. Scott Morton's damages opinions.

**IT IS SO ORDERED.**

Dated: July 20, 2018

_____
BETH LABSON FREEMAN
United States District Judge