John M. Desmarais (*admitted pro hac vice*)
jdesmarais@desmaraisllp.com
Paul A. Bondor (*admitted pro hac vice*)
pbondor@desmaraisllp.com
Alan S. Kellman (*admitted pro hac vice*)
akellman@desmaraisllp.com
Andrew G. Heinz (*admitted pro hac vice*)
aheinz@desmaraisllp.com
Tamir Packin (SBN 317249)
tpackin@desmaraisllp.com
Jeffrey S. Seddon II (SBN 297502)
jseddon@desmaraisllp.com
Brian Leary (*admitted pro hac vice*)
bleary@desmaraisllp.com
William D. Findlay (*admitted pro hac vice*)
wfindlay@desmaraisllp.com
Carson Olsheski (*admitted pro hac vice*)
colsheski@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401

Todd Anten (*admitted pro hac vice*)
toddanten@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sarah E. Piepmeier (SBN 227094)
sarah.piepmeier@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

*Attorneys for Defendant Cisco Systems, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

ARISTA NETWORKS, INC.,

Plaintiff,

v.

CISCO SYSTEMS, INC.,

Defendant.

Case No. 5:16-cv-00923-BLF-SVK

**DEFENDANT CISCO SYSTEMS, INC.'S TRIAL BRIEF**

Date: August 6, 2018
Judge: Hon. Beth Labson Freeman
Dept.: Courtroom 3

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS


Page

INTRODUCTION ..... 1

BACKGROUND ..... 2

FACTUAL AND LEGAL ISSUES ..... 5

I. Cisco's CLI Litigation And Related Communications Are Not Anticompetitive. ..... 5

A. Enforcing Intellectual Property Is Procompetitive, Legitimate Business Activity. ..... 6

B. Cisco Does Not Have A "CLI Policy"—It Has Simply Sued Brazen Copyists. ..... 7

C. Truthfully Informing The Industry About Cisco's Effort To Protect Its Intellectual Property Is Procompetitive, Legitimate Business Activity. ..... 8

II. Cisco Has Neither Monopoly Power Nor A Dangerous Probability Of Obtaining It. ..... 9

A. Arista's Antitrust Market Definitions Are Belied By The Evidence. ..... 9

B. Cisco Cannot Control Price, Restrict Output, Or Exclude Competition. ..... 10

C. Circumstantial Evidence Will Also Show That Cisco Lacks Monopoly Power. ..... 10

III. Arista Cannot Establish A Nexus Between Any Purportedly "Closed" CLI And Lost Sales, And Therefore Cannot Show Causation Or Apportion Damages. ..... 11

A. No Evidence Demonstrates Any Sales Were Lost Due To The "Closed" CLI. ..... 11

B. The Evidence Leaves The Amount Of Damages To Guesswork For The Jury. ..... 13

IV. Cisco's CLI Conduct Did Not Harm Competition. ..... 14

A. Cisco's Conduct Did Not Harm Other Switch Suppliers. ..... 14

B. Cisco's Conduct Did Not Raise Switch Prices Or Diminish Product Quality. ..... 15

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ........ 11

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pub'ns, Inc.*,
108 F.3d 1147 (9th Cir. 1997) ........ 4, 5, 11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ........ 6

*City of Vernon v. S. Cal. Edison Co.*,
955 F.2d 1361 (9th Cir. 1992) ........ 13

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*
773 F.2d 1506 (9th Cir. 1985) ........ 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ........ 2, 5, 6, 10

*Falls City Indus., Inc. v. Vanco Beverages, Inc.*,
460 U.S. 428 (1983)), *aff'd*, 496 U.S. 543 (1990) ........ 14

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.*,
786 F.2d 1342 (9th Cir. 1985) ........ 13

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ........ 11

*Handgards, Inc. v. Ethicon, Inc.*,
601 F.2d 986 (9th Cir. 1979) ........ 11

*Hasbrouck v. Texaco, Inc.*,
842 F.2d 1034 (9th Cir. 1987) ........ 14

*Hynix Semiconductor Inc. v. Rambus Inc.*,
527 F. Supp. 2d 1084 (N.D. Cal. 2007) ........ 5, 11

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ........ 6, 7, 10

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
884 F.2d 504 (9th Cir. 1989) ........ 15

*Los Angeles Land Co. v. Brunswick Corp.*,
6 F.3d 1422 (9th Cir. 1993) ........ 10, 11

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
801 F.3d 1150 (9th Cir. 2015) ........ 13

*Mercatus Grp. LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ........ 9

**Page(s)**

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ........................................ 4, 7

*Moore v. James H. Matthews & Co.*,
682 F.2d 830 (9th Cir. 1982) ........................................ 13

*Nichia Am. Corp. v. Seoul Semiconductor Co.*,
No. 07-cv-8354, 2008 WL 11342571 (N.D. Cal. Oct. 7, 2008) ........................................ 12

*Olin Corp. v. FTC*,
986 F.2d 1295 (9th Cir. 1993) ........................................ 9

*Paladin Assocs., Inc. v. Mont. Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ........................................ 14

*Prof'l Real Estate Investors v. Columbia Pictures Indus.*,
508 U.S. 49 (1993)........................................ 1, 5

