MATTHEW D. POWERS (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
WILLIAM NELSON (Bar No. 196091)
william.nelson@tensegritylawgroup.com
ROBERT GERRITY (Bar No. 268084)
robert.gerrity@tensegritylawgroup.com
NATASHA SAPUTO (Bar No. 291151)
natasha.saputo@tensegritylawgroup.com
SAMANTHA JAMESON (Bar No. 296411)
samantha.jameson@tensegritylawgroup.com
JENNIFER ROBINSON (Bar No. 270954)
jen.robinson@tensegritylawgroup.com
WANLI CHEN (Bar No. 300254)
wanli.chen@tensegritylawgroup.com
DANIEL M. RADKE (Bar No. 307718)
daniel.radke@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:  (650) 802-6000
Fax:  (650) 802-6001

Attorneys for Plaintiff
ARISTA NETWORKS, INC.

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| ARISTA NETWORKS, INC., | Case No. 5:16-CV-00923-BLF |
| Plaintiff, | **ARISTA NETWORKS, INC.'S TRIAL BRIEF** |
| v. | Date:   August 6, 2018<br>Judge:  Hon. Beth Labson Freeman<br>Dept:   Courtroom 3, 5TH Floor |
| CISCO SYSTEMS, INC., | Date Filed: July 30, 2018 |
| Defendant. | Trial Date: August 6, 2018 |
| | **DEMAND FOR JURY TRIAL** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND ..............................................................................2

III.    FACTUAL AND LEGAL ISSUES ....................................................................3

        A.      Unlawful Monopolization/Attempted Monopolization .........................3

                1.      Cisco had monopoly power or a specific intent to achieve
                        monopoly power in the Ethernet Switch Markets and/or High-
                        Speed Ethernet Switch Markets during the past decade...........................3

                2.      The Ethernet switches over which Cisco had monopoly power or
                        attempted to have monopoly power were goods in interstate or
                        foreign commerce......................................................................5

                3.      Cisco knowingly acquired or maintained monopoly power through
                        anticompetitive conduct and/or engaged in anticompetitive conduct
                        to accomplish its intended goal of achieving a monopoly........................5

                4.      Cisco acquired or maintained monopoly power through
                        anticompetitive conduct and/or there was a dangerous probability
                        that Cisco would sooner or later achieve its goal of a monopoly .............7

                5.      Arista's business was injured as a result of Cisco's actions.....................7

        B.      Violation of Section 17200 of the California Business and Professional
                Code ........................................................................................8

        C.      Cisco Will Not Be Able to Prove Its Affirmative Defense of Issue and
                Claim Preclusion.....................................................................9

        D.      Cisco Will Not Be Able to Prove Its Affirmative Defense of a Statute of
                Limitations Bar .......................................................................9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999)..........................................................................................................9

1

## I.      INTRODUCTION

2       Arista asserts claims against Cisco for unlawful monopolization and attempted monopolization

3  under Section 2 of the Sherman Act and violation of Section 17200 of the California Business and

4  Professional Code.

5       Arista contends that Cisco's "open early, closed late" conduct in connection with its Command

6  Line Interface ("CLI"), used to configure and manage networking equipment including Ethernet

7  Switches, constitutes an antitrust violation. Specifically, Arista contends that Cisco has monopoly power

8  in the U.S. and global markets for Ethernet switches. Ethernet switches are devices that control data

9  flow within a network to enable network components to communicate efficiently. They are the

10  fundamental building blocks of modern local area networks, deployed in virtually every modern

11  business and government office. Arista also asserts that Cisco has monopoly power in the U.S. and

12  global markets for high-speed Ethernet switches, and the overall market for Ethernet switches.

13       Arista contends that for over a decade, Cisco encouraged customers and competitors to invest in

14  and adopt Cisco's CLI. This practice was effectuated, among other ways, through Cisco's

15  representations that its CLI was an "industry standard," and without independent assertion of copyright

16  or other intellectual property rights in the CLI commands.

17       Customers wanted this open standard so that their investments in learning the commands and

18  writing scripts that incorporate them would not lock them into using Cisco's products exclusively,

19  because the same commands could be used to operate other vendors' switches. Arista further contends

20  that for over a decade, Cisco knew that other Ethernet switch competitors used these common CLI

21  commands. Arista contends that despite knowing for years that Arista and other competitors had adopted

22  Cisco-like CLIs, prior to 2014 Cisco made no statements that asserted intellectual property or other

23  proprietary rights in the Cisco CLI itself.