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ........................................ 4, 9, 10, 15

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ........................................ 5

*Talking Yellow Pages, Inc. v. P. Telesis Grp.*,
No. 91-15994, 1992 WL 207856 (9th Cir. 1992) ........................................ 15

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
546 F.3d 991 (9th Cir. 2008) ........................................ 11

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989) ........................................ 9

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
512 F.2d 1264 (9th Cir. 1975) ........................................ 11

*United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ........................................ 10

*United States v. Emmert*,
829 F.2d 805 (9th Cir. 1987) ........................................ 12, 13

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ........................................ 14

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)........................................ 6

*Vizio, Inc. v. Funai Elec. Co.*,
No. 09-cv-0174, 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010) ........................................ 11

*Wagner v. Cnty. of Maricopa*,
747 F.3d 1048 (9th Cir. 2013) ........................................ 12

**<u>Rules</u>**

Fed. R. Evid. 803(3)........................................ 12

**INTRODUCTION**

Since its entry into the competitive datacenter switching market ten years ago, Arista has rapidly grown into a $20 billion company. But it built its products on a stolen foundation. Arista "slavishly copied" key Cisco technology that Arista executives—many of whom are former Cisco employees—knew was Cisco's proprietary intellectual property. Arista insists it had every right to do so because Cisco's success and past marketing transformed its copyright-protected user interface into a free-to-use (but undefined) standard. As this trial will show, Arista's claim requires on an untenable expansion of the law and is contrary to the overwhelming balance of the facts.

In December 2014, Cisco exercised its First Amendment right to ask the courts of this District to resolve a dispute regarding Arista's admitted copying of Cisco intellectual property. Arista copied so much of Cisco's command line interface ("CLI") as to copy the user interface itself, not just the underlying commands: Arista verbatim copied screen outputs, help descriptions, over 500 multi-word commands, and the command structure, sequence, and organization of those commands. Arista also copied user interface documentation and switching features covered by fourteen patents. Cisco's lawsuits produced numerous judicial determinations that Arista willfully infringed Cisco's patents as part of a "corporate culture of copying," but Arista never modified its user interface as a result of Cisco's litigation. Nor did any Arista customer have to change the interface it used to manage Arista switches—or even confront a decision whether to purchase Arista switches that ***lacked*** the copied user interface. Yet Arista insists that Cisco should be liable for hundreds of millions of dollars in antitrust damages because Cisco exercised its constitutional rights to enforce valid copyrights.

Arista attempts to support this unjust result by arguing that Cisco "closed" access to its CLI in violation of Sherman Act § 2 by filing the CLI lawsuit and communicating about the lawsuit. This Court has already held that the CLI lawsuit was objectively reasonable, and Supreme Court precedent "irrefutably" extends *Noerr–Pennington* immunity to any litigation that is not objectively baseless. *Prof'l Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993). Arista seeks to circumvent Cisco's *Noerr* immunity by arguing that conduct other than the litigation independently produced anticompetitive harms—*i.e.*, that conduct other than the litigation "closed" the CLI. Arista's theory asks the jury to decide whether a blog post written by a lawyer truthfully stating that Cisco's

CLI is not an industry standard, despite prior use of "industry standard" as marketing lingo, foreclosed competition in the same way that Kodak's decision to cease selling replacement parts to competitors, despite doing so for years, terminated those competitors' ability to service Kodak photocopiers. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). It plainly does not. Whereas Kodak severed its competitors' access to products they needed to compete, Cisco affected no change in industry use of CLI; nothing "closed."

Arista will not meet its burden at trial. The evidence will show a robust, highly competitive market—not a market restrained by exclusionary conduct. Arista itself will present substantial evidence that Cisco competes aggressively in datacenter switching. Throughout the period of alleged anticompetitive conduct, prices for switches declined and output increased. And, rather than exclude competitors, Cisco lost significant market share to Arista, Huawei, Juniper, and others.

Arista knows that Cisco did not engage in any anticompetitive conduct; Arista knows that it experienced no harm whatsoever from the CLI litigation. Arista brought this suit to retaliate for Cisco's intellectual property litigation—cases that publically exposed Arista as a copyist. Cisco's actions before the International Trade Commission ("ITC") have resulted in numerous, public adverse judgments against Arista. The evidence in this case will show that these ITC judgments—not the CLI litigation—cost Arista sales. Indeed, Arista will be unable to show that it has lost even a single, specific sale due to the CLI litigation. What harm Arista has suffered flows from Arista's decision to copy Cisco's intellectual property—from Arista's "corporate culture of copying"—not from any purported "closing" of a CLI.

**BACKGROUND**

Cisco pioneered the networking technologies that enable the Internet, including an innovative, hierarchical user interface by which network engineers efficiently configure and manage Cisco routers and switches. Based on Cisco's decades-long reputation for innovation and quality, customers have come to look to Cisco to set the bar for switching features. As a result, some Cisco marketing materials refer to widely recognized Cisco technologies, such as Cisco's CLI, as "industry standard." Cisco's user interface, however, is not a formal standard; indeed, no standard-setting organization has promulgated a standard CLI for Ethernet switches. Cisco's user interface is proprietary and includes

numerous copyrighted compilations.