24       However, Arista contends that in 2014, Cisco reversed its long-standing practice that the Cisco

25  CLI was open and nonproprietary. Arista, like many other Cisco competitors, had adopted many of

26  Cisco's CLI commands based on Cisco's encouragement and its inaction in the face of widespread

27  industry adoption of a common CLI. Nevertheless, Cisco closed the CLI by declaring in a series of blog

28  posts directed to the industry, including directly to customers, that its CLI was reserved exclusively for

1   use with Cisco's products. Cisco further acted to close the CLI by filing a copyright infringement lawsuit

2   against Arista based on Arista's use of 514 CLI commands Cisco contended were its copyrighted

3   intellectual property. Arista contends that it has been harmed as a result of Cisco's actions, including

4   lost switch sales. Arista further contends that Cisco's actions caused competitive harm by, inter alia,

5   reducing consumer welfare and decreasing innovation in the relevant markets.

6   **II.    FACTUAL BACKGROUND**

7           Arista (initially called Arastra) was founded in 2004 by technology-industry pioneers including

8   Andy Bechtolsheim, founder of Sun Microsystems.  After years of development, Arista launched its first

9   Ethernet switch in 2008.  Since its founding, Arista has pioneered a revolutionary approach to scalable,

10   high-speed Ethernet switches with high-port density and low-latency.  Arista's hardware and software

11   deliberately broke from legacy designs in order to meet the demands of the growing market of cloud

12   computing. Arista's switches offer extremely reliable and stable performance, dramatically lower power

13   consumption, faster switching, and fully customizable features.  Today, Arista's switches are being used

14   in both data center and enterprise applications at cloud computing companies, financial services

15   companies, social media companies, e-commerce companies, as well as government agencies.

16           Like most of the industry, the CLI of Arista's switches recognized a common, industry standard

17   language.  This common language was largely comprised of acronyms, protocol names and parameters

18   derived from well-known networking standards (*e.g., "BGP," "OSPF," "Ethernet"*). Those public

19   domain sources were combined with terms derived from common usage amongst network engineers,

20   such as "router," "default," "hostname,"  and terms Cisco's early engineers borrowed from pre-existing

21   operating systems (*e.g., "show," "clear"*). Cisco—which held upwards of 80% market share in various

22   networking markets over the past two decades—and most of the rest of the industry referred to this

23   common language as the "industry standard CLI."

24           Since at least the late 1990s, many networking equipment vendors, such as Dell, HP, and IBM

25   openly promoted their products as interoperable with the Cisco CLI, touting their CLIs as "industry

26   standard" or "Cisco-like," and assured customers that they would not need to learn a new command

27   language. Cisco knew of these claims, and of the widespread emulation of its CLI across the industry,

28   and yet Cisco never complained or took action to stop them. On the contrary, Cisco itself marketed its

command set as an "industry standard CLI." The only objection Cisco ever raised to another company's use of similarities in the user interface was a lawsuit it filed against Huawei in 2003 after it discovered that Huawei had misappropriated large portions of proprietary Cisco source code. But Cisco never complained about the many other companies who, unlike Huawei, did not use Cisco's source code but built equipment that also responded to the industry standard CLI commands. As to Arista, Cisco knew that Arista's switches recognized the same industry standard CLI for more than six years but never registered any complaint whatsoever before filing a copyright lawsuit against Arista in 2014. *Cisco Sys., Inc. v. Arista Networks, Inc.*, No. 5:14-cv-05344 (N.D. Cal.).

Cisco's policy of tolerating and even encouraging adoption of a common CLI came to an end in 2014 after years of trying and failing to compete with Arista, and following a string of high-profile losses to Arista with major customers. In a desperate effort to maintain its market dominance, Cisco determined to move beyond competition on the merits and find another way to stop Arista – a plan crafted and approved at the highest levels of the company.  Cisco did so by publicly announcing to the networking industry, through the press and through the web blog of its general counsel, that it now declared the CLI to be Cisco's proprietary intellectual property, to be used by no company other than Cisco.  It effected this announcement by, *inter alia,* filing a copyright infringement lawsuit against Arista, marking the first time that Cisco had asserted intellectual property rights or other proprietary rights in the CLI commands and command structure, standing alone.  Cisco further got "down and dirty," engaging in a focused campaign of raising "FUD" (shorthand for "Fear, Uncertainty, and Doubt") in the minds of customers and suppliers regarding Arista's products and its ethics.