Success invites imitation, and many switching competitors have developed commands similar to those Cisco invented. When a competitor brazenly and extensively copies Cisco's proprietary technologies, however, Cisco must act to protect its intellectual property. Since its founding in 1984, Cisco has initiated intellectual property litigation against competitors only twice and in response to widespread infringement: first Huawei, then Arista. In early 2003, Cisco sued Huawei, a switching competitor, for infringing Cisco's rights in its user interface—including multi-word commands and command hierarchies—as well as its source code, user manuals, and patents. (Tr. Ex. 1897 ¶¶ 1, 13–18.) Cisco and Huawei resolved that lawsuit in 2004 with an agreement that required Huawei to modify its infringing CLI (and other infringing features). (Tr. Ex. 1899 § 2.01.)

Also in 2004, several former Cisco executives founded Arista. Arista released its first switch in 2008 and, by 2014, had captured 7.8% of the datacenter switching market. Rather than do what other switching competitors had done—develop its own user interface—Arista took a shortcut: it verbatim copied, without a license, multiple components of Cisco's user interface, including Cisco's multi-word commands, screen outputs, help descriptions, and command hierarchies. And Arista was not shy about its copying. For example, Arista's CEO publicly proclaimed that its CLI so closely resembled Cisco's CLI that anyone trained on Cisco switches could operate Arista switches "right away." (Tr. Ex. 2645 at 2.) Another Cisco employee described Arista switches as a "99.999%" "drop-in replacement" for Cisco switches. (Tr. Ex. 1634.)

On December 5, 2014, once Cisco became aware of the breadth of Arista's infringement, Cisco filed two lawsuits against Arista. In the CLI case before this Court, Cisco sought relief for Arista's verbatim copying of Cisco's manuals, user interfaces, and other copyrighted works. The jury returned a verdict on December 14, 2016, finding that Arista had infringed Cisco's valid copyrights in its user interface but that the scènes à faire doctrine excused Arista's infringement. (Tr. Ex. 1465.) In the second lawsuit, currently stayed, Cisco asserted infringement of twelve patents on various switching-related inventions. These same patents formed the basis of two complaints that Cisco filed with the ITC, instituted as Investigation Nos. 337-TA-944 and 337-TA-945 ("the ITC actions"). These ITC actions resulted in repeated findings of infringement and orders banning Arista products from

importation into the United States. (*E.g.*, Tr. Exs. 1904, 1906, 1907, 1913, 2098.)

Anticipating the first of the ITC's findings of infringement, Arista retaliated with this lawsuit. Arista alleges that Cisco's CLI lawsuit and attendant communications "closed" access to an undefined CLI during the two years between the filing of the CLI lawsuit on December 5, 2014, and the verdict on December 14, 2016. According to Arista, Cisco's conduct violated the prohibitions against monopolization and attempted monopolization in Section 2 of the Sherman Act. 15 U.S.C. § 2 (2004). To prevail on its monopolization claim, Arista must show that Cisco "(1) possessed monopoly power in the relevant market, (2) willfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004) (citing *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pub'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997)). Arista's attempted monopolization claim requires—in addition to exclusionary conduct and causal antitrust injury—a showing that Cisco had a "specific intent to control prices or destroy competition" and "a dangerous probability of achieving 'monopoly power.'" *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–33 (9th Cir. 1995).

Arista will not meet its burden of proof. Arista itself has repeatedly described the datacenter switching market as highly competitive. The evidence reflects declining prices and rising output. Cisco has similarly failed to exclude competition: its market share declined throughout the two-year period, while other competitors, including Arista, Huawei, and Juniper, have gained market share.

There also is no evidence that Cisco engaged in anticompetitive conduct. The First Amendment protects Cisco's right to petition the government for relief when a competitor like Arista infringes Cisco's intellectual property. Cisco's few communications about the CLI lawsuit reflect a legitimate business interest in providing—in a limited, consistent manner—accurate information to Cisco shareholders and other interested parties about high-profile litigation. Cisco's conduct did not "close" any CLI. There is no user interface uniformly adopted by the industry, and neither Arista nor any other competitor altered their user interface in response to Cisco's conduct.

Finally, Arista will not show that any Cisco conduct caused it an antitrust injury. During the two-year pendency of the CLI litigation, the ITC actions progressed through trial and resulted in numerous, public judgments against Arista. The ITC held that Arista infringed five Cisco patents and

issued orders barring Arista products and components thereof from importation into the United States. (*See* Tr. Exs. 1904, 1906, 1907, 1913, 2098.) Arista must show that its alleged damages were caused by Cisco's "closing" of a CLI, not from the impact of the ITC's rulings, but Arista will not be able to prove even a single specific sale was lost due to Cisco's alleged "closing" of a CLI.

**FACTUAL AND LEGAL ISSUES**

**I. Cisco's CLI Litigation And Related Communications Are Not Anticompetitive.**

This Court has already held that Cisco's CLI litigation was "objectively reasonable." (Dkt. 270 at 16:11–13.) Under unambiguous Supreme Court precedent, a finding that litigation is objectively reasonable "***irrefutably*** demonstrates . . . entitl[ment] to *Noerr* immunity." *See Prof'l Real Estate Inv'rs, Inc.*, 508 U.S. at 61–63. Moreover, Cisco's "decision to file the CLI lawsuit is 'conduct incidental to the prosecution of the suit and protected by the *Noerr–Pennington* doctrine.'" (Dkt. 270 at 20:17–19 (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006)).)