III.    **FACTUAL AND LEGAL ISSUES**

A.    **Unlawful Monopolization/Attempted Monopolization**

1.    **Cisco had monopoly power or a specific intent to achieve monopoly power in the Ethernet Switch Markets and/or High-Speed Ethernet Switch Markets during the past decade**

Arista will present factual evidence and expert testimony that Cisco has substantial market power in the supply of Ethernet Switches and High-Speed Ethernet Switches.

Dr. Fiona Scott Morton will testify that in both the Ethernet Switch and High-Speed Ethernet

1   Switch markets, Cisco has held a substantial market share for an extended period of time. For example,

2   since 2004, Cisco's share of Ethernet switch revenue in the United States and the world remained above

3   70% and 60% respectively, sometimes approaching 80% and 70% respectively until recently. *See, e.g.,*

4   [Scott Morton Rpt., ¶ 98]. Prior to 2013, Cisco's share of High-Speed Ethernet switch revenue in the

5   United States and the world was roughly 70% and 65% respectively, diminishing only beginning in 2013

6   with the rise of Arista. *See, e.g.,* [Scott Morton Rpt., ¶ 99]. No single competitor has attained more than

7   an 18.2% and 11.1% share, respectively. *See, e.g.,* [Scott Morton Rpt., ¶ 99].

8        Dr. Scott Morton will testify that Cisco has by far, the largest installed base of Ethernet switches.

9   *See, e.g.,* [Scott Morton Rpt., ¶ 101]. In 2015, Cisco estimated that its products made up 80% of the

10  "network installed base." *See, e.g.,* [Scott Morton Rpt., ¶ 101; Trial Exhibit 8 at 8.00005]. Dr. Scott

11  Morton will further testify that this large installed base means that compatibility with Cisco switches via

12  a common set of CLI commands is important for a competitor attempting to enter and establish itself in

13  the switch market. *See, e.g.,* [Scott Morton Rpt., ¶ 102]. Cisco has referred to its industry standard CLI

14  as ███████████ *See, e.g.,* [6/7/2016 Frank Palumbo Dep. at 21:8-22:23 (Copyright)]. Dr. Scott Morton

15  will testify that the threat of not being able to use industry standard CLI commands may exclude

16  competitors from entering the market or gaining market share. *See, e.g.,* [Scott Morton Rpt., ¶¶ 103,

17  104].

18       Cisco's stature within the networking industry led the industry to be described colloquially as

19  "Cisco and the seven dwarfs". *See, e.g.,* [11/7/2017 Anshul Sadana Dep. at 96:23-97:8; 2/25/2016

20  Jayshree Ullal Dep. at 176:6-10 (Copyright)]. Dr. Scott Morton will testify that to compete on an equal

21  footing with Cisco, a potential market entrant would need hundreds of millions of dollars and many

22  years to develop and customize new switch products. *See, e.g.,* [Scott Morton Rpt., ¶ 104]. Those

23  companies that did try to compete, the "dwarfs," were often large companies with strong market

24  positions in other segments but were still unable to gain a sizable share in the Ethernet Switch market.

25  *See, e.g.,* [Scott Morton Rpt., ¶ 106]. Dr. Scott Morton will testify that no competitor of Cisco in the

26  United States has had a substantial impact on Cisco's market shares until the arrival of Arista in 2008

27  and its increasing share in the High-Speed Ethernet switch market. *See, e.g.,* [Scott Morton Rpt., ¶ 105].

28       Dr. Scott Morton will testify that another indication of Cisco's market power is its sustained

1  ability to charge a significant premium for its products relative to what its competitors charge. *See, e.g.,*

2  [Scott Morton Rpt., ¶ 107].

3          **2.**      **The Ethernet switches over which Cisco had monopoly power or**

4                      **attempted to have monopoly power were goods in interstate or foreign**

5                      **commerce**

6          As noted in the parties' joint proposed jury instructions, the parties agreed that this element is

7  met. Specifically, "That Cisco's conduct occurred in or affected interstate or foreign commerce is also

8  an element of Arista's monopolization and attempted monopolization claims; however, Cisco does not

9  dispute that this element is satisfied for both of Arista's claims, so the parties agree not to instruct the

10  jury regarding this element." ECF No. 321-04 at 32n.