To evade binding precedent on *Noerr*, Arista argues that non-litigation conduct "***independently*** produce[d] anticompetitive harms." *Hynix Semiconductor Inc. v. Rambus Inc.*, 527 F. Supp. 2d 1084, 1096–97 (N.D. Cal. 2007). (*See also* Dkt. 270 at 25 (finding "a material factual dispute" over whether Cisco engaged in "anticompetitive behavior separate from the CLI litigation" under *Hynix* "step one").) The independent anticompetitive conduct Arista alleges consists of public blog posts in which Cisco said that its CLI is "not an industry standard" and spreading so-called "FUD" about Arista. This conduct allegedly "closed" Cisco's CLI akin to the anticompetitive conduct in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). In other words, to comport with the holding of *Hynix*, Arista must first show that Cisco's communications about its CLI "closed" access to an (unidentified) user interface and caused anticompetitive harms independent of the CLI litigation.[1] (*See also Daubert* Hr'g Tr. at 30:1–3 ("And you know, none of us actually knows whether *Kodak* can be stretched in a way that Arista's whole case is built on.").)

The evidence does not support such a tenuous claim, nor does it fit within *Kodak* or related

---

[1] Even if Arista meets its burden under *Hynix* step one, Arista must second show that the CLI litigation was "causally connected" to those anticompetitive harms. *Hynix Semiconductor Inc.*, 527 F. Supp. 2d at 1097. And if Arista can only show that Cisco's communications caused such harm through disparagement of Arista as a "copyist," then Arista must overcome the presumption of *de minimis* harm by meeting all six factors laid out by the Ninth Circuit in *Harcourt Brace*. 108 F.3d at 1151–52.

precedent. There is no evidence that Cisco ever licensed any part of its user interface, abandoned protection of its user interface, committed to make its user interface available, or acquiesced in known infringement of its user interface. To the contrary, Cisco enforced its copyrights in its user interface—including its command hierarchies and multi-word commands—against Huawei. These facts distinguish this case from *Kodak* and *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and make it more like *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). There was no "prior course of dealing" from which a jury could reasonably find that Cisco had acquiesced to its competitors' use of its user interface. Cisco never licensed any part of its user interface to competitors and did not seek to limit competitors' use of their own user interfaces. *Cf. Kodak*, 504 U.S. at 455 (Kodak controlled supply for replacement parts in the market for the servicing of Kodak copiers). Neither Arista nor any competitor changed their user interfaces in response to Cisco's initiation of copyright litigation and statements about that litigation. *Cf. id.* (Kodak severed competitors' access to parts). The evidence will show instead that Cisco engaged in procompetitive business conduct to protect its intellectual property rights from a brazen copyist—as is its constitutional right—and truthfully communicated its motivations for doing so.

### A. Enforcing Intellectual Property Is Procompetitive, Legitimate Business Activity.

This litigation flows entirely from Cisco's legitimate efforts to enforce its valid intellectual property. Exercising intellectual property's statutory right to exclude is presumptively legitimate business activity. *Image Tech. Servs., Inc. v. Eastman Kodak Co.* ("*Kodak II*"), 125 F.3d 1195, 1216 (9th Cir. 1997). As the evidence will show, Cisco brought litigation against Arista after becoming aware of public statements by Arista suggesting that it willfully infringed Cisco's intellectual property to access Cisco customers more easily.

Cisco's belief that Arista engaged in widespread infringement of Cisco intellectual property has proven accurate. The jury in the CLI litigation found that Arista had infringed Cisco's user interface (although it excused the infringement). (Tr. Ex. 1465.) The ITC found that Arista infringed five Cisco patents. (*See* Tr. Exs. 1904, 1911.) The ITC further concluded that Arista was "willfully blind" to Cisco's patents and exhibited "a specific intent to induce infringement" in its customers. (Tr. Ex. 1904 at 15–20.) Arista's behavior demonstrated "a corporate culture of copying." (*Id.* at 20.)

Good-faith enforcement of intellectual property rights promotes competition. Protecting intellectual property encourages innovation. Valid enforcement of intellectual property rights, like Cisco's lawsuits against Huawei and Arista, protects the investment that innovation requires. Moreover, as Dr. Carlton will explain, it was economically rational for Cisco to focus on more flagrant copyists like Huawei and Arista. Because enforcing valid intellectual property rights is a legitimate business justification in a Section 2 case, *see Kodak II*, 125 F.3d at 1216, this evidence will entitle Cisco to judgment as a matter of law even if Arista could prove the other elements of its claims.