11          **3.**      **Cisco knowingly acquired or maintained monopoly power through**

12                      **anticompetitive conduct and/or engaged in anticompetitive conduct to**

13                      **accomplish its intended goal of achieving a monopoly**

14          Arista will present fact evidence and expert testimony that Cisco knowingly acquired or

15  maintained monopoly power through anticompetitive conduct and/or engaged in anticompetitive

16  conduct to accomplish its intended goal of achieving monopoly.

17          From 2012-2014, Arista experienced growing revenue and market share. *See, e.g.,* [Scott Morton

18  Rpt., ¶ 109]. Unlike previous would-be Cisco competitors, Arista targeted the high-end of the switch

19  market, specifically high-speed. *See, e.g.,* [Scott Morton Rpt., ¶ 108]. Arista's products initially enjoyed

20  their greatest success in the high-frequency trading segment. *See, e.g.,* [Scott Morton Rpt., ¶ 108]. By

21  late 2014, Arista represented a growing threat to Cisco's share of the Ethernet Switch market. *See, e.g.,*

22  [Scott Morton Rpt., ¶ 109]. Cisco executives and employees recognized that Arista posed a threat not

23  only to the high-end of the market but also to enterprise and service provider segments. *See, e.g.,* [Scott

24  Morton Rpt., ¶ 110; Trial Exhibit 4343 at 4343.00006 ("

25  

26  "); Trial Exhibit 4340 at 4340.00001 ("

27  

28  ") (emphasis in original)].

1  In response to the threat from Arista, Cisco initially attempted to use competitive strategies like

2  product improvements and pricing.  *See, e.g.,* [Scott Morton Rpt., ¶ 111].  When these strategies did not

3  work to prevent further gains in Arista market share, Cisco initiated a new strategy centered around a

4  change in its practice regarding what it had marketed as its industry standard CLI.  In 2014, Cisco filed

5  a copyright lawsuit against Arista asserting that it had intellectual property and proprietary rights in the

6  CLI itself.

7  Prior to the 2014 copyright lawsuit against Arista, Cisco encouraged customers and competitors

8  to invest in and adopt Cisco's CLI which Cisco referred to as "industry standard."  *See, e.g.,* [Trial

9  Exhibit 162 at 162.00001].  Customers and competitors did adopt Cisco's industry standard CLI.

10  Specifically, as Cisco's former CDO Charles Giancarlo will testify, Cisco identified its CLI commands

11  as standard so that customers would not be locked in and would be more comfortable buying from Cisco.

12  *See, e.g.*, [Trial Exhibit 4162 at 4162.00023].  As Arista's expert, Dr. Black, will testify, competitors

13  incorporated commands from Cisco's CLI into their switches and publicly marketed these products as

14  featuring "Cisco-like CLI" or "industry standard CLI.  *See, e.g.,* [Trial Exhibit 715 at 715.00001

15  (Document regarding Force10); [Trial Exhibit 782 at 782.00010] (Document regarding Avaya)]. Cisco

16  knew that competitors, including Arista, were using Cisco's CLI and did not seek to stop this use.  *See,

17  e.g.,* [Trial Exhibit 166 at 166.00058; Trial Exhibit 39 at 0039.00006 (Cascade Insights Arista

18  Competitive Intelligence].

19  Concurrent with the filing of its lawsuits against Arista, Cisco initiated a publicity campaign

20  asserting to the public as well as customers and potential customers that Arista infringed Cisco's

21  copyrights in the CLI and would be forced to use a different CLI by an injunction.  *See, e.g.,* [Trial

22  Exhibit 173].  This publicity campaign continued throughout the legal cases, and was aided in large part

23  by blogs written by Cisco's General Counsel, Mark Chandler. *See, e.g.,* [Trial Exhibit 639].  In an effort

24  to spread fear, uncertainty, and doubt (FUD), Cisco employees got "down and dirty" by pointing to

25  Arista's alleged intellectual property violations including accusations of stolen technology.  *See, e.g.,*

26  [Trial Exhibit 51 at 51.00002].

27  Dr. Scott Morton will testify that Cisco's actions at the end of 2014 with respect to the CLI to

28  protect its market power represented an attempt to subvert competition on the merits.  *See, e.g.,* [Scott

Morton Rpt., ¶ 155].