**B. Cisco Does Not Have A "CLI Policy"—It Has Simply Sued Brazen Copyists.**

Cisco has never had a policy allowing competitors to copy its user interface. Cisco has never given any competitors permission to copy the protectable expression in its CLI, including its command hierarchies, multi-word commands, help descriptions, and screen outputs. Jurors will readily perceive the obvious contextual differences between marketing materials describing Cisco's CLI as an "industry standard" and Cisco's General Counsel stating that Cisco's CLI is not a legally defined "industry standard." The differences between these two statements—which address different audiences for different purposes—do not reflect any change in policy. Furthermore, there is nothing anticompetitive in refusing to license valuable intellectual property to competitors. Judges deciding antitrust cases have imposed a duty to deal with competitors only in very limited circumstances—unilateral termination of a voluntary and profitable course of dealing, refusal to sell at a prevailing retail price, and refusal to sell products already sold to other customers—none of which are present here. *See MetroNet Servs.*, 383 F.3d at 1131–34 (citing *Trinko*, 540 U.S. at 407–10).

The evidence will show, instead, that Cisco has only initiated patent and copyright litigation twice, both times to stop widespread, brazen infringement. Cisco sued Huawei for infringement of its CLI in 2003. Like Arista, Huawei copied numerous protected aspects of Cisco's products, including its user interface, source code, and user manuals (with typos). The jury will hear that Huawei's infringement of Cisco's CLI was an integral part of that lawsuit, and that the settlement required Huawei to change its CLI. (*See* Tr. Exs. 1897, 1788, 1899.) Arista board member Charles Giancarlo served as the business lead supporting Cisco's suit against Huawei and submitted a sworn declaration to federal court averring to the importance of the CLI. (*See* Tr. Ex. 2212.) The importance of Cisco's

user interface to the Huawei lawsuit was public knowledge and cited repeatedly by the press. Arista cannot credibly claim that it or the industry believed that Cisco's user interface was freely available.

### C. Truthfully Informing The Industry About Cisco's Effort To Protect Its Intellectual Property Is Procompetitive, Legitimate Business Activity.

Cisco had procompetitive and legitimate business justifications for communicating about its litigation with Arista. Given the rarity of Cisco lawsuits against its competitors and the high-profile nature of its suits against Arista, Cisco adopted a communication strategy that provided interested customers, vendors, shareholders, and partners a knowledgeable source of information about the lawsuits—Cisco's General Counsel, Mark Chandler, posting occasional blogs to Cisco's website. (*See* Tr. Exs. 1715–1735, 1783–1785.)

Cisco's blog strategy sought to limit—not expand—communication about the litigation and to ensure accuracy—not spread "FUD"—in those communications. Through the blog, Cisco truthfully explained that it had sued to stop Arista's egregious copying of Cisco intellectual property, and as developments warranted, the blog offered limited, accurate updates. Indeed, blog posts also updated interested third parties about unfavorable events in Cisco's cases against Arista, (*see, e.g.*, Tr. Ex. 1921 (discussing verdict in CLI litigation)), and, where relevant, linked to primary sources—such as public versions of the ITC's decisions—to provide interested third parties complete information. (*See, e.g.*, Tr. Exs. 1919 (citing Initial Determination in '944 Action), 1920 (citing Initial Determination in '945 Action).) Cisco also instructed its salespersons to refrain from discussing the litigation with customers except to direct them to Mr. Chandler's blogs if asked questions. That instruction discouraged salespersons from communicating inaccurate or inconsistent statements about Cisco's position on a legal matter. Cisco's salespersons will explain why they would not use the litigation as a sales strategy in any event. Tellingly, discovery identified no customer that asked Cisco salespersons about the CLI litigation or expressed concern that Cisco had "closed" access to Cisco's CLI.

When Cisco truthfully communicated about the litigation—as it did through Mr. Chandler's blog posts—customers were better positioned to make informed decisions. Arista also communicated its views about the litigation through blog posts, press releases, and letters to customers. (*See, e.g.*, Tr. Exs. 1941–1943 (Arista blog posts); Tr. Ex. 1944 (press release); Tr. Exs. 1400–1460 (Arista letters

to customers).) The large, sophisticated customers purchasing datacenter switches have the technical and legal expertise to evaluate both Cisco's and Arista's communications and make intelligent, informed decisions. "[W]henever one competitor's statements about another are false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas." *Mercatus Grp. LLC v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011).

## II. Cisco Has Neither Monopoly Power Nor A Dangerous Probability Of Obtaining It.

### A. Arista's Antitrust Market Definitions Are Belied By The Evidence.

Arista bears the burden to define and prove a relevant antitrust market in which Cisco has monopoly power. *See Rebel Oil Co.*, 51 F.3d at 1434. Arista has proposed four relevant antitrust markets: both worldwide and U.S. "high-speed" Ethernet switch markets and both worldwide and U.S. "all speed" Ethernet switch markets. The evidence will show, however, that the products contained within these purported markets lack the requisite "reasonable interchangeability of use or cross-elasticity of demand." *Olin Corp. v. FTC*, 986 F.2d 1295, 1298 (9th Cir. 1993).

As to the all-switches markets, the evidence will show that low- and high-speed switches are not interchangeable. For example, significant price differentials exist between switches of different speeds. Such "differential[s] reflect[] consumer willingness to pay a premium" for higher-speed switches, demonstrating a "low cross-price elasticity" and disproving the purported "all Ethernet" switch markets. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989).