        **4.**    **Cisco acquired or maintained monopoly power through anticompetitive conduct and/or there was a dangerous probability that Cisco would sooner or later achieve its goal of a monopoly**

As discussed above, Arista fact evidence and expert testimony will show that as a result of Cisco's 2014 change in policy related to the CLI and associated publicity campaign, Cisco acquired or maintained monopoly power through anticompetitive conduct and/or there was a dangerous probability that Cisco would sooner or later achieve its goal of a monopoly.

        **5.**    **Arista's business was injured as a result of Cisco's actions**

In an effort to spread fear, uncertainty, and doubt (FUD), Cisco employees ███████████ the litigation when competing with Arista. *See, e.g.,* [Trial Exhibit 51 at 51.00002]. Arista fact witnesses, including Anshul Sadana and Kevin McCabe, will testify that sales people as well as senior executives spent time addressing customers concerns regarding the lawsuit, often after having the issue raised by Cisco. *See, e.g.,* [Trial Exhibit 235] (██████████████████████████████████████████████████████████); [Trial Exhibit 186] (████████████████████████████████████████).

During the copyright litigation, Cisco's Senior Vice President of data center sales, Frank Palumbo, testified as Cisco's 30(b)(6) representative that having a Cisco-like CLI was █████████████ to Arista's ability to make sales against Cisco, and Mr. Palumbo testified that a list of 74 major customers, including ██████████████████████████████████████████████████████████████████████████, would not have bought from Arista were it not for its use of a Cisco-like CLI. *See, e.g.,* [6/7/2016 Frank Palumbo Dep. at 20:2-9, 22:14-20; Trial Exhibit 120 at 120.00015-18] Arista fact witnesses, including Anshul Sadana and Kevin McCabe, will also testify that Arista lost sales due to litigation concerns from customers that Cisco had identified as placing high value on the CLI. Documentary evidence will also show the same. For example, ██████████████████████████████████████████████████████████



*See, e.g.,* [Trial Exhibit 227 at 227.00002].  In response, *See, e.g.,* [Trial Exhibit 4449 at 4449.00002, 4449.00003]. *See, e.g.,* [Trial Exhibit 235].  Less than a week later, . *See, e.g.,* [Trial Exhibit 233].

Arista fact witnesses, including Mark Foss, will testify that during the period of litigation, Arista's acquisitions of new customers declined and only started to recover after a favorable ruling in the copyright case.  Dr. Scott Morton will testify about the impact of the decline of new customer acquisition in terms of lost revenues and profits.  *See, e.g.,* [Scott Morton Rpt., ¶¶ 178-192].

Dr. Scott Morton will testify about how she calculated the damages to Arista from Cisco's policy change related to the CLI and accompanying litigation and FUD campaign.  *See, e.g.,* [Scott Morton Rpt., ¶¶ 193-242].

Arista fact witnesses, including Anshul Sadana, will testify about how Arista resources were diverted away from innovative activities due to the time needed to respond to customer concerns stoked by Cisco's lawsuits and associated FUD campaign.  Arista fact witnesses, including Anshul Sadana, will also testify that the amount of money spent on Arista's research and development is a percentage of its topline revenue and consequently, if revenues decrease, so too does Arista's research and development budget.

Additionally, Dr. Scott Morton will testify that Cisco's anticompetitive actions harmed not only Arista but also consumers of Ethernet switches.  *See, e.g.,* [Scott Morton Rpt., ¶ 243].  For example, customers who would have preferred buying their Ethernet switches from Arista absent a CLI policy change and the associated lawsuit and FUD campaign were deterred from their first choice purchases by Cisco's strategy.  *See, e.g.,* [Scott Morton Rpt., ¶¶ 244].

**B.      Violation of Section 17200 of the California Business and Professional Code**

To prove a violation of Section 17200 of the California Business and Professional Code, Arista

must establish that Cisco's conduct related to the CLI is "unfair" in that it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). The Court recognized that because the three prongs of Section 17200 are disjunctive, the "unfair" prong sweeps more broadly than the federal antitrust laws. See *id.* at 180 ("a practice [can be] prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." (internal quotation and citation omitted)). The Court suggested that federal case law interpreting Section 5 of the FTC Act would provide guidance. See *id.* at 185-87.

As discussed above, Arista will present fact evidence and expert testimony establishing an antitrust violation.  Such a violation meets the requirements for a violation of Section 17200 of the California Business and Professional Code.