The evidence will also show that all of Arista's purported markets include both datacenter and campus switches—products that serve different customer needs and contain different features. For example, campus switches, which connect end-user devices (*e.g.*, personal computers, cellphones, security cameras, etc.), often include features like power-over-Ethernet that are absent from datacenter switches, which connect racks of servers that do not need to draw power from an Ethernet switch.

Finally, none of Arista's purported antitrust markets is the product market in which Arista and Cisco actually compete. Arista describes that market as "the data center switching market for 10 Gigabit Ethernet and above, excluding blade switches." (Tr. Ex. 2500 at 11/166.) Arista's CEO has testified that Arista does not compete in the all-switch or high-speed switch markets but in "the data center and cloud market." (*See* Dkt. 236, Cisco Opp'n to Arista Mot. Summ. J., Ex. D at 1949:1–6.)

### B. Cisco Cannot Control Price, Restrict Output, Or Exclude Competition.

Monopoly power is "the power to control market prices or exclude competition." *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). The direct evidence will show that Cisco cannot do either. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) ("restricted output and supracompetitive prices" are direct evidence of monopoly power).

Pricing in all of Arista's putative markets is highly competitive. Arista's own SEC filings repeatedly emphasize the "increase[ing] pricing pressures" in the market. (*See, e.g.*, Tr. Exs. 1107 at 41/152, 1108 at 24/125, 1109 at 43/157.) Cisco's economic expert, Dr. Carlton, will also explain that prices for Ethernet switches—across all of Arista's purported markets—declined throughout the two-year conduct period (and were declining for years before the alleged anticompetitive conduct). Dr. Carlton will also demonstrate that Cisco's per-port switching prices were not supra-competitive relative to numerous market competitors. Indeed, where the defendant's "prices were lower than some and higher than others," as Cisco's were, there can be no "inference of monopoly pricing" or "power to control prices." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1426 (9th Cir. 1993).

Output has increased in all of Arista's alleged markets throughout the two-year conduct period. Dr. Carlton will explain that market-wide output has increased in every one of Arista's alleged markets, whether measured by revenue or ports shipped. Over the past six years, Arista itself has grown its output by [REDACTED]. (*See* Dkt. 221, Cisco Mot. for Summ. J., Ex. A69 at 239:16–21.) Dr. Carlton will also explain that numerous competitors have achieved significant gains in market share—at Cisco's expense. In Arista's putative high-speed Ethernet market, for example, Arista, Huawei, Juniper, and white boxes have gained an additional 21% share of the market. This and other evidence will show that Cisco lacks the ability to restrict output or exclude competitors and thereby lacks monopoly power. *See Rebel Oil Co.*, 51 F.3d at 1441; *cf. Eastman Kodak Co.*, 504 U.S. at 455 (Kodak controlled access to replacement parts in the relevant market).

### C. Circumstantial Evidence Will Also Show That Cisco Lacks Monopoly Power.

"Courts generally require a 65% market share to establish a prima facie case" of monopoly power. *Kodak II*, 125 F.3d at 1206. Arista will be unable to make this prima facie showing: Arista's own economic expert, Dr. Scott Morton, concluded that Cisco's market shares were below 65% in

each of the putative relevant markets by the end of the conduct period. (*See* Dkt. 209, Cisco *Daubert* Mot., Ex. A Figs. 17–19.) In the purported worldwide and U.S. high-speed Ethernet markets, Arista's expert concluded that Cisco's share fell to 49.1% and 53.1%, respectively. (*Id.*) "[C]ourts have considered a 50% share of the market as inadequate to establish a proscribed monopoly." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975).

Nor will Arista be able to demonstrate that Cisco's market position is protected by significant barriers to entry. High start-up costs and vendor reputation are both insignificant as a matter of law. *See Los Angeles Land Co.*, 6 F.3d at 1429 ("The mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry.'"); *Harcourt Brace*, 108 F.3d at 1154 ("[R]eputation alone does not constitute a sufficient entry barrier in this Circuit."). And, as noted above, the evidence will show that Arista and several other competitors have expanded output and market share throughout the two-year period of Cisco's alleged anticompetitive conduct.

## III. Arista Cannot Establish A Nexus Between Any Purportedly "Closed" CLI And Lost Sales, And Therefore Cannot Show Causation Or Apportion Damages.

### A. No Evidence Demonstrates Any Sales Were Lost Due To The "Closed" CLI.

To prevail in its case, Arista must show that Cisco's conduct "caus[ed] an injury" to Arista "that flows from that which makes the conduct unlawful." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)). Arista will not be able to meet this burden because "[i]f the injury flows from aspects of defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003 (9th Cir. 2008). Cisco's enforcement of its patents in the ITC actions "does not constitute harm to competition." *Vizio, Inc. v. Funai Elec. Co.*, No. 09-cv-0174, 2010 WL 7762624, *5 (C.D. Cal. Feb. 3, 2010) (citing *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir. 1979)). Thus, Arista must show that Cisco's alleged "closing" of its CLI—not other causes such as the ITC actions—caused Arista injury.[2]

The evidence will show, however, that while customers were concerned with the impact of the

[2] Indeed, Arista must show that Cisco "closed" its CLI separate from the CLI litigation *and* that the separate act "*independently* produce[d] anticompetitive harms." *Hynix Semiconductor Inc.*, 527 F. Supp. 2d at 1096–97.