**C.**     **Cisco Will Not Be Able to Prove Its Affirmative Defense of Issue and Claim Preclusion**

Cisco has asserted that Arista's claims under Section 2 of the Sherman Act and violation of Section 17200 of the California Business and Professional Code are barred, in whole or in part, by the doctrines of claim and issue preclusion based on the earlier copyright case between the parties.  *Cisco Systems, Inc. v. Arista Networks, Inc.*, No. 5:14-cv-05344 (N.D. Cal.).  ECF No. 230 (Cisco Amended Answer to Amended Complaint) at 11-12.

Arista's claims in this case are not precluded under either doctrine. Cisco has not established that the elements of these defenses are met. Arista is not relitigating in this litigation claims or issues decided in the earlier copyright litigation, although the copyright case remains on appeal.

**D.**     **Cisco Will Not Be Able to Prove Its Affirmative Defense of a Statute of Limitations Bar**

Cisco has asserted the statute of limitations as an affirmative defense to Arista's claims under Section 2 of the Sherman Act and violation of Section 17200 of the California Business and Professional Code.  ECF No. 230 (Cisco Amended Answer to Amended Complaint) at 12.

Arista will present fact evidence and expert testimony that the anticompetitive act that is the

basis for these claims was Cisco closing the CLI in December 2014.  Arista asserted its claims under

Section 2 of the Sherman Act and violation of Section 17200 of the California Business and Professional

Code by filing the present action on February 24, 2016 – within the four year statute of limitations.

Date: July 30, 2018                              Respectfully submitted,


                                                 _____/s/  Matthew D. Powers_____
                                                 MATTHEW D. POWERS (SBN 104795)
                                                 WILLIAM NELSON (SBN 196091)
                                                 ROBERT GERRITY (SBN 268084)
                                                 NATASHA SAPUTO (SBN 291151)
                                                 SAMANTHA JAMESON (Bar No. 296411)
                                                 JENNIFER ROBINSON (Bar No. 270954)
                                                 WANLI CHEN (Bar No. 300254)
                                                 DANIEL M. RADKE (Bar No. 307718)
                                                 TENSEGRITY LAW GROUP, LLP
                                                 555 Twin Dolphin Drive, Suite 650
                                                 Redwood Shores, CA 94065
                                                 Telephone:     (650) 802-6000
                                                 Facsimile:     (650) 802-6001
                                                 Email:
                                                 matthew.powers@tensegritylawgroup.com
                                                 william.nelson@tensegritylawgroup.com
                                                 robert.gerrity@tensegritylawgroup.com
                                                 natasha.saputo@tensegritylawgroup.com
                                                 samantha.jameson@tensegritylawgroup.com
                                                 jen.robinson@tensegritylawgroup.com
                                                 wanli.chen@tensegritylawgroup.com
                                                 daniel.radke@tensegritylawgroup.com

                                                 DAVID H. REICHENBERG (*Pro Hac Vice*)
                                                 COZEN O'CONNOR
                                                 277 Park Avenue, 19th Floor
                                                 New York, NY 10172
                                                 Telephone:  (212) 883-4900
                                                 Fax:  (646) 461-2091
                                                 Email:
                                                 dreichenberg@cozen.com

                                                 JONATHAN M. JACOBSON (NY SBN 1350495)
                                                 CHUL PAK (*Pro Hac Vice*)
                                                 WILSON SONSINI GOODRICH & ROSATI
                                                 1301 Avenue Of The Americas, 40th Floor
                                                 New York, NY 10019
                                                 Telephone: (212) 999-5800
                                                 Facsimile: (212) 999-5899
                                                 Email:
                                                 jjacobson@wsgr.com
                                                 cpak@wsgr.com

SUSAN CREIGHTON (SBN 135528)
SCOTT A. SHER (SBN 190053)
BRADLEY T. TENNIS (SBN 281206)
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, Fifth Floor
Washington, D.C., 20006
Telephone: (202) 973-8800
Facsimile: (202) 973-8899
Email:
screighton@wsgr.com
ssher@wsgr.com
btennis@wsgr.com

ROBERT A. VAN NEST (SBN 84065)
BRIAN L. FERRALL (SBN 160847)
DAVID J. SILBERT (SBN 173128)
NICHOLAS DAVID MARAIS
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
Email:
rvannest@keker.com
bferrall@keker.com
dsilbert@keker.com
nmarais@keker.com

Attorneys for Plaintiff
ARISTA NETWORKS, INC.