ITC actions on Arista's products (due to findings of infringement) and Arista's supply (due to exclusion orders), they did not express concern about the CLI litigation. Whereas Arista was found to infringe five Cisco patents and consequently was forced to design around those technologies, Arista never changed its user interface, and no customer had to decide whether to purchase an Arista switch without the infringing user interface. Despite extensive discovery, Arista has been unable to identify even one documented instance of a customer communicating that it declined to purchase Arista switches due to the "closed" CLI. By contrast, the sworn public statements of Arista and its customers insist that "[t]he gravity of harm" from the ITC actions "cannot be overstated." (Tr. Ex. 1949 at 2.)

To overcome this adverse evidence, Cisco expects Arista to rely on inadmissible hearsay: statements allegedly made by customers to Arista employees. Arista could have subpoenaed customers to obtain evidence of their reasons for purchasing (or not purchasing) Arista switches, but chose not to do so. Undocumented, unsubstantiated hearsay cannot fill the hole in Arista's case: Rule 803(3) bars hearsay "statement[s] of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). This "limiting language . . . bars statements as to why [the declarant] held the particular state of mind"—precisely the purpose for which Arista is seeking to introduce the hearsay. *Wagner v. Cnty. of Maricopa*, 747 F.3d 1048, 1052–53 (9th Cir. 2013). As this Court has ruled, "the customer's statements as to why it had the motive to reject Arista's product would be offered for the truth" and "therefore would not fall within the Rule 803(3) exception." (Dkt. 342 at 23:4–13.) "If the reservation in the test of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—'I'm scared'—and not belief—'I'm scared because Galkin threatened me.'" *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987); *see also, e.g.*, *Nichia Am. Corp. v. Seoul Semiconductor Co.*, No. 07-cv-8354, 2008 WL 11342571, at *6 (N.D. Cal. Oct. 7, 2008) ("Mr. Quan's email is inadmissible hearsay because it is an out-of-court statement offered for the truth of the matter asserted, *i.e.*, that Mr. Quan's decision to purchase Plaintiff's products is influenced by the validity of claims that Plaintiffs are not prevailing in their lawsuits."). Moreover, most of these customer statements contain layers of hearsay, alleged customer statements relayed from one Arista employee to another, which this Court has already excluded. (*See* Dkt. 342 at 24:5–10.) And to the extent Arista offers any hearsay statements not barred for these two

reasons, those statements must still pass the Ninth Circuit's "foundational inquiry . . . under Rule 803(3): contemporaneousness, chance for reflection, and relevance." *Emmert*, 829 F.2d at 810. Arista's proffered statements are unsubstantiated, after-the-fact reflections and will not meet this test.

**B. The Evidence Leaves The Amount Of Damages To Guesswork For The Jury.**

Arista must also provide the jury sufficient evidence "to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982); *see also City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371–73 (9th Cir. 1992) (similar). Arista principally attempts to do so via the econometric model offered by its economic expert, Dr. Fiona Scott Morton. (Dkt. Dkt. 209, Ex. A § IX.) Dr. Scott Morton's model forecasted Arista's revenue during the two-year CLI litigation based on Arista's revenue trends prior to that litigation. (*Id.*) Arista claims as damages the difference between the modeled revenue and Arista's actual revenue—$191.8 million. (*Id.*) But Dr. Scott Morton's model cannot "segregate the losses . . . caused by acts which were not antitrust violations from those that [allegedly] were." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159–60 (9th Cir. 2015). And Dr. Scott Morton's expert report makes no other attempt to apportion damages between the CLI conduct and lawful conduct like the ITC actions. (*See generally* Dkt. 209, Ex. A.)

Neither will Arista be able to meet its burden to apportion damages through other evidence. As the jury will learn, Dr. Scott Morton's opinion that the CLI conduct was "more important" to customers than the ITC actions is unsupported by the factual record. And her vague qualitative assessment fails to meet Arista's apportionment burden in any event because it leaves the jury to the uninformed "guesswork" of selecting a damages number between $97.8 and $191.8 million. *Magentar Techs. Corp.*, 801 F.3d at 1159. Guessing how many jellybeans are in half a jar is no less speculative than guessing how many jellybeans are in a full jar. Arista lacks "direct evidence concerning the behavior and motivations of the . . . *customers*." *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985) (emphasis in original). Arista will try to rely on "testimony at trial," but the bald assertions of its witnesses cannot alone provide the jury sufficient evidence to "reasonably estimate the amount of . . . injury without speculation." *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1508–09, 1512–13 (9th Cir. 1985) (plaintiff could

supplement damages analysis with "testimony at trial and . . . tabulation of survey results" collected by an expert). Arista has no similar evidence and will be unable to meet its burden of apportioning the harm it claims to have experienced by reason of Cisco's anti-competitive conduct.

## IV. Cisco's CLI Conduct Did Not Harm Competition.

Arista's theory of harm focuses on its own losses, yet it is axiomatic that "the antitrust laws protect competition, not competitors." *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990). Arista will try to spin some theoretical yarns about harm to customers or Arista innovation, but the evidence will show that Cisco's conduct has not harmed competition. As described above, competition among Ethernet switching vendors—particularly in the datacenter market where Cisco and Arista compete—remains highly competitive. *See supra* Section II.A. Cisco's conduct has not impacted other switch vendors and has not raised switch prices or lowered switch quality. "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

### A. Cisco's Conduct Did Not Harm Other Switch Suppliers.

Cisco's alleged antitrust conduct—its CLI litigation against Arista and statements about the litigation—has had no impact on any other switch vendor. Cisco sued only Arista and accused only Arista of intellectual property theft in communications about the litigation. (*See, e.g.*, Tr. Ex. 1715.) No other vendors joined Arista in its antitrust suit against Cisco. No vendors altered their user interfaces in response to Cisco's purported "closing" of its CLI. Nor have any other vendors sought licenses to Cisco's user interface. And the parties agree that no standard setting organization has adopted Cisco's—or any other—CLI as an industry standard. Indeed, as Juniper has testified, other switch vendors developed their own user interfaces and successfully compete against Cisco.

Although the Ninth Circuit has suggested that harm to one competitor "***may*** be probative of harm to competition," that ruling applied the Robinson-Patman Act, which only requires "'a reasonable possibility that a price differential may harm competition.'" *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040–41 (9th Cir. 1987) (quoting *Falls City Indus., Inc. v. Vanco Beverages, Inc.*, 460 U.S. 428, 434-35 (1983)), *aff'd*, 496 U.S. 543 (1990). This is not a Robinson-Patman Act price discrimination case. Furthermore, the Ninth Circuit has instructed that "[s]uch circumstances are the

exception, . . . generally . . . confined to situations in which 'the relevant market is both narrow and discrete and the market participants are few.'" *Talking Yellow Pages, Inc. v. P. Telesis Grp.*, No. 91-15994, 1992 WL 207856, at *2 (9th Cir. 1992) (quoting *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508–09 (9th Cir. 1989)). Arista has proposed broad relevant markets, including one that encompasses every Ethernet switch sold anywhere in the world. As the evidence will show, numerous market participants compete in each of Arista's purported markets. Nor is Arista the only competitor that has gained market share against Cisco during the relevant time period—Huawei, Juniper, and commodity "white boxes" all gained significant shares during the same time period. This case is not "the exception": thus, Arista must prove harm to competition, not merely itself. *Talking Yellow Pages, Inc.*, 1992 WL 207856, at *2. It will not do so.

**B. Cisco's Conduct Did Not Raise Switch Prices Or Diminish Product Quality.**

"[A]n act is deemed *anticompetitive* under the Sherman Act only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality." *Rebel Oil Co.*, 51 F.3d at 1433. Arista will not be able to show either raised prices or diminished quality. The undisputed evidence on price within Arista's purported markets shows that Cisco's conduct has not raised Ethernet switch prices; rather, prices continued a longstanding downward trend throughout the conduct period. *See supra* Section II.A. And Arista has publicly stated—more than once—that the datacenter switching market in which it competes with Cisco is "highly pressured on price." (*E.g.*, Tr. Ex. 1945 at 21.) Nor does the evidence support any inference of diminished quality. As described above, neither Arista nor any other switch vendor altered its user interface in response to Cisco's conduct. And the evidence will show that any slowdown in Arista's own research-and-development efforts—such as diverted engineering resources—flowed from the ITC actions, not the CLI conduct. The ITC actions resulted in adverse findings of infringement and exclusion orders that necessitated product redesigns; Cisco's CLI conduct has not resulted in any changes whatsoever.

**CONCLUSION**

Arista's claims will fail at trial. The jury will readily determine that Cisco merely asserted its constitutional right to protect its intellectual property against a brazen copyist. Arista's theory lacks both legal and factual basis, and Arista will not be able to prove even a single element of its claim.

Respectfully submitted,

DESMARAIS LLP

Dated: July 30, 2018

By: */s/ John M. Desmarais*

John M. Desmarais (*admitted pro hac vice*)
jdesmarais@desmaraisllp.com
Paul A. Bondor (*admitted pro hac vice*)
pbondor@desmaraisllp.com
Alan S. Kellman (*admitted pro hac vice*)
akellman@desmaraisllp.com
Andrew G. Heinz (*admitted pro hac vice*)
aheinz@desmaraisllp.com
Tamir Packin (SBN 317249)
tpackin@desmaraisllp.com
Jeffrey S. Seddon II (SBN 297502)
jseddon@desmaraisllp.com
Brian Leary (*admitted pro hac vice*)
bleary@desmaraisllp.com
William D. Findlay (*admitted pro hac vice*)
wfindlay@desmaraisllp.com
Carson Olsheski (*admitted pro hac vice*)
colsheski@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401

Todd Anten (*admitted pro hac vice*)
toddanten@quinnemanuel.com
QUINN EMANUEL
URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sarah E. Piepmeier (SBN 227094)
sarah.piepmeier@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

*Attorneys for Defendant Cisco Systems, Inc.*